ACCEPTED
15-24-00098-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
2/11/2025 2:02 PM
CHRISTOPHER A. PRINE
CLERK

Cause No. 15-24-00098-CV

**FIFTEENTH COURT OF APPEALS**

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
2/11/2025 2:02:28 PM
CHRISTOPHER A. PRINE
Clerk

**ARTHUR ARRIT CHAVASON, M.D.,**
*Appellant*,

v.

**TEXAS MEDICAL BOARD,**
*Appellee*.

_____

**On Appeal from the 200th Judicial District Court of Travis County, Texas
No. D-1-GN-22-003661**

_____

**APPELLEE'S BRIEF**

_____

| | |
|---|---|
| **KEN PAXTON**<br>**Attorney General of Texas** | **ERNEST C. GARCIA**<br>**Chief, Administrative Law Division** |
| **BRENT WEBSTER**<br>**First Assistant Attorney General** | **TED A. ROSS**<br>**Assistant Attorney General**<br>**State Bar No. 24008890** |
| **RALPH MOLINA**<br>**Deputy First Assistant Attorney General** | **Office of the Attorney General**<br>**P.O. Box 12548 (MC 018)**<br>**Austin, Texas 78711-2548**<br>**(512) 475-4191** |
| **JAMES LLOYD**<br>**Deputy Attorney General for Civil Litigation** | **ted.ross@oag.texas.gov** |
| | ***Attorneys for Appellee, the Texas Medical Board*** |

**February 11, 2025**

# TABLE OF CONTENTS

INDEX OF AUTHORITIES ...................................................................... 5

RECORD AND PARTY REFERENCES........................................................8

STATEMENT OF THE CASE.......................................................................9

ISSUES PRESENTED FOR REVIEW ........................................................ 10

STATEMENT REGARDING ORAL ARGUMENT ....................................11

INTRODUCTION ......................................................................................11

STATEMENT OF FACTS ...........................................................................11

SUMMARY OF THE ARGUMENT ...........................................................17

STANDARDS OF REVIEW AND APPLICABLE LAW...............................18

I.      Substantial Evidence Standard of Review. ...............................18

II.     Standards applicable to the admission of expert testimony......................21

III.    Applicable Law under the Texas Medical Practice Act. .........................22

ARGUMENT............................................................................................. 24

I.      The TMB Final Order is Supported by Overwhelming Substantial Evidence.......................................................................... 24

        A.      TMB Staff's expert witness was highly qualified, and her testimony supported the ALJs' findings that Dr. Chavason committed numerous violations of the Medical Practice Act...................................................................................... 24

        B.      Substantial evidence related to Patient Eleven. ........................... 26

C.     Substantial evidence related to Patient One. ................................ 32

D.     Substantial evidence related to Patient Two................................ 36

E.     Substantial evidence related to Patient Six. ................................ 39

F.     Substantial evidence related to Patient Twelve. ...........................41

G.     Substantial evidence related to Patient Seven. ............................ 42

H.     Substantial evidence related to Patient Ten. ................................ 44

I.     Substantial evidence related to Patient Nine. ............................. 46

J.     Discipline by Peers and Resignation under Investigation – 2018. ................................................................................ 50

    1.  Dr. Chavason's termination from Holiner Group .................. 50

    2.  Dr. Chavason's resignation from MCGO and Medical City McKinney and Relinquished Privileges from Medical City Dallas..................................................................51

K.     Aggravating Factors................................................................. 52

    1.  Continued Violations Despite Remedial Education................ 52

    2.  Continued Violations Despite Warnings and Disciplinary Action .................................................................53

    3.  Inappropriate Conduct towards and Sexual Harassment of Subordinate Employees....................................57

    4.  Harm to one or more patients. ................................................ 60

    5.  The severity of patient harm ...................................................61

    6.  Increased potential for harm to the public ...............................61

7. Attempted concealment of the act(s) constituting a violation ................................................................................ 62

8. Intentional, premeditated, knowing, or grossly negligent acts constituting a violation ..................................... 62

9. Other relevant circumstances increasing the seriousness of the misconduct. ............................................. 63

II.  Response to Dr. Chavason's Arguments. .............................................. 64

    A.  Jurisdictional Issues ......................................................... 64

    B.  Due Process ...................................................................... 68

    C.  Dr. Chavason's other arguments ..................................... 71

CONCLUSION AND PRAYER ......................................................................... 73

CERTIFICATE OF COMPLIANCE ................................................................. 75

CERTIFICATE OF SERVICE ........................................................................... 75

APPENDIX ......................................................................................................... 76

# INDEX OF AUTHORITIES

**Cases**

*Bd. of Law Exam'rs v. Stevens,*
868 S.W.2d 773 (Tex. 1994) .................................................................19

*Central Power & Light Co. v. Pub. Util. Comm'n,*
36 S.W.3d 547 (Tex. App.—Austin 2000, pet. denied) ................................. 67, 72

*City of El Paso v. Pub. Util. Comm'n,*
883 S.W.2d 179 (Tex. 1994) .................................................................19

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
509 U.S. 579 (1993) ..................................................................... 21, 23

*E.I. du Pont de Nemours & Co., Inc. v. Robinson,*
923 S.W.2d 549 (Tex. 1995) .................................................................21

*Fay-Ray Corp. v. Tex. Alcoholic Beverage Comm'n,*
959 S.W.2d 362 (Tex. App.—Austin 1998, no pet.) ..................................20, 21

*Gerst v. Goldsbury,*
434 S.W.2d 665 (Tex. 1968) .................................................................19

*Granek v. Tex. State Bd. of Med. Exam'rs,*
172 S.W.3d 761 (Tex. App.—Austin 2005, pet. denied) .............................. 21, 72

*Grubbs Nissan Mid-Cities, Ltd. v. Nissan N. Am., Inc.,*
No. 03–06–00357–CV, 2007 WL 1518115 (Tex. App.—Austin
May 23, 2007, pet. denied) (mem op.) ......................................... 67, 72

*Guerrero-Ramirez v. Tex. State Bd. of Med. Exam'rs,*
867 S.W.2d 911 (Tex. App. —Austin 1993, no writ)...........................................65

*Hagedorn v. Tisdale,*
73 S.W.3d 341 (Tex. App.—Amarillo 2002, no pet.)...........................................21

*Lauderdale v. Tex. Dep't of Agric.*,
   923 S.W.2d 834 (Tex. App.—Austin 1996, no writ) ...........................................19

*Leonard v. Tex. Med. Bd.*,
   656 S.W.3d 456 (Tex. App.—El Paso 2022, pet. denied) ................................. 68

*Lewis v. Metro. Sav. & Loan Ass'n*,
   550 S.W.2d 11 (Tex. 1977) ...............................................................................19

*Mireles v. Tex. Dep't of Pub. Safety*,
   9 S.W.3d 128 (Tex. 1999) (per curiam)......................................................... 18, 19

*Olveda v. Sepulveda*,
   141 S.W.3d 679 (Tex. App.—San Antonio 2004, pet denied).......................21, 22

*Padilla v. Loweree*,
   354 S.W.3d 856 (Tex. App.—El Paso 2011, pet. denied) ..................................21

*Pierce v. Underwood*,
   487 U.S. 552 (1988)........................................................................................19

*R.R. Comm'n v. Mackhank Petroleum Co.*,
   190 S.W.2d 802 (Tex. 1945) ........................................................................... 20

*Rodriguez-Aguero v. Tex. Med. Bd.*,
   No. 03-09-00262-CV, 2010 WL 1730023 (Tex. App.—Austin
   Apr. 30, 2010, no pet.) (mem. op.) .......................................................................65

*Scally v. Tex. State Bd. of Med. Exam'rs*,
   351 S.W.3d 434 (Tex. App.—Austin 2011, pet. denied) ................................... 20

*Stark v. Geeslin*,
   213 S.W.3d 406 (Tex. App.—Austin 2006, pet. denied) ................................... 20

*Tex. Health Facilities Comm'n v. Charter Med.-Dall., Inc.*,
   665 S.W.2d 446 (Tex. 1984)..............................................................................19

*Tex. State Bd. of Med. Exam'rs v. Dunn*,
   No. 03-03-00180-CV, 2003 WL 22721659 (Tex. App.—Austin
   Nov. 20, 2003, no pet.) (mem. op.) ................................................................ 19, 20

**Statutes**

Tex. Gov't Code
   § 2001.054 ................................................................................................. 65
   § 2001.054(c) ............................................................................................. 65

Tex. Occ. Code
   § 154.051(e)............................................................................. 22, 32, 65
   § 164.004 ................................................................................................... 65
   § 164.051(a)(1) .......................................... 22, 31, 35, 38, 40 41, 43, 45, 49
   § 164.051(a)(6) ...................................................... 23, 31, 38, 43, 45, 49
   § 164.051(a)(7) ................................................................................. 23, 52
   § 164.052............................................................................................ 22
   § 164.052(a)(5).......................................... 23, 24, 31, 35, 38, 40, 41, 43, 45, 49
   § 164.053(a)(1) .................................................................................. 31

**Rules**

22 Tex. Admin. Code
   § 179.7....................................................................................... 22, 32
   § 187.18 ......................................................................................... 22
   § 187.18(k)(1) ............................................................................. 22, 32
   § 190.8(1)(C)........................................................ 23, 31, 38, 43, 45, 49
   § 190.8(1)(M).................................................................................. 23, 31
   § 190.8(2)(E) ........................................................... 23, 24, 31, 35
   § 190.8(2)(F) ......................................... 23, 24, 31, 35, 38, 40, 41, 43, 45, 49
   § 190.8(2)(G) ...................................................... 23 24, 31, 35, 38, 40
   § 190.8(2)(K) ...................................... 23, 24, 31, 35, 40, 41, 43, 45, 49
   § 190.8(2)(P)........................................... 24, 31, 35, 41, 43, 46, 49
   § 190.8(4)............................................................................. 23, 52
   § 190.14............................................................................................52
   § 190.15............................................................................................52

Tex. R. App. P
   38.1 ............................................................................................... 11
   38.1(g)........................................................................................... 12

# RECORD AND PARTY REFERENCES

**Parties**

| | |
|---|---|
| Dr. Chavason: | Plaintiff/Appellant, Arthur Arrit Chavason, M.D. |
| TMB: | Defendant/Appellee, Texas Medical Board |

**Administrative Record[1]**

| | |
|---|---|
| AR at _____ (Bates stamp no.): | Administrative Record |

**SOAH Hearing Transcript**

| | |
|---|---|
| Tr. ___ (Vol. number), _____: ___(page numbers): | SOAH contested case hearing transcript |
| Staff Ex. (number): | TMB Staff contested case hearing exhibits |

**Appendix**

| | |
|---|---|
| App. Tab _____ | The Appendix attached to this brief |

## OTHER REFERENCES

| | |
|---|---|
| **ALJs** | The SOAH Administrative Law Judges |
| **PFD** | The Administrative Law Judge's Proposal for Decision signed on February 4, 2022 (App. Tab 1) |
| **Final Order** | The TMB Final Order entered June 10, 2022 (App. Tab 2) |
| **SOAH** | The State Office of Administrative Hearings |

---

[1] The administrative record filed with the Court has been redacted to delete the names of the patients/clients in this proceeding. The TMB is willing to provide unredacted pages for in camera inspection if the Court so desires.

# STATEMENT OF THE CASE

*Nature of the Case*:  This is a substantial evidence suit for judicial review of a TMB final order dated June 10, 2022, which found that Dr. Chavason committed multiple violations of the Texas Medical Practice Act and TMB rules.

*Administrative Proceedings*:  After a TMB investigation of complaints against Chavason, the TMB referred the matter for a contested case hearing at SOAH (Docket No. 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). The ALJs then issued a PFD, which contained dozens of findings that Dr. Chavason committed multiple violations of the Act and TMB rules.

*Agency Disposition*:  The TMB Final Order of June 28, 2022, adopted all of the ALJs' findings and conclusions in the PFD and revoked Chavason's license to practice medicine in the State of Texas.

*District Court Disposition*:  After briefing and oral argument, the Travis County District Court affirmed the TMB Final Order in a Final Judgment signed on September 6, 2024. App. Tab 3.

# ISSUES PRESENTED FOR REVIEW

## I.

Testimony and other record evidence shows that Dr. Chavason violated the personal and sexual boundaries of eight of his psychiatry patients. That evidence includes hundreds of pages of testimony from the patients themselves, extensive documentation, employer testimony, and qualified opinions rendered by TMB Staff's expert witness.

*Should the Court grant Dr. Chavason's request to second guess the ALJs and the TMB and re-weigh the substantial evidence in support of the revocation of his license to practice medicine?*

## II.

The SOAH ALJs held that SOAH had jurisdiction over Dr. Chavason's disciplinary proceeding, and Dr. Chavason attended ISCs and had the opportunity to show compliance with the Medical Practice Act.

*Did SOAH have subject matter jurisdiction over Dr. Chavason's disciplinary proceeding?*

## III.

In the SOAH proceeding, Dr. Chavason had the opportunity to call witnesses, conduct discovery, submit evidence, and cross-examine adverse witnesses with respect to all of his patients.

*Was Dr. Chavason denied due process of law?*

## STATEMENT REGARDING ORAL ARGUMENT

The TMB does not request oral argument in this appeal because the factual issues are straightforward, and the legal issues have previously been addressed by the courts. However, the TMB requests the opportunity to present oral argument if the Court otherwise determines that oral argument is warranted.

## INTRODUCTION

The TMB initially notes that Dr. Chavason's brief is formatted and organized in a manner that makes it difficult to decipher and cumbersome to address. Moreover, the brief fails to comply with the briefing requirements set forth in Rule 38.1 of the Texas Rules of Appellate Procedure. Dr. Chavason's brief contains no distinct statement of facts or statement of issues presented. The brief also contains numerous allegations that are not supported by citations to the administrative record.

The TMB will respond to each overall issue, but for brevity's sake, it will not address each of Dr. Chavason's assertions where they appear to be redundant, moot, or unclear.

## STATEMENT OF FACTS

Dr. Chavason's statement of facts is for the most part an un-annotated narrative of his version of the events. It is replete with conjecture and opinion and

does not comply with the Court's briefing rules, particularly Rule 38.1(g) of the Texas Rules of Appellate Procedure ("The brief must state concisely and without argument the facts pertinent to the issues or points presented."). The Court should therefore disregard Dr. Chavason's Statement of Facts.

The TMB therefore submits the following statement of facts and procedural history:

Procedural History

1.      Dr. Chavason is a Texas-licensed physician, License No. M-7104, and was issued a license to practice medicine on August 24, 2007.[2] His medical license was in full force and effect at all times material and relevant to this proceeding. AR 6799 (PFD; Finding of Fact (FOF) 1. *See also* App. Tab 1 at PFD page 111.[3]

2.      On or around June 23, 2011, TMB Staff notified Dr. Chavason that an Informal Settlement Conference (ISC) would be held related to allegations about Patient Eleven on August 15, 2011,[4] which Dr. Chavason attended with counsel Fred Davis. App. Tab 1 at 5, Stipulated Fact No. 3.

---

[2] Staff Ex. 33 (Public Physician Profiles). The parties' contested case hearing exhibits are part of the administrative record.

[3] Subsequent references to the PFD will be to Tab 1 of the Appendix filed with this brief and to the page numbers in the upper right corner of each page.

[4] *See also* Staff Ex. 42B (ISC Notice for Legal Case No. 11-0868)

3.     On or around June 7, 2018, TMB Staff notified Dr. Chavason that he was invited to another ISC to address disciplinary action by peers at Medical City Green Oaks (MCGO) following Dr. Chavason's resignation while under investigation. *Id.*, Stipulated Fact No. 5.[5] The ISC was convened on August 10, 2018, which Dr. Chavason attended with counsel, Edward P. Waller, Jr. TMB Staff and Dr. Chavason were not able to negotiate an agreed order or other satisfactory resolution following this ISC. *Id.*, Stipulated Fact No. 6.

4.     On February 5, 2019, TMB Staff filed a formal Complaint against Dr. Chavason. Dr. Chavason and counsel, Lee Bukstein, received a copy and filed an Answer and General Denial on February 19, 2019. AR 3; App. Tab 1 at 5, Stipulated Fact No. 7.

5.     TMB Staff filed a First Amended Complaint in this matter on October 7, 2019, a copy of which Dr. Chavason and his counsel, Lee Bukstein received. AR 298; App. Tab 1 at 5, Stipulated Fact No. 8.

6.     On February 27, 2020, TMB Staff filed a Second Amended Complaint in this matter, which Dr. Chavason and his counsel received. AR 676; 5, Stipulated Fact No. 9.

---

[5] *See also* Staff Ex. 42B (ISC Notice for Legal Case 18-0697)

7.      On March 16, 2021, TMB Staff filed a Third Amended Complaint and Notice of Administrative Hearing in this matter which was received by Dr. Chavason and his counsel. AR 5763; App. Tab 1 at 5, Stipulated Fact No. 10.

8.      The notice of the SOAH hearing contained a statement of the legal authority and jurisdiction under which the hearing was to be held, a reference to the applicable rules and statutes, and either a short, plain statement of the factual matters asserted or an attachment that incorporated by reference the factual matters asserted in the complaint or petition filed with the state agency. Order No. 16, issued May 3, 2021, notified the parties of the date and time for the convening of the hearing. App. Tab 1 at 12, FOF 12.

9.      A hearing on the merits at SOAH was convened day to day from September 13th to September 23rd, 2021. Both parties attended the hearing; TMB Staff rested their case on September 17th, and Dr. Chavason rested his case on September 23rd. Dr. Chavason was represented by counsel Lee Bukstein. The transcript of the proceeding was provided to TMB Staff on October 27, 2021. TMB Staff and Dr. Chavason's Closing Arguments were due on or before November 15, 2021. App. Tab 1 at 112, FOF 13.

10.     The ALJs then issued a PFD on February 4, 2022, which contained dozens of findings that Dr. Chavason committed multiple violations of the Act and TMB rules. App. Tab 1.   Those violations include:

- Asking a patient to taste her nipples, sometimes putting his fingers in her vagina and continuing to hug her, feel her breasts and buttocks. App. Tab 1 at 113, FOF 21.

- Making another patient feel uncomfortable, sexually abused and traumatized, and causing her to have trust issues with authority figures. *Id.* at 114 FOF 25.

- Hugging another patient during sessions and commenting on her appearance and sexual desirability and telling her that, if he were her husband, he would "fuck her brains out." *Id.* at 99. *See also Id.* at 114, FOF 30; Staff Ex. 3A (deposition) at 20, 33.

- Coming up behind a patient while she was trying take a clock off his office wall, causing the patient to feel his erection on her backside. *Id.* at 114, FOF 31.

- Asking another patient to see photos of her breasts post-surgery and walking over to try to look at her phone, making the patient feel uncomfortable. *Id.* at 115, FOFs 46-47.

- Stroking another patient's back and sliding his hands down the patient's side and long the area between her back and her breast. *Id.* at 116, FOF 51.

- Commenting to another patient, who had a history of abuse, that she had a "nice butt." *Id.* at 116, FOFs 52, 55.

- Asking intrusive questions of another patient about her marriage and her sex life and how he could keep her sexually satisfied and repeatedly telling her he was available for a sexual relationship even though the patient reminded him that she was married. *Id.* at 117, FOFs 61-63.

- Making unwanted comments to at least five of his patients, which included telling some of them that she was a "crazy hot bitch" and that she was "smoking hot, and her "boyfriend must be lucky." *Id.* at 117, FOF 69. *See also Id.* at 32, 38, 104.

- Massaging an employee's shoulders, hugging her, attempting to kiss her, and groping her bottom, and having unprotected sexual intercourse at the office. *Id.* at 121, FOF 92 (aggravating factor).

- Making unwanted sexual advances toward another employee, asking her constantly about her personal life, including who she was dating, and telling the employee that she had a "good body" and a "good butt." *Id.* at 121, FOF 93 (aggravating factor).

11. The SOAH ALJ also found several aggravating factors, including that:

- Dr. Chavason's actions resulted in severe harm to multiple patients. *Id.* at 119, FOF 83.

- Dr. Chavason's conduct involved one or more violations that involved more than one patient. *Id.* at 119, FOF 84.

- Dr. Chavason's conduct increased the potential for harm to the public because he remains untruthful about his conduct, fails to take responsibility for harm done to his patients, has shown no remorse or regret, and has continued to engage in inappropriate conduct despite receiving warnings and admonitions from is employer. *Id.* at 119, FOF 85.

- Dr. Chavason's continued violations occurred despite him having attended remedial courses and workshops, received warnings, and been subject to disciplinary action. *Id.* at 120, FOF 90.

12. After his motion for rehearing was denied, Dr. Chavason filed the underlying suit for judicial review in a Travis County District Court. After briefing

16

and oral argument, the district court affirmed the TMB Final Order in a Final Judgment signed on September 6, 2024. App. Tab 3. Dr. Chavason filed a request for findings of fact and conclusions of law, which was denied on September 12, 2024.

13.     Dr. Chavason filed a notice of appeal in the district court on September 4, 2024, and a copy of the notice in the district Court on September 5, 2024.

## SUMMARY OF THE ARGUMENT

Dr. Chavason is a psychiatrist who preyed on multiple, vulnerable female patients. As will be more fully discussed below, there is overwhelming substantial evidence to support the ALJs' and the TMB's findings that he committed multiple violations of his patients' boundaries, including sexual boundaries. Dr. Chavason wants the Court to disregard overwhelming substantial evidence that he did just that. He should not be allowed to practice medicine again in the State of Texas.

Further, there is no question that SOAH and the TMB had jurisdiction to discipline Dr. Chavason for his disgraceful, aggressive conduct. Dr. Chavason resigned from the medical facility where he worked while under a peer review investigation for his conduct. He was then given a TMB ISC, which he attended, to discuss the peer review. In addition, he was afforded full due process in the SOAH contested case proceeding, which included proper notice, discovery (including

depositions), and the right to call expert and other witnesses and cross-examine TMB Staff's witnesses.

Dr. Chavason's weak attempts to justify his conduct by claiming that there was no proper standard or definition of how hugs can make a patient feel uncomfortable should be rejected. There was ample expert testimony and documentary evidence at the SOAH trial demonstrating that Dr. Chavason's repeated hugging of his patients—who were already extremely vulnerable because of the prior histories of abuse and Dr. Chavason treating their mental conditions—blatantly violated the patients' boundaries and caused them harm.

The rest of Dr. Chavason's arguments are nothing more than a request for this Court to re-weigh the evidence and second-guess the discretion of the ALJs, which is clearly improper under the substantial evidence standard of review.

As more fully discussed below, all of Dr. Chavason's arguments should be rejected, and this Court should affirm the TMB Final Order in its entirety.

## STANDARDS OF REVIEW AND APPLICABLE LAW

### I. Substantial Evidence Standard of Review.

Substantial evidence is slightly more than a scintilla of evidence; if there is more than a scintilla of evidence to support findings of fact, the findings satisfy the substantial evidence standard. *Mireles v. Tex. Dep't of Pub. Safety*, 9 S.W.3d 128, 131

(Tex. 1999) (per curiam). Further, the majority of the evidence may actually preponderate against an agency's final order, yet the decision may be supported by substantial evidence. *Tex. Health Facilities Comm'n v. Charter Med.-Dall., Inc.*, 665 S.W.2d 446, 453 (Tex. 1984) (citing *Lewis v. Metro. Sav. & Loan Ass'n*, 550 S.W.2d 11, 13 (Tex. 1977)). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion' of fact." *Lauderdale v. Tex. Dep't of Agric.*, 923 S.W.2d 834, 836 (Tex. App.—Austin 1996, no writ) (quoting *Pierce v. Underwood*, 487 U.S. 552, 564-65 (1988)). Further, if the evidence is such that reasonable minds could have reached the conclusion that was adopted by the agency, the Final Order must be affirmed. *City of El Paso v. Pub. Util. Comm'n*, 883 S.W.2d 179, 186 (Tex. 1994); *Charter Med-Dall.*, 665 S.W.2d at 453. Likewise, if the evidence would support either affirmative or negative findings on a specific matter, a court must uphold the agency's decision. *Charter Med-Dall.*, 665 S.W.2d at 453 (citing *Gerst v. Goldsbury*, 434 S.W.2d 665, 667 (Tex. 1968)).

The reviewing court in a substantial evidence appeal is prohibited from substituting its judgment for that of the agency as to the weight of the evidence on questions committed to agency discretion. *Bd. of Law Exam'rs v. Stevens*, 868 S.W.2d 773, 778 (Tex. 1994); *Tex. State Bd. of Med. Exam'rs v. Dunn,* No. 03-03-00180-CV,

19

2003 WL 22721659, at *8 (Tex. App.—Austin Nov. 20, 2003, no pet.) (mem. op.) ("Issues of credibility are to be decided by the impartial finder of fact, the ALJ, and the TMB should not redetermine those issues or reweigh the evidence.").

It is presumed that "the agency's order is supported by substantial evidence, and the challenging party bears the burden to demonstrate otherwise." *Stark v. Geeslin*, 213 S.W.3d 406, 411 (Tex. App.—Austin 2006, pet. denied). "The burden is a heavy one—even a showing that the evidence preponderates against the agency's decision will not be enough to overcome it, if there is some reasonable basis in the record for the action taken by the agency." *Scally v. Tex. State Bd. of Med. Exam'rs*, 351 S.W.3d 434, 441 (Tex. App.—Austin 2011, pet. denied). "The Court cannot strike down an administrative order on the ground that the evidence heard by the Court indicated that a more equitable one could be entered." *R.R. Comm'n v. Mackhank Petroleum Co.*, 190 S.W.2d 802, 804 (Tex. 1945).

Further, an ALJ's ruling on the admissibility of evidence, including expert testimony, is determined under the abuse-of-discretion standard applied to trial courts. *Scally*, 351 S.W.3d at 450. As the Court held in that case, "[a]n ALJ, like a trial court, has broad discretion when deciding whether to admit expert testimony in a contested-case hearing, and we will not disturb that decision on appeal in the absence of an abuse of discretion." *Id.*, citing *Fay-Ray Corp. v. Tex. Alcoholic Beverage*

20

*Comm'n*, 959 S.W.2d 362, 367 (Tex. App.—Austin 1998, no pet.). The same standard applies to non-expert witnesses. In SOAH contested cases "the ALJ is the sole judge of witness credibility" and is free to accept or reject the testimony of any witness or even accept part of a witness's testimony and disregard the rest. *Granek v. Tex. State Bd. of Med. Exam'rs*, 172 S.W.3d 761, 778 (Tex. App.—Austin 2005, pet. denied).

## II.     Standards applicable to the admission of expert testimony.

Texas courts use the guidelines for expert testimony set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995). Under the *Daubert* standard, in addition to showing that an expert witness is qualified, Rule 702 also requires the proponent to show that the expert's testimony is relevant to the issues in the case and is based upon a reliable foundation. 509 U.S. at 597. Put another way, the issue is the specific subject matter and the expert's familiarity with it. *Padilla v. Loweree*, 354 S.W.3d 856, 863 (Tex. App.—El Paso 2011, pet. denied) (citing *Hagedorn v. Tisdale*, 73 S.W.3d 341, 350 (Tex. App.—Amarillo 2002, no pet.)). The expert need only "establish that he (or she) has practical knowledge of what is usually and customarily done by other practitioners under the same or similar circumstances." *Id.* (citing *Olveda v. Sepulveda*, 141 S.W.3d 679, 682 (Tex. App.—San Antonio 2004,

pet denied)). Put another way, the question is whether "an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.

## III.    Applicable Law under the Texas Medical Practice Act.

Section 154.051(e) of the Medical Practice Act (Act) authorizes the TMB to reconsider previously investigated complaints and to take disciplinary action against Dr. Chavason based on a pattern or practice violating the Act or TMB rules, as further defined by 22 Texas Administrative Code, Section (TMB Rule) 179.7, which provides that past complaints made against a licensee, and investigations conducted by the TMB concerning the subject licensee, may be examined during the course of a new investigation concerning the subject licensee to determine if there is a pattern or practice of behavior on the part of the subject licensee; and, TMB Rule 187.18(k)(1), stating that the dismissal of any investigation or disciplinary proceeding before the TMB is without prejudice to additional investigations and/or reconsideration of the matter at any time. Tex. Occ. Code § 154.051(e); 22 Tex. Admin. Code §§ 179.7, 187.18.

Section 164.051(a)(1) of the Act authorizes the TMB to take disciplinary action against Dr. Chavason based on Dr. Chavason's commission of an act prohibited under Section 164.052 of the Act. Tex. Occ. Code § 164.051(a)(1).

Section 164.051(a)(6) of the Act authorizes the TMB to take disciplinary action against Dr. Chavason based on Dr. Chavason's failure to practice medicine in an acceptable professional manner consistent with public health and welfare, as further defined by TMB Rule 190.8(1)(C), failure to use proper diligence in one's professional practice; and 190.8(1)(M), inappropriate prescription of dangerous drugs or controlled substances to oneself, family members, or others in which there is a close personal relationship. Tex. Occ. Code § 164.051(a)(6); 22 Tex. Admin. Code §§ 190.8(1)(C), 190.8(1)(M).

Section 164.051(a)(7) of the Act authorizes the TMB to take disciplinary action against Dr. Chavason based on disciplinary action taken by Dr. Chavason's peers, as further defined by TMB Rule 190.8(4), related to disciplinary action by peers. Tex. Occ. Code § 164.051(a)(7); 22 Tex. Admin. Code § 190.8(4).

Section 164.052(a)(5) of the Act authorizes the TMB to take disciplinary action against Dr. Chavason based upon Dr. Chavason's unprofessional or dishonorable conduct that is likely to deceive or defraud the public or injure the public, as further defined by TMB Rules: 190.8(2)(E), engaging in sexual contact with a patient; 190.8(2)(F), engaging in sexually inappropriate behavior or comments directed towards a patient; 190.8(2)(G), becoming financially or personally involved with a patient in an inappropriate manner; 190.8(2)(K),

23

behaving in an abusive or assaultive manner towards a patient or the patient's family or representatives that interferes with patient care or could be reasonably expected to adversely impact the quality of care rendered to a patient; 190.8(2)(P), behaving in a disruptive manner toward licensees, hospital personnel, other medical personnel, patients, family members or others that interferes with patient care or could be reasonably expected to adversely impact the quality of care rendered to a patient. Tex. Occ. Code § 164.052(a)(5); 22 Tex. Admin. Code §§ 190.8(2)(E)-(G), (K), (P).

## ARGUMENT

I. **The TMB Final Order is Supported by Overwhelming Substantial Evidence.**[6]

A. **TMB Staff's expert witness was highly qualified, and her testimony supported the ALJs' findings that Dr. Chavason committed numerous violations of the Medical Practice Act.**[7]

TMB Staff's expert witness, Dr. Barbara Ellen Ziv, a board-certified psychiatrist,[8] prepared an expert report for this contested proceeding and gave testimony both in deposition and at the hearing. As part of her eighty-seven-page report, Dr. Ziv reviewed all patient medical records, depositions, and Dr.

---

[6] All footnote citations are to the administrative record and will not be proceeded by "AR."

[7] References to the parties' exhibits will be to the document page numbers, not the bates stamp numbers.

[8] Staff Ex. 19, Curriculum Vitae for Dr. Ziv

24

Chavason's employment file.[9] As part of her report and testimony, Dr. Ziv elucidated that in the psychiatry field, there is a need for further diligence by a psychiatrist toward the psychiatric patient. Dr. Ziv noted that the American Psychiatric Association's (APA) guidelines on Ethics in Practice control the standards of psychiatric care: they state that psychiatric patients who are sharing sensitive details with their psychiatrist can be especially vulnerable to undue influence. As such, psychiatrists should ensure that their conduct does not exploit or harm the patient, be it physically, sexually, psychologically, spiritually or financially. Dr. Ziv, echoing the APA guidelines, opined unequivocally that sexual behavior with patients is unethical. Sexual behavior with a former psychiatric patient is also unethical (which differs from other specialties where a physician may be permitted to date a patient following the termination of the physician-patient relationship).[10]

Furthermore, even hugging or touching a patient is not generally appropriate and should be evaluated on a case-by-case basis in light of the therapeutic impact; the psychiatrist should ensure his or her conduct is not misconstrued and is in the best interest of the patient.[11] Similarly, commenting on a patient's sexual desirability is inappropriate and without justification.[12] As to the specific vulnerability of

---

[9] Staff Ex. 18, Dr. Ziv expert report
[10] Staff Ex. 18 at 66-68; Tr. Vol. 4 at 347:11-17 and 348:12-350.
[11] Tr. Vol. 4 at 357:1-24
[12] Tr. Vol. 4 at 358:1-359:15

psychiatric patients, Dr. Ziv opined that individuals who have problems with depression, anxiety, a history of abuse, neglect, and low self-esteem (characteristics found in all of the patients in this case) are vulnerable to manipulation and are less able to defend themselves against sexualized behavior or inappropriate touching and suggestions for outside contact.[13]

In her report, Dr. Ziv also noted that many of the patients in this case, in addition to psychological weaknesses, had their defenses lowered as a consequence of being on habit forming medications, such that they would have a heightened level of dependence on Dr. Chavason and would be in a subordinate position knowing he could deny access to those medications.[14] Dr. Ziv also opined on Dr. Chavason's conduct towards female employee subordinates and the multiple infractions noted in his employment file.[15] These patterns tend to show that Dr. Chavason's conduct poses an increased potential harm to the public, as discussed below.

B.    Substantial evidence related to Patient Eleven.

Dr. Chavason's Patient Eleven, a 30-year-old-woman, was admitted to Green Oaks Hospital for suicidal ideation on or about August 27, 2010, and shortly thereafter began receiving psychiatric treatment from Dr. Chavason at Holiner

---

[13] Tr. Vol. 4 at 359:16-361:2
[14] Staff Ex. 18 at TMB6327
[15] Staff Ex. 1C. *See also* Staff Ex. 18 at TMB6296-6304

Group on or about September 14, 2010. Dr. Chavason diagnosed Patient Eleven with bipolar affective, mixed moderate and severe major recurring depression. Patient Eleven was prescribed Risperdal, among other medications.[16] Patient Eleven testified under oath at her deposition that, beginning at her first visit at Holiner Group, Dr. Chavason flirted with her, asked her questions about her sexual preferences, and told her "if she wasn't his patient, he would do [her] right there on his desk." Patient Eleven testified that she reported to Dr. Chavason that she believed the Risperdal was making her hypersexual.[17] At the conclusion of this visit on September 14, 2010, Patient Eleven testified that Dr. Chavason rubbed the front part of his body on her backside as she exited the door. Patient Eleven submitted a complaint to the TMB on November 23, 2010, which echoed this information about her first and subsequent interactions with Dr. Chavason.[18]

On or about September 21, 2010, Dr. Chavason saw Patient Eleven for a medication management session. Patient Eleven reported that she was feeling isolated and lonely and wanted to be with someone "so bad."[19] Patient Eleven testified that Dr. Chavason approached her on her side of his desk, hugged her, pulled her close and squeezed her breasts and buttocks. When she asked Dr.

---

[16] Staff Ex. 11C at TMB4342-4346
[17] Staff Ex. 11A, depo transcript 11:7-21
[18] *Id.* at 11:23-12:4; Staff Ex. 11F, Patient Eleven Complaint
[19] Staff Ex. 11C, TMB4347-4349

Chavason if the Risperdal could make her breasts lactate, Dr. Chavason responded by asking to taste Patient Eleven's breast milk, lifting her blouse and sucking both of her nipples. Dr. Chavason told her that her breast milk was tasty and that he enjoyed it. Dr. Chavason increased Patient Eleven's dose of Risperdal to 3mg from 2mg.[20]

On or about September 30, 2010, Dr. Chavason saw Patient Eleven for a medication management session, the record of which reflects that Dr. Chavason noted that Patient Eleven could be pregnant. Patient Eleven testified that Dr. Chavason told her he could justify spending more time in sessions with her if he claimed he was counseling her about pregnancy and her medications. Patient Eleven testified that Dr. Chavason again groped her breasts and buttocks and stuck his fingers into her vagina and masturbated her.[21]

On or about October 6, 2010, Patient Eleven saw Dr. Chavason for a medication management session. Dr. Chavason expressed concern in the patient's chart about risky sexual behavior. Patient Eleven testified that Dr. Chavason again squeezed her buttocks, rubbed her breasts and inserted his fingers into her vagina to masturbate her. Dr. Chavason told Patient Eleven that she turned him on and that she was "hot" and "sexy."[22] In a phone note dated October 14, 2010, Dr. Chavason

---

[20] Staff Ex. 11A, depo transcript 17:11-22; Staff Ex. 11C, TMB4349
[21] Staff Ex. 11C, TMB4350; Staff Ex. 11A, depo transcript 42:1-21 and 26:21-27:6
[22] Staff Ex. 11C, TMB4354-4357, Staff Ex.t 11A, depo transcript 39:10-22

wrote that the patient reported that her breasts were lactating and again noted that he counseled the patient about pregnancy, though Patient Eleven disputes that she was ever pregnant and was only concerned about lactation.[23] On November 5th and November 7th, 2010, Patient Eleven called the Holiner Group and reported that she felt sedated and "spacey" with poor memory and that she wanted to decrease her dosage of Risperdal. On November 8, 2010, Dr. Chavason returned the patient's call and reinstated her Risperdal dose and advised her to increase it again.[24]

At a medication management visit with Dr. Chavason on November 9, 2010, Dr. Chavason noted that Patient Eleven was "manicky" in the medical record. Patient Eleven testified that Dr. Chavason put his foot against his office door to block entry and masturbated her and that he pulled down his boxers and had her perform oral sex on him intermittently because he was nervous about getting caught.[25]

At a final visit with Dr. Chavason on November 16, 2010, Patient Eleven testified that Dr. Chavason again groped her and used his foot to block entry to his office while he attempted to insert his fingers into Patient Eleven's vagina. She was menstruating and had a tampon in; Dr. Chavason remarked that she already had something in there. Dr. Chavason then unzipped his pants, pulled down his boxers

---

[23] Staff Ex. 11C, TMB4358; Staff Ex. 11A, depo transcript 43:7-44
[24] Staff Ex. 11C, TMB4364-4366
[25] Staff Ex. 11C, TMB4367-4370; Staff Ex. 11A, depo transcript 61:22-62:11

and had Patient Eleven go back and forth between masturbating him and performing oral sex on him.[26]

On or around December 9, 2010, Patient Eleven called the Holiner Group to discuss the complaint she had made to the Board about Dr. Chavason, and Dr. Joel Holiner returned her call. Dr. Holiner created a call note describing what Patient Eleven reported to him, which was included in Dr. Chavason's employment file. Dr. Holiner testified under oath at the hearing that Patient Eleven reported that she had sexual relations with Dr. Chavason, including that he put his mouth on her breasts, put his fingers in her vagina, and that they had oral sex.[27] Patient Eleven was terminated from Holiner Group as a patient the next day, on December 10, 2010, at least in part for a "breakdown in doctor/patient relationship," which Dr. Holiner attributed to the complaint Patient Eleven had made to the TMB.[28] Dr. Chavason attended an ISC on August 15, 2011, as verified above, for the allegations related to Patient Eleven. *See, e.g.*, AR 6424.

Dr. Ziv specifically cited Patient Eleven as vulnerable and susceptible to manipulation and coercion by Dr. Chavason: she entered treatment because of past trauma and suicidal ideation.[29] Patient Eleven testified that she was taken advantage

---

[26] *Id.* at TMB4373-4376 and depo transcript 69:1-70:6
[27] Staff Ex. 11E, TMB4410-11 (Patient Eleven Holiner Statement)
[28] Staff Ex. 11A, depo transcript at 84:2-20
[29] Staff Ex. 18 at 71

of and has a hard time trusting authority figures, and that Dr. Chavason, knowing she needed help, instead hurt her.[30]

Commenting on a psychiatric patient's appearance, groping her breasts and buttocks, masturbating her, and having a patient perform oral sex is a violation of sections 164.051(a)(1), 164.051(a)(6), 164.052(a)(5) and 164.053(a)(1) of the Act and the following TMB Rules: 190.8(1)(C), failure to use proper diligence in one's professional practice; 190.8(1)(M), inappropriate prescription of dangerous drugs or controlled substances to oneself, family members, or others in which there is a close personal relationship; 190.8(2)(E), engaging in sexual contact with a patient; 190.8(2)(F), engaging in sexually inappropriate behavior or comments directed towards a patient; 190.8(2)(G), becoming financially or personally involved with a patient in an inappropriate manner; 190.8(2)(K), behaving in an abusive or assaultive manner towards a patient or the patient's family or representatives that interferes with patient care or could be reasonably expected to adversely impact the quality of care rendered to a patient; 190.8(2)(P), behaving in a disruptive manner toward licensees, hospital personnel, other medical personnel, patients, family members or others that interferes with patient care or could be reasonably expected to adversely impact the quality of care rendered to a patient.

---

[30] Staff Ex. 11A, depo transcript 96:15-97:2

Section 154.051(e) of the Act authorizes the TMB to reconsider previously investigated complaints and to take disciplinary action against Dr. Chavason based on a pattern or practice violating the Act or TMB Rules, as further defined by TMB Rules 179.7, past complaints made against a subject licensee and investigations conducted by the TMB concerning the subject licensee may be examined during the course of a new investigation concerning the subject licensee to determine if there is a pattern or practice of behavior on the part of the subject licensee, and 187.18(k)(1), the dismissal of any investigation or disciplinary proceeding before the TMB is without prejudice to additional investigations and/or reconsideration of the matter at any time.

### C. Substantial evidence related to Patient One.

On or around July 1, 2013, Patient One, a 46-year-old woman, began receiving treatment from Dr. Chavason at Holiner Group for Attention Deficit Non-Hyperactive, Generalized Anxiety, Panic Disorder and Recurring Major Depression.[31] Dr. Chavason documented in Patient One's medical record that she had a history of physical and emotional abuse.[32]

---

[31] Staff Ex. 3B, TMB1281-1284
[32] Staff Ex. 3B, TMB1282, TMB1286, TMB1291, TMB1295, TMB1300

Patient One testified under oath during her deposition and at trial, that during sessions, Dr. Chavason commented on her appearance, calling her good-looking, attractive, pretty, that her husband must be crazy and that he would treat her differently than her husband.[33] Patient One testified that Dr. Chavason asked her intimate personal details about her marriage and her sexual relationship with her husband, including asking what foreplay she liked and suggesting that he would do those acts to her. Dr. Chavason told Patient One that he would "fuck her brains out."[34]

Dr. Chavason's last visit with Patient One was on May 14, 2014.[35] In what TMB Staff has dubbed the clock incident, Patient One testified under oath during her deposition and at trial that at this last visit, she noticed a large clock on Dr. Chavason's office wall was not working. Patient One offered to help change the batteries, and as she reached up to remove the clock from the wall, Dr. Chavason approached her from behind and made grinding motions with an erection on Patient One's backside.[36]

---

[33] Staff Ex. 3A, depo transcript 29:4-10; 33:6-8; Tr. Vol. 6 at 630:9-12
[34] Staff Ex. 3A, depo transcript 19:20-20:2; 22:3-18; 33:6-34:18; Tr. Vol. 6 at 621:15-622:2 and 631:10-632:5
[35] Staff Ex. 3B, TMB1304-1308
[36] Tr. Vol. 6 at 632:9-633:6; Staff Ex. 3A, depo transcript 40:17-44:5

Patient One immediately reported the clock incident to Dr. Chavason's nurse practitioner, Rinda Jordan.[37] Nurse Jordan did not believe Patient One, but on or around March 3, 2015, Patient One told Emily Buchanan, a supervisor at Holiner Group about the clock incident, which Ms. Buchanan included in Dr. Chavason's employment file. Patient One's complaint about the clock incident was the subject of an internal investigation at Holiner Group, which was also documented in Dr. Chavason's employment file.[38]

TMB Staff's expert witness, Dr. Ziv, opined in her trial testimony that Patient One, with a history of physical abuse acknowledged and documented by Dr. Chavason, would have poor ego strength as well as emotional and interpersonal relationship problems. Dr. Chavason's actions could reinforce Patient One's bad feelings she had about herself, could worsen her depression, and make her less likely to seek out appropriate care and trust subsequent providers. Dr. Ziv also pointed out in her report that Patient One was prescribed both Klonopin and Ativan by Dr. Chavason. She could have had her defenses lowered by her need for these medications, especially with respect to the subordinate position she was in relative to Dr. Chavason prescribing them to her.[39] Patient One testified that the drugs that

---

[37] Tr. Vol. 6 at 623:8-19
[38] Staff Ex. 1C, TMB788-791
[39] Tr. Vol. 4 at 362:17-364:2; Staff Ex. 18 at 71; *see* prescriptions at Staff Ex. 3B, TMB1307

she was prescribed by Dr. Chavason made her incredibly sedated which led to difficulty holding down a job, and that they impacted her marriage and her memory.[40]

Commenting on a psychiatric patient's appearance, placing himself in hypothetical sexual acts with the patient, and inappropriately grinding his groin on the patient's backside is a violation of sections 164.051(a)(1) and 164.052(a)(5) of the Act and the following TMB Rules: 190.8(2)(E), engaging in sexual contact with a patient; 190.8(2)(F), engaging in sexually inappropriate behavior or comments directed towards a patient; 190.8(2)(G), becoming financially or personally involved with a patient in an inappropriate manner; 190.8(2)(K), behaving in an abusive or assaultive manner towards a patient or the patient's family or representatives that interferes with patient care or could be reasonably expected to adversely impact the quality of care rendered to a patient; 190.8(2)(P), behaving in a disruptive manner toward licensees, hospital personnel, other medical personnel, patients, family members or others that interferes with patient care or could be reasonably expected to adversely impact the quality of care rendered to a patient.

---

[40] Tr. Vol. 6 at 615:10-616:17

**D.    Substantial evidence related to Patient Two.**

On or around July 2013, Patient Two, a 33-year-old female, began seeing Dr. Chavason at Holiner Group for generalized anxiety disorder, opioid dependence in remission, panic disorder, persistent insomnia, and recurring major depression.[41]

On or about October 17, 2014, Patient Two had a medication management session with Dr. Chavason. According to a note in Dr. Chavason's employment file, Dr. Chavason was scheduled to see the patient at 11:00 a.m., but he had contacted her without documenting it and rescheduled her appointment to noon. At 12:25 p.m., Dr. Holiner knocked on Dr. Chavason's office door, only to find that Dr. Chavason had locked the door with him and Patient Two inside. The note detailed that Dr. Chavason had billed for no psychotherapy even though he appeared to be counseling the patient, and that a prescription for Patient Two had been issued, although no documentation of the prescription could be found in her file. The employment file note points out that Dr. Chavason had previously been told not to text patients on his personal phone and to document every patient interaction.[42] Dr. Holiner's testimony at trial corroborated the events described in the note and that he had

---

[41] Staff Ex. 4B, TMB1415-1419
[42] Staff Ex. 4B, TMB1543-1547; Staff Ex. 1C, TMB769

discussed the billing, door locking, and documentation issues with Dr. Chavason previously.[43]

Dr. Holiner also expressed concerns, which he placed in Dr. Chavason's employment file, that Dr. Chavason was overprescribing benzodiazepines to Patient Two, a person with a past history of opioid abuse.[44]

In July and August 2015, Patient Two was mentioned in Dr. Chavason's employment file on multiple occasions for him calling the patient without documenting it in the medical record and spending extra time in sessions with the patient in a casual manner including laughing and joking. One note details that Dr. Chavason was observed on video handing Patient Two an unmarked envelope and touching her backside. Dr. Holiner spoke with Dr. Chavason about calling the patient repeatedly, scheduling the patient at low staffing times, and giving her special treatment.[45]

Dr. Chavason and Patient Two met on at least one occasion outside of the office, when Dr. Chavason went to Patient Two's job (she was an aesthetician) and she performed a back facial on his back. Dr. Chavason also admitted that he went to lunch with Patient Two.[46] Patient Two testified that Dr. Chavason managed

---

[43] Tr. Vol. 2 at 167:22-171:9
[44] Staff Ex. 4C, TMB1673
[45] Staff Ex. 4C, TMB1671 and 1674; Staff Ex. 1C, TMB801 and 808
[46] Staff Ex. 4A, depo transcript 20:5-22; Tr. Vol. 6 at 733:16-734:16

medications for Patient Two following a surgery when she was no longer a patient at Holiner Group.[47]

TMB Staff's expert testified about the effects of benzodiazepines on patients. Dr. Ziv flagged Dr. Chavason's prescribing to Patient Two as particularly problematic due to her history of addiction coupled with her reliance on Dr. Chavason for prescription medications.[48]

Contacting a psychiatric patient without documenting it, making contact with her backside, giving her preferential treatment, and having outside clinical contact with the patient while still prescribing to her is a violation of sections 164.051(a)(1), 164.051(a)(6) and 164.052(a)(5) of the Act and the following TMB Rules: 190.8(1)(C), failure to use proper diligence in one's professional practice; 190.8(2)(F), engaging in sexually inappropriate behavior or comments directed towards a patient; and 190.8(2)(G), becoming financially or personally involved with a patient in an inappropriate manner.

---

[47] Staff Ex. 4A, depo transcript 28:8-29-17
[48] Tr. Vol. 4 at 374:15-377:6

### E. Substantial evidence related to Patient Six.

On or about May 9, 2021, Patient Six, a 44-year-old woman, began receiving psychiatric treatment from Dr. Chavason at Holiner Group for suicidal ideation, anxiety, and feelings of worthlessness and hopelessness.[49]

Patient Six, a licensed professional counselor with training in patient boundaries, testified under oath at her deposition that Dr. Chavason hugged her. This made her feel uncomfortable and "awkward," and she felt it was inappropriate for Dr. Chavason to hug patients.[50] A note dated July 9, 2015, included in Dr. Chavason's employment file, indicated that Dr. Chavason was observed via live camera feed by two employees at Holiner Group hugging Patient Six in his office.[51]

On or about December 9, 2015, Patient Six had a medication management session with Dr. Chavason. Patient Six testified at her deposition that she had had a "mommy makeover," which included a breast lift, liposuction and a tummy tuck about a month before this appointment. Patient Six mentioned this to Dr. Chavason, who commented "every woman takes pictures after she has her boobs done," walked around his desk and asked Patient Six to open her phone so he could see them.

---

[49] Staff Ex. 6B, TMB2130-2134
[50] Staff Ex. 6A, depo transcript 37:3-38:20 and 46:21-24
[51] Staff Ex. 1C, TMB800

Patient Six felt "panicked," nervous and anxious. Patient Six refused, placing her phone back in her purse. Dr. Chavason told her she was "no fun."[52]

On or about July 14, 2016, Patient Six had her last appointment with Dr. Chavason. At the appointment, he gave Patient Six a hug and slowly ran his hand down her back to try and grope her bottom. Patient Six terminated the hug. She testified that she stopped seeing Dr. Chavason because she felt his actions were wrong. He was supposed to be helping her, but instead he objectified her by calling her "hot" and "beautiful." Patient Six felt that Dr. Chavason was "more sick" than she was at that point.[53]

Commenting on a psychiatric patient's appearance, asking to see pictures of her breasts, and attempting to grope the patient's backside is a violation of sections 164.051(a)(1) and 164.052(a)(5) of the Act and the following TMB Rules: 190.8(2)(F), engaging in sexually inappropriate behavior or comments directed towards a patient; 190.8(2)(G), becoming financially or personally involved with a patient in an inappropriate manner; 190.8(2)(K), behaving in an abusive or assaultive manner towards a patient or the patient's family or representatives that interferes with patient care or could be reasonably expected to adversely impact the quality of

---

[52] Staff Ex. 6B, TMB2252-2257; Staff Ex. 6A, depo transcript 43:5-45:12
[53] Staff Ex. 6B, TMB2276-2279; Staff Ex. 6A, depo transcript 50:16-54:4

care rendered to a patient; 190.8(2)(P), behaving in a disruptive manner toward licensees, hospital personnel, other medical personnel, patients, family members or others that interferes with patient care or could be reasonably expected to adversely impact the quality of care rendered to a patient.

## F.  Substantial evidence related to Patient Twelve.

On or about June 30, 2016, Patient Twelve had a medication management visit with Dr. Chavason, which was captured on video. At the end of the visit, Dr. Chavason is seen on video inappropriately hugging, touching, stroking, and squeezing Patient Twelve's back, arm, and side before exiting the room with his arm over her shoulders.[54]

Sharing a lingering hug and touching a patient as though you are intimately involved is a violation of sections 164.051(a)(1) and 164.052(a)(5) of the Act and the following TMB Rules: 190.8(2)(F), engaging in sexually inappropriate behavior or comments directed towards a patient; 190.8(2)(K), behaving in an abusive or assaultive manner towards a patient or the patient's family or representatives that interferes with patient care or could be reasonably expected to adversely impact the quality of care rendered to a patient; 190.8(2)(P), behaving in a disruptive manner toward licensees, hospital personnel, other medical personnel, patients, family

---

[54] Staff Ex. 12B (Video)

members or others that interferes with patient care or could be reasonably expected to adversely impact the quality of care rendered to a patient.

## G. Substantial evidence related to Patient Seven.

On or about May 25, 2016, Patient Seven, a 20-year-old woman, began receiving treatment from Dr. Chavason at MCGO. She was admitted for suicidal ideation, depression, anxiety and for drug detox. Upon intake, Patient Seven disclosed that she had a history of sexual trauma and abuse from childhood.[55] Patient Seven testified under oath at trial and in her deposition that on or about May 26, 2016, she was assaulted by a male patient at MCGO who grabbed her by the hair and pulled her down to the ground, causing her to hit her head.[56] Patient Seven testified that she reported this incident to Dr. Chavason at her first visit with him on May 28, 2016; however Dr. Chavason did not document it in his visit note.[57]

Dr. Chavason saw Patient Seven a second time on May 29, 2016, at which time she reported that earlier that day, another male patient had exposed his penis to her in the courtyard of MCGO. She testified to feeling not safe and "scared." Dr. Chavason did not include the assault in his visit note from that day and only included a note that Patient Seven was "handling the stress of the unit well."[58] Instead of

---

[55] Staff Ex. 7B, TMB2502-2505 and TMB2709; Tr. Vol. 1 at 30:24-31:15
[56] Staff Ex. 7B, TMB2471-72 and 2511-2512, Tr. Vol. 1 at 33:16-25; Staff Ex. 7A, depo tr. 16:3-18:4
[57] Staff Ex. 7B, TMB2710-2712
[58] Staff Ex. 7B, TMB2713-2715; Tr. Vol. 1 at 50:25-54:2

appropriately addressing her concerns, Dr. Chavason commented to Patient Seven that she "had a nice butt" and that the male patient had "great taste."[59]

Patient Seven testified both at trial and when deposed that she had reported her history of abuse to Dr. Chavason and felt that Dr. Chavason knew her history of abuse and was testing for weaknesses to push her further.[60] Dr. Ziv, Staff's expert specifically noted that Patient Seven was vulnerable, as she had been sexually abused by her stepfather when she was young and was at MCGO due to suicidal ideation.[61]

Commenting on a psychiatric patient's appearance after she had been assaulted and already felt unsafe is a violation of sections 164.051(a)(1), 164.051(a)(6), and 164.052(a)(5) of the Act and the following TMB Rules: 190.8(1)(C), failure to use proper diligence in one's professional practice; 190.8(2)(F), engaging in sexually inappropriate behavior or comments directed towards a patient; 190.8(2)(K), behaving in an abusive or assaultive manner towards a patient or the patient's family or representatives that interferes with patient care or could be reasonably expected to adversely impact the quality of care rendered to a patient; 190.8(2)(P), behaving in a disruptive manner toward licensees, hospital personnel, other medical personnel, patients, family members or others that

---

[59] Tr. Vol. 1 at 54:3-18; Staff Ex. 7A, depo transcript 26:19-27:19
[60] Tr. Vol. 1 at 62:1-20; Staff Ex. 7A, depo transcript 21:4-19
[61] Staff Ex. 18 at 71

interferes with patient care or could be reasonably expected to adversely impact the quality of care rendered to a patient.

## H.    Substantial evidence related to Patient Ten.

On or about July 21, 2010, Patient Ten, a 41-year-old woman, began receiving psychiatric treatment from Dr. Chavason at Holiner Group for depression, anxiety and past eating disorder.[62] Patient Ten testified under oath at her deposition that her appointments with Dr. Chavason never felt like a "formal" doctor-patient relationship and that Dr. Chavason was always very chatty and made personal remarks, but that their interactions got increasingly uncomfortable and invasive.[63] Patient Ten, who is a nurse with experience in patient boundaries, testified that she did not think it was appropriate when Dr. Chavason tried to hug her at every visit.[64] Dr. Chavason commented on Patient Ten's desirability, calling her hot and asking about her sexual satisfaction with her husband. Dr. Chavason asked what foreplay she liked and told her that he was great at oral sex and could satisfy her better than her husband. Dr. Chavason even offered to take Patient Ten out on a date when her husband was away and replied "who cares" when she pointed out that they were both married.[65]

---

[62] Staff Ex. 10B, TMB3677-3679
[63] Staff Ex. 10A, depo transcript 14:11-25
[64] Staff Ex. 10A, depo transcript 15:18-18:23
[65] Staff Ex. 10A, depo tr. 24:5-13; 33:1-13; 34:20-35:17; 39:13-40:21; 50:11-51:23; 58:14-59:16

Dr. Chavason told Patient Ten he would diagnose her as bipolar so that she could see him instead of a nurse practitioner and inaccurately recorded her vitals in the medical record.[66]

On or about August 1, 2017, Patient Ten's care was transferred to Walter Elliston, M.D., another provider at Holiner Group.[67] After she was no longer a patient of Dr. Chavason, Patient Ten ran into Dr. Chavason in the lobby of Medical City Dallas. Dr. Chavason told her that since she was no longer his patient, they could go out. Dr. Chavason tried to give her his number, but Patient Ten declined. Patient Ten later told Dr. Elliston about Dr. Chavason's inappropriate conduct. Dr. Elliston submitted a note dated April 4, 2018, to Holiner Group, a copy of which was included in Dr. Chavason's employment file.[68]

Commenting on a psychiatric patient's appearance, denigrating her spouse, and propositioning her for dates and sex is a violation of sections 164.051(a)(1), 164.051(a)(6), and 164.052(a)(5) of the Act and the following TMB Rules: 190.8(1)(C), failure to use proper diligence in one's professional practice; 190.8(2)(F), engaging in sexually inappropriate behavior or comments directed towards a patient; 190.8(2)(K), behaving in an abusive or assaultive manner towards

---

[66] Staff Ex. 10A, depo transcript at 12:22-13:17; 19:6-20:24; 26:15-28:16
[67] Staff Ex. 10B, TMB3972-3975
[68] Staff Ex. 10A, depo transcript 74:9-80:15; Staff Ex. 1C, TMB834

a patient or the patient's family or representatives that interferes with patient care or could be reasonably expected to adversely impact the quality of care rendered to a patient; and 190.8(2)(P), behaving in a disruptive manner toward licensees, hospital personnel, other medical personnel, patients, family members or others that interferes with patient care or could be reasonably expected to adversely impact the quality of care rendered to a patient.

## I.    Substantial evidence related to Patient Nine.

On or about December 19, 2017, Patient Nine, a 22-year-old woman, began receiving psychiatric treatment from Dr. Chavason at MCGO, where she was admitted following a suicide attempt in which she made superficial cuts to her throat. Patient Nine disclosed her history of sexual assault in adolescence during her intake.[69] Dr. Chavason evaluated Patient Nine while she was an in patient at MCGO. Patient Nine testified under oath at her deposition that Dr. Chavason called her a "crazy hot bitch." She outcried to her father, but he dismissed her concerns.[70] Patient Nine was discharged from the inpatient program to the outpatient program at MCGO on December 26, 2017.[71]

---

[69] Staff Ex. 9B, TMB3166-3167
[70] Staff Ex. 9A, depo transcript 18:5-19:2
[71] Staff Ex. 9B, TMB3125-3126

Dr. Chavason was also Patient Nine's physician during her outpatient program. On January 4, 2018, Patient Nine had a medication management visit with Dr. Chavason. Patient Nine mentioned that her leg hurt from exercising and Dr. Chavason said if he could, he would massage it for her and that she had a "great body and didn't need to work out."[72] Dr. Chavason hugged Patient Nine at the end of the session, which was captured on video in his office. As Patient Nine exited his office door, Dr. Chavason reached up and stroked her hair without her knowledge. Upon viewing the video, Patient Nine testified said she felt as though she was watching "prey versus predator."[73]

On January 5, 2018, Dr. Chavason had a medication management session with Patient Nine. Patient Nine testified that she tried to be less presentable to deflect Dr. Chavason's interest.[74] Patient Nine testified that she offered to play Dr. Chavason one of her songs on her phone when he asked about her hobbies. She put her phone on the desk while the song was playing, and Dr. Chavason picked it up and went through her pictures. When Patient Nine got her phone back, she saw that Dr. Chavason was looking at a picture of her in her nightgown, which made her feel embarrassed.[75] At the end of the video, Patient Nine is depicted attempting to shake

---

[72] Staff Ex. 9B, TMB3347-3349; Staff Ex. 9A, depo transcript 20:16-21; 92:12-19; 103:9-25
[73] Staff Ex. 9D (Patient Nine); Staff Ex. 9A, depo transcript 63:16-65:3
[74] Staff Ex. 9B, TMB3343-3345; Staff Ex. 9D (PatNine1_5_18); Staff Ex. 9A, depo tr. 74:11-19
[75] Staff Ex. 9A, depo transcript 45:9-21; 55:2-17; 59:3-60:10

hands across the desk, because she sensed that Dr. Chavason did not have good intentions. Dr. Chavason stood up and told Patient Nine to hug him anyway. The hug is seen on camera.[76]

On January 8, 2018, Dr. Chavason had a medication management visit with Patient Nine.[77] Patient Nine testified that she mentioned that she was having financial difficulties and had not eaten, to which Dr. Chavason replied that he could bring her food or buy her groceries and bring it to her apartment. Patient Nine interpreted it as "groceries for sex."[78] Dr. Chavason once again pulled Patient Nine in for a hug at the end of the visit, and Patient Nine testified that Dr. Chavason moaned in her ear. Patient Nine believed that Dr. Chavason had an erection that he brushed against her.[79]

On January 9, 2018, Patient Nine had a medication management visit with Dr. Chavason. In the visit note, Dr. Chavason wrote that he was trying to improve the patient's self-esteem and "made it clear there would never be anything more than a doctor-patient relationship and apologized if she got the wrong impression."[80] Patient Nine testified that at this visit, she confronted Dr. Chavason and told him

---

[76] Staff Ex. 9A, depo transcript 72:10-73:15; Staff Ex. 9D (PatNine1_5_18)
[77] Staff Ex. 9B, TMB3339-3341
[78] Staff Ex. 9A, depo transcript 99:18-101:24; 139:2-141:3
[79] Staff Ex. 9D (PatNine1_8_18); Staff Ex. 9A, depo tr. 98:11-13; 120:7-121:20; 144:13-145:23
[80] Staff Ex. 9B, TMB3335-3337

that she was uncomfortable with how he spoke to her. Dr. Chavason tried to minimize her complaint and said that he had a wife and daughter and was just trying to fit into her environment.[81] Patient Nine complained to MCGO, and an investigation was opened.[82] Patient Nine stopped attending the outpatient program.[83]

Dr. Ziv called Dr. Chavason's conduct toward Patient Nine "grossly inappropriate, unethical, harmful, inexcusable, damaging," and "abusive."[84]

Commenting on the psychiatric patient's appearance, suggesting they meet outside of the office, stroking the patient's hair, and hugging the patient with an erection is a violation of sections 164.051(a)(1), 164.051(a)(6), and 164.052(a)(5) of the Act and the following TMB Rules: 190.8(1)(C), failure to use proper diligence in one's professional practice; 190.8(2)(F), engaging in sexually inappropriate behavior or comments directed towards a patient; 190.8(2)(K), behaving in an abusive or assaultive manner towards a patient or the patient's family or representatives that interferes with patient care or could be reasonably expected to adversely impact the quality of care rendered to a patient; 190.8(2)(P), behaving in a disruptive manner toward licensees, hospital personnel, other medical personnel, patients, family

---

[81] Staff Ex. 9A, depo transcript 83:15-84:24
[82] Staff Ex. 1B, TMB107-108 (Green Oaks Peer Review Records)
[83] Staff Ex. 9B, TMB3316-3333
[84] Tr. Vol. 4 at 365:16-21

members or others that interferes with patient care or could be reasonably expected to adversely impact the quality of care rendered to a patient.

## J. Discipline by Peers and Resignation under Investigation – 2018.

Dr. Joel Holiner, who is the sole owner of Holiner Group, testified under oath in a deposition and at the hearing on the merits that he was involved in employee discipline and termination and authorized investigations for employee and patient complaints. Dr. Holiner also testified that he has been involved in over a hundred peer review actions, was medical director at Medical City Dallas, and sat on the MCGO peer review committee during all times relevant to TMB Staff's complaint.[85]

### 1. Dr. Chavason's termination from Holiner Group.

Dr. Chavason sent a letter of resignation to Holiner dated January 1, 2018, giving his 90-day notice. Dr. Chavason testified that, at least in part, he resigned because he felt he was being singled out for discipline.[86] On or about January 9, 2018, Patient Nine complained to MCGO about Dr. Chavason's conduct, which initiated an investigation.[87] On January 12, 2018, in a letter included in Dr. Chavason's employment file, Dr. Holiner terminated Dr. Chavason from Holiner Group, effective immediately.

---

[85] Tr. Vol 2 at 123:10-124:12; 125:18-126:2; 127:10-131:6 and 232:7-10; Staff Ex. 27, depo tr. 12:3-19
[86] Staff Ex. 1C, TMB820; Tr. Vol. 7 at 926:19-927:20
[87] Staff Ex. 1B, TMB98-99 and TMB107-108

The letter detailed that the decision was based on Patient Nine's complaint. Dr. Holiner testified that during the MCGO peer review investigation, he reviewed the video of Dr. Chavason stroking Patient Nine's hair. He stated the video was consistent with Patient Nine's complaint and that viewing the video played a large role in why he terminated Dr. Chavason.[88] Dr. Chavason notably denied stroking Patient Nine's hair at trial, despite evidence to the contrary.[89]

### 2. Dr. Chavason's resignation from MCGO and Medical City McKinney and Relinquished Privileges from Medical City Dallas.

On January 16, 2018, a Peer Review Committee meeting was held at MCGO. Dr. Chavason attended the meeting and was asked questions about Patient Nine. Additional concerns about Dr. Chavason's past conduct were also discussed. After the meeting, on January 16th, Dr. Chavason emailed the CEO of MCGO resigning, effective immediately. MCGO accepted his resignation while under investigation in a letter dated January 22, 2018. The letter also detailed that the committee had voted to recommend Dr. Chavason's privileges be terminated.[90] On or about February 28, 2018, Dr. Chavason resigned his privileges at Medical City-McKinney.[91]

---

[88] Staff Ex. 1C, TMB821-822; Tr. Vol. 2 at 233:17-234:18
[89] Tr. Vol. 7 at 927:21-929:2
[90] Staff Ex. 1B, TMB98-101 and TMB106 (*see also*: Staff Ex. 9C, TMB3430-3433)
[91] Tr. Vol. 7 945:6-10

Medical City Dallas sent Dr. Chavason a letter dated April 17, 2018, detailing that Dr. Chavason's privileges were relinquished because he failed to report his resignation while under investigation at MCGO to Medical City Dallas, a violation of their credentialing policy.[92]

Dr. Chavason's resignation while under investigation for unprofessional conduct towards a patient violates Section 164.051(a)(7) of the Act which authorizes the TMB to take disciplinary action against Dr. Chavason based on disciplinary action taken by Dr. Chavason's peers, as further defined by TMB Rule 190.8(4), related to disciplinary action by peers.

### K. Aggravating Factors.

TMB Rule 190.14 provides that the TMB may impose more restrictive sanctions when there are multiple violations of the Act. TMB Rule 190.15 provides that the TMB may consider aggravating factors that warrant more severe or restrictive disciplinary action. 22 Tex. Admin. Code § 190.15. This case includes the following aggravating factors:

### 1. Continued Violations Despite Remedial Education.

On or about March 30, 2015, Dr. Chavason completed a Sexual Harassment and Prevention training and Counseling Workshop by the Sexual Harassment

---

[92] Respondent Ex. 21

Prevention Institute, LLC.[93] On or about August 1, 2015, the Holiner Group adopted an Employee Handbook Romantic Relationships Policy, which Dr. Chavason reviewed and signed. The policy detailed rules governing contact and relationships with patients and coworkers. The agreement also mandated that Dr. Chavason attend a course on boundaries, go to a minimum of three therapy sessions, and get a letter of clearance from that therapy provider. The agreement stated that if Dr. Chavason did not follow these guidelines or had any future violations, he could be subject to termination.[94]

On or about October 9, 2015, Dr. Chavason completed the Vanderbilt University Maintaining Proper Boundaries Course.[95] The evidence above shows that Dr. Chavason continued committing boundaries violations that harmed patients with at least Patient Two, Six, Seven, Nine, Ten and Twelve even after completing both boundaries courses.

### 2. Continued Violations Despite Warnings and Disciplinary Action.

On or about July 15, 2014, Dr. Chavason was told that texting patients raises security and HIPAA issues and could result in a fine. Dr. Holiner testified that he discussed the issue of texting with Dr. Chavason and that Holiner Group does not

---

[93] Staff Ex. 1C, TMB799
[94] Staff Ex. 1C, TMB803-804
[95] Staff Ex. 1C, TMB810

allow providers to text patients.[96] On or about October 22, 2014, the Holiner Group admonished Dr. Chavason, via email, for having undocumented contact with patients. The practice administrator noted that there were patients on Dr. Chavason's schedule that did not have phone messages or documented indication as to how their appointments were scheduled. Dr. Chavason was told that every patient phone call, conversation, and interaction should be documented.[97]

On October 27, 2014, everyone at the Holiner Group was told not to lock doors via email. This was to address the instance on October 17, 2014, where Dr. Holiner tried to enter Dr. Chavason's office, but found that the door was locked with Patient Two inside. Dr. Chavason responded flippantly to the email. Dr. Holiner testified that he told Dr. Chavason that locking doors is not an option.[98]

On or about January 12, 2015, Dr. Holiner met with Dr. Chavason in the physician's lounge to discuss "problematic" practice issues related to documenting patient phone calls, not having sessions with patients with no staff in office, scheduling his own patients/changing his schedule without staff knowledge, long appointments with female patients, and locking doors. Dr. Holiner noted that he asked Dr. Chavason to consider if Dr. Chavason was meeting his own needs and

[96] Staff Ex. 1C, TMB766; Tr. Vol. 2 at 164:25-165:6
[97] Staff Ex. 1C, TMB772; Tr. Vol. 2 at 165:7-19
[98] Staff Ex. 1C, TMB769 and 781; Tr. Vol. 2 at 167:22-169:8 and 172:10-173:1

gratification by giving extra attention to some patients. Dr. Holiner testified that this was not the first conversation he had had with Dr. Chavason and that these were continued problems with Dr. Chavason not following office guidelines.[99]

On or about March 3, 2015, Patient One complained to Holiner Group about the clock incident; and Lydia Martinez, a human resources consultant that Holiner testified he brought in to conduct an investigation, created a report (Martinez report). The report noted that Dr. Chavason had previously been the subject of past complaints and found that Dr. Chavason's conduct supported a finding of sexually harassing behavior, that he had a disregard for the rules, posed a high risk of further sexual misconduct and that his credibility had been damaged. The report went on to recommend that Dr. Chavason complete a workshop or training related to physician-patient relationships, sexual harassment, and ethics (the Sexual Harassment Prevention training mentioned in the above section A).[100]

On or about March 12, 2015, Dr. Chavason was made to sign an "Office Concerns" policy form which listed numerous issues that had been previously discussed, mandated that Dr. Chavason attend a workshop per the Martinez report, and articulated that he could be subject to disciplinary action if these demands were

---

[99] Staff Ex. 1C, TMB786; Tr. Vol. 2 at 178:3-179:23
[100] Staff Ex. 1C, TMB788 -791; Tr. Vol. 2 at 185:15-189:16

not followed.[101] On or about August 4, 2015, the Holiner Group evaluated whether Dr. Chavason was complying with the March 12th agreement. There were still similar concerns, and Dr. Chavason was advised to attend therapy and complete the PACE boundaries course. Dr. Holiner testified that he continued to feel that Dr. Chavason was trying to meet his own needs rather than doing what was right for the patient and that, at that point, he could be subject to termination or more disciplinary action.[102]

On or about June 23, 2016, Dr. Holiner met with Dr. Chavason about Patient Seven's complaint that Dr. Chavason had told Patient Seven she had a "nice butt" and that the patient who had exposed himself to her had "good taste." Dr. Holiner told Dr. Chavason that MCGO would likely contact him and again discussed boundaries.[103] On January 19, 2017, an office-policies document included in Dr. Chavason's employment file noted that he had failed to comply with previous agreements and noted boundary issues like calling staff "hot." Dr. Chavason was suspended for three days and ordered to do patient rounds at McKinney hospital, a hospital that no other doctors wanted to cover. Interestingly, as Dr. Chavason conceded, there would be more oversight there, as Dr. Chavason would not have

---

[101] Staff Ex. 1C, TMB792-793: Tr. Vol. 2 at 191:9-196:12
[102] Staff Ex. 1C, TMB803-804; Tr. Vol. 2 at 212:2-213:17
[103] Staff Ex. 1C, TMB813; Tr. Vol. 2 at 219:19-220:17

been alone with patients. Dr. Holiner testified that at this point, he was "frustrated" with Dr. Chavason.[104]

A timeline of Dr. Chavason's infractions was included in his employment file, a document that Dr. Holiner testified he thought would be good to create to have perspective on Dr. Chavason's conduct in the lead up to termination.[105] On or about January 12, 2018, as noted above, Dr. Chavason was terminated from Holiner Group, effective immediately. Shortly thereafter, on January 28, 2018, Holiner Group submitted a complaint to the TMB against Dr. Chavason based on Patient Nine's complaint and "years of behaviors that are similar."[106] Dr. Chavason's conduct continued unabated, despite the aforementioned remedial education and despite numerous warnings and disciplinary actions by his employer.

3. **Inappropriate Conduct towards and Sexual Harassment of Subordinate Employees.**

Dr. Chavason's inappropriate and unprofessional conduct extended to female subordinates. Employee One, a 32-year-old woman, began working as a Nurse Practitioner at Holiner Group and MCGO in or around 2009. Employee One testified under oath at a deposition that over the course of working with Dr.

---

[104] Staff Ex. 1C, TMB814; Tr. Vol. 2 at 221:18-223:12; Tr. Vol. 7 at 922:25-923:23
[105] Staff Ex. 1C, TMB817-819; Tr. Vol. 2 at 225:3-12
[106] Staff Ex. 1C, TMB828-829; Staff Ex. 34, TMB14813-14815

Chavason, he became more possessive and checked in on her, which set off her "red flags;" Dr. Chavason would check her patient caseload to make sure most were with him. Dr. Chavason would come into her office and massage her shoulders, which made Employee One uncomfortable. Dr. Chavason would pull Employee One close, hug her, tried to kiss her twice and groped her bottom. Employee One testified to feeling confused because this was her supervising physician that she thought she could trust.[107] On one occasion over a weekend, Employee One testified that after she and Dr. Chavason rounded on patients, they went back to Holiner Group. Dr. Chavason and Employee One had unprotected sexual intercourse on a couch in one of the offices. Employee One testified that although Dr. Chavason did not force her to have sex with him, she felt like she had to do it.[108] When Employee One began setting boundaries after this incident, Dr. Chavason became possessive and would call her at night. Once, Dr. Chavason mentioned her dating profile on Plenty of Fish. Employee One said she felt violated because Dr. Chavason had clearly been researching her on the internet.[109] Employee One told a fellow nurse in the office about Dr. Chavason making her feel uncomfortable. She also told Dr. Holiner, who stated that they would have to conduct an investigation, which involved getting a

[107] Staff Ex. 14, depo transcript 10:13-11:3; 33:9-35:18; 38:4-14; 40:2-43:24
[108] Staff Ex. 14, depo transcript 38:15-39:4; 45:16-47:4; 47:18-51:3
[109] Staff Ex. 14, depo transcript 51:22-52:22; 53:7-55:9

statement from all relevant employees. Dr. Holiner advised Dr. Chavason that it was important to maintain a professional relationship with coworkers and not have it evolve into a personal relationship. An investigation memo was created and added to Dr. Chavason's file. Employee One was ultimately reassigned to a new physician.[110]

In October 2014, staff at Holiner Group committed a note to Dr. Chavason's file regarding Employee Two, a 22-year-old woman who worked as a technician at Green Oaks Hospital. Dr. Chavason was seen on video sharing a Coke, hugging, and attempting to hold hands with Employee Two. Employee Two was written up for poor performance while working, since Dr. Chavason was pulling her away from her work duties. Dr. Holiner testified that he discussed the inappropriateness of what he viewed on the video with Dr. Chavason and communicated to him that if the behavior continued, there would be consequences.[111] Employee Two testified under oath at a deposition that Dr. Chavason started out by spending more time chatting with her and asking her about her personal life, including who she was dating. Dr. Chavason would find ways to touch her unnecessarily on her shoulder or the small of her back during work.[112] Dr. Chavason also went through Employee Two's phone without her permission to find pictures of her and commented on her attractiveness

---

[110] Staff Ex. 1C, TMB722-725; Tr. Vol. 2 at 143:23-146:21; Staff Ex. 14, depo tr. 66:11-67:2
[111] Staff Ex. 1C, TMB768; Tr. Vol. 2 at 161:6-162:10
[112] Staff Ex. 16, depo transcript 35:14-37:2; 37:9-24; 53:12-54:12

in her photos. He told her she had a "good body" and a "good butt."[113] Dr. Chavason would purchase Coca-Colas for Employee Two and get her sandwiches from the cafeteria.[114] Employee Two described the incident where Dr. Chavason grabbed her hand in the parking lot, an action that "startled" her.[115] Employee Two testified that Dr. Chavason's conduct impacted her ability to do her job and impacted patient care by taking away her availability to patients.[116]

Staff's expert opined that medical ethics advise against sexual contact with subordinates because of a power differential; the relationship can become problematic and coercive, since the subordinate individual may be worried about economic or employment consequences.[117]

### 4. Harm to one or more patients.

The evidence presented during this hearing with respect to Dr. Chavason's care and treatment of Patients One, Two, Six, Seven, Nine, Ten, Eleven, and Twelve show that there was harm to more than one patient. *See* App. Tab 1 at 119. These patients suffered psychological harm from Dr. Chavason's inappropriate actions. *Id.* at 106. Further, several of the patients expressed distrust for medical professionals

---

[113] Staff Ex. 16, depo transcript 39:7-42:21
[114] Staff Ex. 16, depo transcript 61-62
[115] Staff Ex. 16, depo transcript 61:2-64:9
[116] Staff Ex. 16, depo transcript 79:11-23
[117] Tr. Vol. 4 at 381:20-383:11

following their interactions with Dr. Chavason, as noted above. Patient Nine even stopped attending her outpatient program after the inappropriate words and actions of Dr. Chavason. *Id.*

Evidence was also presented that Dr. Chavason's employer documented concerns about multiple past complaints and incidents with more than one patient.

## 5.    The severity of patient harm.

The harm to all patients was severe. The ALJs found that:

> Dr. Chavason's actions resulted in severe harm to multiple patients. Patient One testified that the prescriptions Dr. Chavason prescribed her affected her personal life and memory function. Patient Eleven was traumatized and felt sexually abused as a result of her interactions with Dr. Chavason. Patient Nine left her outpatient program and feels that she has a phobia around older male professionals after Dr. Chavason's actions. Patients Four and Seven testified credibly that Dr. Chavason's actions resulted in them losing trust in male healthcare providers completely and seeing only female healthcare providers. Patient Six testified that Dr. Chavason's actions negatively affected her because it brought up issues related to her being a survivor of sexual abuse. Patient Ten no longer wants to receive treatment from a psychiatrist because of Dr. Chavason's actions.

*Id.*

## 6.    Increased potential for harm to the public.

The facts in evidence demonstrate that Dr. Chavason presents increased potential for harm to the public because he is not truthful, he has not taken responsibility for the harm done to his patients, and he has shown no remorse or

regret. In short, he preyed on vulnerable, female patients to satisfy his own physical and emotional needs. *Id.* at 107. Moreover, he has a history of disregarding warnings and admonitions from his employer and continuing to behave inappropriately towards patients even when warned. *Id.*

### 7. Attempted concealment of the act(s) constituting a violation.

Dr. Chavason attempted to conceal his conduct with many of these patients by continuing to deny the overwhelming evidence and video depictions of him acting inappropriately. *Id.* He has denied hugging patients, calling it a "lean in, side hug" even when anyone can see him wrapping both arms around and having a lingering touch on at least two patients: Patient Nine and Patient Twelve. *Id.* [118]

### 8. Intentional, premeditated, knowing, or grossly negligent acts constituting a violation.

Engaging in sexual contact and making inappropriate comments to patients was intentional, as reflected by the numerous discussions, warnings and disciplinary sanctions Dr. Chavason was given by his employer, *see Id.* at 108, none of which deterred him from continuing to engage in inappropriate conduct. Dr. Chavason took a boundaries course and still did not heed the advice in the curriculum about avoiding close personal relationships with employees and patients. App. Tab 1 at 108.

---

[118] *See also, e.g.,* Tr. Vol. 7 at 816

9. **Other relevant circumstances increasing the seriousness of the misconduct.**

Dr. Chavason has had multiple complaints against him documented in his employment file and had two separate TMB complaints about unprofessional conduct, all spanning more than a decade.[119] Staff's expert Dr. Ziv noted that Dr. Chavason's tendency to push boundaries and scale up his conduct and comments, depending on the reaction, is troubling. Many of the patients echoed the sentiment that Dr. Chavason seemed to be testing their boundaries and that he would push further if given the chance.[120]

Dr. Chavason failed to maintain professional boundaries with patients and employees and resigned while under investigation by his peers for several instances of misconduct. Dr. Chavason, a psychiatrist treating vulnerable patients, posed inappropriate questions of a sexual nature, commented on patients' physical appearance and sexual desirability, fondled, groped, and in several instances, engaged in sexual contact with patients.[121] TMB Staff's expert opined that Dr. Chavason's behavior was detrimental to these patients and was grossly inappropriate, unethical, harmful, inexcusable and damaging.[122] Dr. Chavason's

---

[119] Staff Exs. 1B and C, 11F and 34
[120] *See, e.g.*, Staff Ex. 6A, Patient Six depo. tr. at 37-39, 52-53; Staff. Ex. 7A, Patient Seven depo. tr. at 21, 45, 58; Staff Ex. 10, Patient Ten-A depo. tr. at 17, 24, 43, 58, 59
[121] *See,* App. Tab 1 at 24, 40, 44-48, 109-110, 113-115, 121
[122] Tr. Vol. 4 at 365

inappropriate conduct, physical contact, and unwanted sexual advances extended to female subordinates with whom he worked.

## II. Response to Dr. Chavason's Arguments.

### A. Jurisdictional Issues.

It is difficult to decipher Dr. Chavason's jurisdictional allegations in his brief. The TMB believes the gravamen of his argument is that SOAH lacked jurisdiction because there were, according to him, no ISCs for all of the patients subject to the SOAH proceeding. *See* Chavason Br. at 7. Dr. Chavason further claims that conducting ISCs and providing notice and the opportunity to be heard are "statutory prerequisites" to SOAH jurisdiction. *Id.* Yet, he provides no authority for such a claim, and the TMB is unaware of any statute or case law that specifically provides that ISC requirements are jurisdictional.

More importantly, TMB Staff alleged in the SOAH complaints that Dr. Chavason received notice of one or more ISCs, that all jurisdictional prerequisites have been met, and that the TMB complied with all procedural rules. AR 298-299, 676-677. The Third Court of Appeals has held that is sufficient to establish jurisdiction:

> The administrative record refutes appellant's complaints that these jurisdictional requirements were not satisfied. The Board filed a sworn complaint with SOAH alleging violations of the Medical Practice Act against appellant based on his treatment of E.R. In its sworn complaint,

> the Board averred that an informal settlement conference was held on September 16, 2005 in accordance with government code section 2001.054(c) and section 164.004 of the Medical Practice Act. ***The Board's sworn complaint was sufficient to satisfy the statutory jurisdictional requirements****. See* Tex. Gov't Code Ann. § 2001.054(c); Tex Occ. Code Ann. § 164.004; *see also Guerrero-Ramirez v. Texas State Bd. of Med. Exam'rs,* 867 S.W.2d 911, 917-18 (Tex. App. Austin 1993, no writ) (finding that Board complaint was sufficient to satisfy requirements in section 2001.054 as long as it adequately informs the licensee of the subject matter of the hearing).

*Rodriguez-Aguero v. Tex. Med. Bd.*, No. 03-09-00262-CV, 2010 WL 1730023, at *11 (Tex. App.—Austin Apr. 30, 2010, no pet.) (mem. op.) (Emphasis added).

Even if the Court could disregard TMB Staff's jurisdictional allegations, it remains that Dr. Chavason was fully apprised of the charges regarding his patients. He stipulated that he attended the 2011 and 2018 ISCs. AR 6424. The 2011 ISC involved Patient 11. The underlying case was eventually dismissed for lack of evidence. However, section 154.051(e) of the Act authorizes the TMB to revive previously dismissed cases at the SOAH stage. Tex. Occ. Code § 154.051(e) ("On receipt of a complaint, the board may consider a previously investigated complaint to determine whether there is a pattern of practice violating this subtitle."). That section does not require a second show-compliance proceeding on those dismissed allegations. To hold otherwise would frustrate the TMB's ability to act quickly to protect the public when it becomes

apparent that there is a pattern of violations, in this case Dr. Chavason's multiple violations of his patients' sexual and other boundaries.

There was another ISC in 2018 concerning Dr. Chavason's Patients 1, 2 and 8. The summary of allegations for those ISCs also noted that Chavason was subject to a peer review investigation and resigned his privileges while the investigation was pending, based upon boundary violations related to the three patients.[123]

Dr. Chavason's other patients are referenced in two peer review files that were provided to Dr. Chavason as part of the materials to discuss at the ISC (found at Exhibit 1). Those files were the Holiner Group peer review file, and the Green Oaks peer review file.[124]

In summary, all of these patients were named and identified in the 2011 and 2018 cases that were part of the ISC procedures that Dr. Chavason received notice of and in which he participated. Four patients were specifically named in the

---

[123] Staff Ex. 3 (Patient One); Ex. 4 (Patient Two)
[124] Staff Ex. 1C at 784 (Patient Three in Holiner Group peer review)
*Id.* at 770, 772, 784, 785, 794, 798 (Patient Five in Holiner Group peer review file)
*Id.* at TMB800 (Patient Six in Holiner Group peer review file)
*Id.* at TMB813, 818 *(*Patient Seven in Holiner Group peer review file)
Staff Ex. 1B at TMB98, 99, 107-108, 116-117 (Patient Nine in Green Oaks peer review file)
Staff Ex. 1C at TMB 821-836 (Patient Nine in Holiner Group peer review file)
*Id.* at TMB 834 (Patient Ten in Holiner Group peer review)
*Id.* at TMB 802 (Patient Twelve in Holiner Group peer review)

summary of allegations and eight others were part of the peer review files that evidenced the peer review action taken against his license. Dr. Chavason was provided notice that the alleged violations included the peer review investigation and his resignation of privileges, and the peer review file was provided to him as part of the ISC packet.[125] He was on notice that those patients were at issue and the TMB considered those patients as part of the informal settlement process for that case.

Finally, this Court can affirm the TMB Final Order on any basis in the record. *Grubbs Nissan Mid-Cities, Ltd. v. Nissan N. Am., Inc.*, No. 03–06–00357–CV, 2007 WL 1518115, at *3 (Tex. App.—Austin May 23, 2007, pet. denied) (mem op.) ("When a court reviews an agency decision under the substantial evidence rule, the issue for the reviewing court is not whether the agency's decision was correct, but whether the record demonstrates some reasonable basis for the agency's action."). *See also Central Power & Light Co. v. Pub. Util. Comm'n*, 36 S.W.3d 547, 561 (Tex. App.—Austin 2000, pet. denied). Even if the Court were to disregard *Rodriguez-Aguero* and Dr. Chavason's peer review files, there is still overwhelming substantial evidence to support revocation of Dr. Chavason's license based on the four patients named in the 2011 and 2018 ISCs along, i.e., Patients One, Two, Eight and Eleven. *See* discussion above. In fact, Dr. Chavason's abuse of Patient Eleven would alone

---

[125] Staff Ex. 42B (February 21, 2018 letter)

support revocation of his license. The evidence regarding that patient is not only substantial it is conclusive. Dr. Chavason flirted with her, asked her questions about her sexual preferences, and told her "if she wasn't his patient, he would do [her] right there on his desk." He rubbed the front part of his body on her backside as she exited the door and, in another visit, he approached her on her side of his desk, hugged her, pulled her close and squeezed her breasts and buttocks. Dr. Chavason also asked Patient Eleven to taste her breast milk, lifting her blouse and sucking both of her nipples. He also put his foot against his office door to block entry and masturbated her and that he pulled down his boxers and had her perform oral sex on him intermittently because he was nervous about getting caught. In yet another visit, Dr. Chavason again groped Patient Eleven and used his foot to block entry to his office while he attempted to insert his fingers into her vagina, and then unzipped his pants, pulled down his boxers and had Patient Eleven go back and forth between masturbating him and performing oral sex on him.

## B. Due Process.

Dr. Chavason's due process arguments are baseless. TMB Staff's complaints fully apprised him of the charges and applicable law. AR 298, 676. *See Leonard v. Tex. Med. Bd.*, 656 S.W.3d 456, 463 (Tex. App.—El Paso 2022, pet. denied) ("Here, the administrative record reflects the Board filed a sworn complaint with SOAH against

Dr. Leonard based on alleged violations of the Texas Medical Practice Act. The complaint detailed specific factual allegations and corresponding statutory violations sufficient to notify Dr. Leonard of 'the nature of the complaint.' Thus, the Board's complaint satisfied the statutory jurisdictional requirements.").

Furthermore, Dr. Chavason fully participated in the SOAH contested case proceeding, including conducting discovery, calling witnesses (including testifying himself and offering the testimony of his own expert), cross-examining TMB Staff's witnesses, and being able to fully brief the issues.

Dr. Chavason's claim that TMB Staff failed to "connect facts to violations" is equally baseless. Dr. Chavason simply wants the Court to second-guess the ALJs' discretion on this issue. Dr. Chavason cannot show how the facts were not connected to the violations. That was done through extensive documentary evidence and witness testimony. This is nothing more than an attempt to have the Court re-weigh the evidence in direct violation of the well-settled substantial evidence standard of review.

Dr. Chavason's argument that TMB Staff failed to comply with SOAH Order No. 1 regarding "harm" is wrong. That order directed TMB Staff to file an amended complaint reorganizing the allegations into certain categories, i.e. alleged conduct

with patients, alleged conduct with employees, peer discipline matters, etc. AR 253. TMB Staff's amended complaints complied with this directive. AR 298, 676.

Dr. Chavason's claim that his repeatedly hugging his patients did not cause harm is specious. Dr. Ziv stated that the act of hugging patients, in general, from a psychiatric practice, is damaging or is potentially damaging.[126] Dr. Chavason's expert Dr. Adhia admitted that he does not hug his patients.[127] However, Dr. Chavason testified throughout trial with respect to multiple patients that he was a hugger and hugged patients.[128] It was evident in the videos TMB Staff presented as evidence that he continued to hug patients even when they tried to shake his hand or avoid his embrace.[129] Moreover, Dr. Chavason's employer told him not to be so casual with patients and not to hug them, by Dr. Chavason's own admission, yet he continued to do so. Tr. Vol. 6 at 727, 779. What's more, Dr. Chavason was adamant he did not hug patients after taking a boundaries course in 2015, a clear falsehood when you consider the evidence that shows that hugs with Patients Nine and Twelve all took place after 2015.[130] Even if a patient did not object to being hugged by Dr. Chavason, it was inappropriate to hug her frequently, as it eroded the therapeutic

---

[126] Tr. Vol. 4 at 437
[127] Tr Vol. 9 at 1146
[128] *See, e.g.* Tr. Vol. 8 at 976-977
[129] Staff Ex. 9D
[130] Tr. Vol. 6 at 758, 779; Tr. Vol. 7 at 829; Staff Exs. 9D and 12B

relationship with the patient, there was a power differential, and hugs went against Dr. Chavason's employer's protocols.

Dr. Chavason goes on to make a desperate claim that TMB Staff "manipulated" and "woodshedded" witness testimony. Chavason Br. at 23-25. He alleges that TMB Staff violated ethical rules by providing fact witnesses with statements related to other alleged victims. To the contrary, TMB Staff merely provided the witnesses with the SOAH complaint, a publicly available document. It is true that interviews were conducted with each of the fact witnesses in this case prior to their depositions. That is commonplace in any type of litigation. There is nothing nefarious about the standard practice of witness preparation. Any good lawyer should prepare a witness thoroughly for deposition testimony; failure to do so could show a lack of diligence and result in poor trial outcomes.[131]

## C. Dr. Chavason's other arguments.

Dr. Chavason further claims that the "ALJ excluded evidence that TMB Staff Attorneys actively interfered with revealing the truth about how heavy-handed TMB Staff Attorneys had fabricated the case against Chavason at SOAH" and that "[t]his testimony would have provided indisputable evidence that the TMB Staff Attorneys' manipulation of witnesses was the exclusive TMB investigation for most

---

[131] *See* AR 5963 (27 A.F.L. Rev. 21)

allegations in the Complaints at SOAH." Chavason Br. at 25. This is nothing other than pure speculation and is just part of Dr. Chavason's strategy to "throw mud at the wall and see what sticks." Dr. Chavason cannot demonstrate that the ALJs abused their discretion in admitting testimony and ruling on objections. *Granek*, 172 S.W.3d at 778 (stating that ALJ is sole judge of witness credibility and may accept or reject testimony of any witness).

Dr. Chavason's other claims, including his challenges to the PFD's findings of aggravating and mitigating factors, are also speculative and unsupported. Chavason Br. at 15-31. And, as with many of his other claims, Dr. Chavason is essentially requesting the Court to re-weigh the evidence in violation of the substantial evidence standard of review. *See* Chavason Br. at 31-50. The ALJs are the sole judge of the weight of the evidence and the credibility of the witnesses. *Central Power & Light*, 36 S.W.3d at 561; *Grubbs*, 2007 WL 1518115, at *3. *See also* discussion of the substantial evidence standard of review above.

Dr. Chavason's challenge to the findings of aggravating factors is particularly egregious. The record evidence shows that there are aggravating factors in this case that justify increased disciplinary sanctions, and the ALJs' analysis on this point was reasoned and supported by the record. *See* App. Tab 1 at 105-110. Dr. Chavason has demonstrated a brazen disregard for the Act and TMB Rules that govern his practice

as a physician, as discussed above. That includes well-supported findings that (1) there was harm to more than one patient; (2) several patients were severely harmed, including Patient One who testified that his conduct and prescribing negatively impacted her life, and Patient Eleven who testified to having PTSD, as well as Patient Nine who left the MCGO program without completing it; (3) there were numerous violations involving all twelve of the patients enumerated in TMB Staff's complaints; and he knowingly engaged in repeated sexually inappropriate acts or comments directed towards his female psychiatric patients while employed at the Holiner Group. Notwithstanding all the documentary and videotape evidence, the expert-witness and patient testimony, as well as the testimony of his employer, Dr. Chavason is still trying to conceal his misconduct with denials, mistruths, evasiveness, and a complete lack of accountability, all of which show that he is prone to recidivism and continues to pose a threat to his patients, co-workers, and the public.

## CONCLUSION AND PRAYER

For the reasons discussed above, TMB respectfully requests that this Court affirm the TMB Final Order in all respects.

Dated:       February 11, 2025

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

JAMES LLOYD
Deputy Attorney General for Civil Litigation

ERNEST C. GARCIA
Chief, Administrative Law Division

*/s/ Ted A. Ross*
Ted A. Ross
Assistant Attorney General
State Bar No. 24008890
OFFICE OF THE TEXAS ATTORNEY GENERAL
ADMINISTRATIVE LAW DIVISION
P. O. Box 12548
Austin, Texas 78711-2548
Telephone: (512) 475-4191
Email: ted.ross@oag.texas.gov

***Attorneys for Appellee, Texas Medical Board***

## CERTIFICATE OF COMPLIANCE

In compliance with Texas Rule of Appellate Procedure 9.4(i)(2)(B), this brief contains 14,206 words, excluding the portions of the brief exempted by Rule 9.4(i)(1).

*/s/ Ted A. Ross*
Ted A. Ross
Assistant Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and forgoing document has been served on the 11th day of February 2025 to the following counsel:

Lee Bukstein                    *Via E-Service*
612 Crystal Creek
Austin, Texas 78746
Telephone: (512) 626-0215
Fax: (512) 256-8152
buksteinlegalservices@gmail.com

*Attorney for Appellant,*
*Arthur Arrit Chavason, M.D.*

*/s/ Ted A. Ross*
Ted A. Ross
Assistant Attorney General

# APPENDIX

App. Tab 1 – Proposal for Decision

App. Tab 2 – Final Order

App. Tab 3 – District Court Final Judgment

# APPENDIX
# TAB 1

ACCEPTED
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
2/4/2022 4:52:07 pm
STATE OFFICE OF
ADMINISTRATIVE HEARINGS
Pegah Nasrollahzadeh, CLERK

FILED
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
2/4/2022 4:44 PM
STATE OFFICE OF
ADMINISTRATIVE HEARINGS
Pegah Nasrollahzadeh, CLERK



# State Office of Administrative Hearings

Kristofer S. Monson
Chief Administrative Law Judge

February 4, 2022

Stephen Brint Carlton                                    **VIA EFILE TEXAS**
Executive Director
Texas Medical Board
333 Guadalupe, Tower III, Suite 610
Austin, TX 78701

> **RE:  Docket No. 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.MD; Texas Medical Board v. Arthur A. Chavason, M.D.**

Dear Mr. Carlton:

Please find enclosed a Proposal for Decision in this case.

Exceptions and replies may be filed by any party in accordance with 1 Tex. Admin. Code § 155.507, a SOAH rule which may be found at www.soah.texas.gov.

Sincerely,

/s/ Beth Bierman
Administrative Law Judge

/s/ Amy Davis
Administrative Law Judge

BB/tt
Enclosures

xc:  Kemisha Williams, Staff Attorney, Texas Medical Board, 333 Guadalupe, Tower III, Suite 610, Austin, TX 78701 – **VIA EFILE TEXAS**
Michelle McFaddin, Staff Attorney, Texas Medical Board, 333 Guadalupe, Tower III, Suite 610, Austin, TX 78701 – **VIA EFILE TEXAS**
Robin Etheridge, Hearings Coordinator, Texas Medical Board, 333 Guadalupe, Tower III, Suite 610, Austin, TX 78701 - **VIA EFILE TEXAS**
Lee Bukstein, Attorney, 612 Crystal Creek Austin, TX 78746 – **VIA EFILE TEXAS**

TMB0006684

# SOAH DOCKET NO. 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.MD

| | | |
|---|---|---|
| TEXAS MEDICAL BOARD, | § | BEFORE THE STATE OFFICE |
| Petitioner | § | |
| | § | |
| v. | § | OF |
| | § | |
| ARTHUR ARRIT CHAVASON, M.D., | § | |
| Respondent | § | ADMINISTRATIVE HEARINGS |

## TABLE OF CONTENTS

I. JURISDICTION, NOTICE, AND PROCEDURAL HISTORY ........................................ 1

II. APPLICABLE LAW ................................................................................................. 2

III. STIPULATED FACTS ............................................................................................. 5

IV. STAFF'S FORMAL CHARGES ............................................................................. 6

V. EVIDENCE............................................................................................................... 6

    A.      Patient One .................................................................................................. 8

          1.      Patient One's Testimony ................................................................. 8
          2.      Dr. Chavason's Testimony about Patient One............................. 12

    B.      Patient Two................................................................................................. 15

          1.      Patient Two's Testimony............................................................... 16
          2.      Dr. Chavason's Testimony about Patient Two ............................. 16

    C.      Patient Four................................................................................................ 20

          1.      Patient Four's Testimony.............................................................. 20
          2.      Dr. Chavason's Testimony about Patient Four............................ 21

    D.      Patient Six.................................................................................................. 22

          1.      Patient Six's Testimony ................................................................. 22
          2.      Dr. Chavason's Testimony about Patient Six............................... 24

    E.      Patient Seven ............................................................................................. 26

          1.      Patient Seven's Testimony ............................................................ 26
          2.      Dr. Chavason's Testimony about Patient Seven .......................... 29

TMB0006685

F.      Patient Eight ......................................................................................... 30

        1.      Patient Eight Video ................................................................. 30
        2.      Dr. Chavason's Testimony about Patient Eight ...................... 31

G.      Patient Nine ......................................................................................... 32

        1.      Patient Nine's Testimony ......................................................... 32
        2.      Videos of Patient Nine and Dr. Chavason ............................. 35

                a.      January 4, 2018 Video (1 minute) ............................... 35
                b.      January 5, 2018 Video (1 minute, 31 seconds) .......... 36
                c.      January 8, 2018 Video (1 minute) ............................... 36

        3.      Dr. Chavason's Testimony about Patient Nine ...................... 37

H.      Patient Ten ........................................................................................... 39

        1.      Patient Ten's Testimony ........................................................... 39
        2.      Dr. Chavason's Testimony about Patient Ten ........................ 43

I.      Patient Eleven ...................................................................................... 44

        1.      Patient Eleven's Testimony ..................................................... 44
        2.      Dr. Chavason's Testimony about Patient Eleven .................. 48

J.      Patient Twelve ..................................................................................... 54

        1.      Patient Twelve Video ............................................................... 54
        2.      Dr. Chavason's Testimony about Patient Twelve ................... 56

K.      Employee One....................................................................................... 57

L.      Employee Two ...................................................................................... 58

M.      Dr. Holiner ........................................................................................... 61

N.      First Peer Discipline Action ............................................................... 79

O.      Second Peer Discipline Action ........................................................... 79

P.      Expert Witness Testimony .................................................................. 79

        1.      Dr. Barbara Ziv...................................................................... 79

                a.      Dr. Ziv's Background ................................................. 79
                b.      Dr. Ziv's Testimony ................................................... 81

        2.      Dr. Adhia ................................................................................. 89

TMB0006686

        a.     Dr. Adhia's Background .............................................. 89

        b.     Dr. Adhia's Testimony.............................................. 90

VI. ANALYSIS ................................................................................................ 93

    A.     Failure to Practice Medicine Consistent with the Public Health and Welfare and Unprofessional Conduct ................................................................ 93

        1.     Patient Eleven ................................................................ 97
        2.     Patient Four ................................................................... 98
        3.     Patient One .................................................................... 99
        4.     Patient Two .................................................................. 100
        5.     Patient Six ................................................................... 101
        6.     Patient Twelve ............................................................. 101
        7.     Patient Seven .............................................................. 102
        8.     Patient Eight ............................................................... 102
        9.     Patient Ten .................................................................. 103
        10.    Patient Nine ................................................................ 104

    B.     Peer Review Disciplinary Actions ................................................. 105

VII. AGGRAVATING AND MITIGATING FACTORS ................................. 105

    A.     Aggravating Factors ......................................................................... 105

        1.     Harm to One or More Patients ................................. 106
        2.     Severity of Patient Harm ........................................... 106
        3.     One or More Violations that Involve More than One Patient ......... 106
        4.     Increased Potential for Harm to the Public ........................................ 107
        5.     Attempted Concealment of the Act Constituting a Violation ........... 107
        6.     Intentional, Premeditated, Knowing, or Grossly Negligent Act Constituting a Violation ............................................................. 108
        7.     Previous Disciplinary Action by the Board, any Government Agency, Peer Review Organization, or Health Care Entity ....................... 108
        8.     Other Relevant Circumstances Increasing Seriousness of the Misconduct .............................................................................. 108

            a.     Continued Violations Despite Remedial Education, Warnings, and Disciplinary Action ........................................... 108
            b.     Inappropriate Conduct Towards and Sexual Harassment of Subordinate Employees ......................................... 109

    B.     Mitigating Factors ............................................................................. 110

        1.     Effect of Community and Life Experience ......................................... 110
        2.     Asserted Supportive Value of Hugging .............................................. 111
        3.     Effects of Remedial Measures ............................................................. 111

TMB0006687

VIII.  FINDINGS OF FACT ................................................................................................ 111

IX.  CONCLUSIONS OF LAW.......................................................................................... 121

TMB0006688

| | | | |
|---|---|---|---|
| **TEXAS MEDICAL BOARD,** | § | **BEFORE THE STATE OFFICE** | |
| Petitioner | § | | |
| | § | | |
| v. | § | **OF** | |
| | § | | |
| **ARTHUR ARRIT CHAVASON, M.D.,** | § | | |
| Respondent | § | **ADMINISTRATIVE HEARINGS** | |

## PROPOSAL FOR DECISION

The staff (Staff) of the Texas Medical Board (Board) seeks to sanction Arthur Arrit Chavason, M.D. (Dr. Chavason or Respondent) for alleged violations of the Medical Practice Act (Act)[1] and the Board's rules.[2] Staff's allegations relate to Dr. Chavason's conduct and care of patients and his conduct with coworkers from about 2010 through 2018. The Administrative Law Judges (ALJs) determine that: (1) Dr. Chavason committed some of the alleged violations; (2) Staff proved several aggravating factors; and (3) Dr. Chavason did not prove any mitigating factors that may be taken into consideration when the Board takes disciplinary action.

## I. JURISDICTION, NOTICE, AND PROCEDURAL HISTORY

This case was referred to the State Office of Administrative Hearings (SOAH) for a contested-case hearing on February 5, 2019. In July 2019, Dr. Chavason filed his first plea to the jurisdiction, generally disputing SOAH's jurisdiction because Staff had allegedly failed to comply with certain due process requirements prior to bringing formal charges, as required by Texas

---

[1] Tex. Occ. Code (Code) title 3, subtitle B. The Act has been amended several times since 2010, when the initial events in this case began. The amendments did not substantially affect the specific provisions cited by Staff, and the current statutes are cited in the Proposal for Decision (PFD).

[2] The relevant Board rules are found in title 22, part 9 of the Texas Administrative Code. They are referred to as "Board Rule ___" in this PFD. Several of the rules have been amended since the events at issue began. Because the amendments did not substantively change the specific provisions relied upon by Staff, the current rules are cited in this PFD.

TMB0006689

Occupations Code § 164.004. The plea to the jurisdiction was denied in Order No. 1. Dr. Chavason's second plea to the jurisdiction was denied in Order No. 3.

The Act gives the Board jurisdiction over this matter. SOAH has jurisdiction to hold a contested case hearing and to issue findings of fact and conclusions of law, subject to the provisions of Section 164.007 of the Act, pursuant to Texas Government Code, chapter 2003.

On March 16, 2021, Staff filed a Third Amended Complaint, which was Staff's live pleading at the hearing on the merits. The hearing was initially set to convene in April 2021, but was continued because of health issues of Dr. Chavason's counsel.

Staff filed its Request for Official Notice on March 19, 2021. On March 26, 2021, Dr. Chavason filed objections to Staff's request for official notice items numbered 7 through 14. His objections were overruled, and Staff's Request for Official Notice, covering items numbered 1 through 14, was granted by Order No. 14, issued April 9, 2021.

The hearing on the merits convened via the Zoom government videoconference platform before ALJs Beth Bierman and Amy Davis on September 13 to 23, 2021. Notice was not contested. Staff attorneys Kemisha Williams and Michelle McFaddin represented Board Staff. Dr. Chavason appeared and was represented by attorney Lee Bukstein. The record closed on December 6, 2021, after the parties filed their final written closing arguments.

## II. APPLICABLE LAW

Pursuant to the Act, the Board is required to take disciplinary action against a licensed physician determined to have violated a Board rule or the Act.[3] Possible disciplinary actions include revocation, suspension, or probated suspension of the physician's license; reprimand; imposition of practice restrictions; and/or requirements that a physician submit to counseling,

---

[3] Tex. Occ. Code § 164.001.

treatment, or continuing education.[4] In this case, Staff has alleged violations of the following provisions of the Act and Board rules.

Section 164.051(a)(1) of the Act authorizes the Board to take disciplinary action against a physician based on the commission of an act prohibited under Section 164.052 of the Act.

Section 164.051(a)(6) of the Act authorizes the Board to take disciplinary action against a licensee based on the failure to practice medicine in an acceptable professional manner consistent with public health and welfare. As further defined by Board Rule 190.8(1)(C) and (M), the Board may discipline a physician for failure to use proper diligence in one's professional practice; and for inappropriate prescription of dangerous drugs or controlled substances to oneself, family members, or others in which there is a close personal relationship.

Section 164.051(a)(7) of the Act authorizes the Board to take disciplinary action against a physician based on disciplinary action taken by Dr. Chavason's peers, as further defined by Board Rule 190.8(4), related to disciplinary action by peers.

Section 164.052(a)(5) of the Act authorizes the Board to take disciplinary action against a licensee based upon unprofessional or dishonorable conduct that is likely to deceive or defraud the public or injure the public, as further defined by Board Rules: 190.8(2)(E), engaging in sexual contact with a patient; 190.8(2)(F), engaging in sexually inappropriate behavior or comments directed towards a patient; 190.8(2)(G), becoming financially or personally involved with a patient in an inappropriate manner; 190.8(2)(K), behaving in an abusive or assaultive manner towards a patient or the patient's family or representatives that interferes with patient care or could be reasonably expected to adversely impact the quality of care rendered to a patient; 190.8(2)(P), behaving in a disruptive manner toward licensees, hospital personnel, other medical personnel, patients, family members, or others that interferes with patient care or could be reasonably expected to adversely impact the quality of care rendered to a patient; and 190.8(2)(R), commission of the following violations of federal and state laws whether or not there is a complaint, indictment,

---

[4] Tex. Occ. Code §§ 164.001, .051(a). The ultimate sanction is within the sole authority and discretion of the Board, and the ALJs make no recommendation regarding disciplinary actions. Tex. Occ. Code § 164.007(a-1).

TMB0006691

or conviction: (i) any felony; (ii) any offense in which assault or battery, or the attempt of either is an essential element; and (v) any misdemeanor involving moral turpitude. Under Rule 190.8(R), Staff has alleged that Dr. Chavason committed indecent assault under Texas Penal Code § 22.012(a) (Indecent Assault).[5]

Section 164.053(a)(1) of the Act authorizes the Board to take disciplinary action against a licensee based on the commission of an act that violates a law of this state that is connected with the licensee's practice of medicine, specifically 25 Texas Administrative Code § 441.101(1) (Abuse), and (114) (Sexual Exploitation).[6]

The Board's rules set out certain specified aggravating and mitigating factors relevant to determining whether more or less severe or restrictive action by the Board is warranted. Staff has the burden to present evidence regarding any aggravating factors that may apply in a particular case, and the physician has the burden to present evidence regarding any mitigating factors that may apply.[7]

Part of the evidence in this case includes consideration of a patient complaint that was previously submitted to the Board but was subsequently dismissed. Section 154.051(e) of the Act authorizes the Board to reconsider previously investigated complaints and to take disciplinary action against a licensee based on a pattern of practice violating the Act or Board Rules. Board Rule 179.7 authorizes the Board to examine past complaints made against a licensee and prior

---

[5] Texas Penal Code § 22.012(a) provides: A person commits an offense if, without the other person's consent and with the intent to arouse or gratify the sexual desire of any person, the person: (1) touches the anus, breast, or any part of the genitals of another person; (2) touches another person with the anus, breast, or any part of the genitals of any person; (3) exposes or attempts to expose another person's genitals, pubic area, anus, buttocks, or female areola; or (4) causes another person to contact the blood, seminal fluid, vaginal fluid, saliva, urine, or feces of any person.

[6] 25 Texas Administrative Code § 441.101(1) and (114) provide in part: (1) Abuse—An intentional, knowing, or reckless act or omission by provider personnel, a counselor, applicant for counselor licensure, or counselor intern that causes or may cause death, emotional harm or physical injury to a participant or client. Abuse includes without limitation the following: (A) any sexual activity between provider personnel, a counselor, applicant for counselor licensure, or counselor intern and a participant or client; and (114) Sexual Exploitation—A pattern, practice, or scheme of conduct by provider personnel or other individual working under the auspices of a provider, or by a counselor, intern, or applicant that involves a client or participant and can reasonably be construed as being for the purpose of sexual arousal or gratification or sexual abuse. It may include sexual contact, a request for sexual contact, or a representation that sexual contact or exploitation is consistent with, a part of or, a condition of receiving services.

[7] 22 Tex. Admin. Code § 190.15.

TMB0006692

investigations conducted by the Board concerning the licensee during the course of a new investigation concerning the same licensee, to determine if there is a pattern or practice of behavior on the part of the licensee. In addition, Board Rule 187.18(k)(1) provides that the dismissal of any investigation or disciplinary proceeding before the Board is without prejudice to additional investigations and/or reconsideration of the matter at any time.

## III. STIPULATED FACTS

The parties filed the following stipulations on September 2, 2021.

1.    Dr. Chavason is a Texas physician and holds Texas Medical License No. M-7104, which was originally issued by the Board on August 24, 2007.

2.    Dr. Chavason's license was in full force and effect at all times material and relevant to this Complaint.

3.    Dr. Chavason and his attorney Fred Davis were invited to an Informal Settlement Conference (ISC) regarding Case No. 11-0868 by letter dated June 23, 2011.

4.    Dr. Chavason and his counsel Mr. Davis appeared at an ISC regarding Case No. 11 0868 on August 15, 2011.

5.    Dr. Chavason and his attorney Edward P. "Joe" Waller, Jr. were invited to an ISC regarding Case No. 18-0697 by letter dated June 7, 2018.

6.    Dr. Chavason and his counsel Mr. Waller appeared at an ISC regarding Case No. 18-0697 on August 10, 2018.

7.    On or around February 5, 2019, Dr. Chavason and his counsel Lee Bukstein received a copy of the Board's Complaint.

8.    On or around October 7, 2019, Dr. Chavason and his counsel Mr. Bukstein received a copy of the Board's First Amended Complaint in this matter.

9.    On or around February 27, 2020, Dr. Chavason and his counsel Mr. Bukstein received a copy of the Board's Second Amended Complaint in this matter.

10.   On or around March 16, 2021, Dr. Chavason and his counsel Mr. Bukstein received a copy of the Board's Third Amended Complaint in this matter.

TMB0006693

11.     On or around March 19, 2021, Dr. Chavason and his counsel Mr. Bukstein received a copy of the Board's Notice of Administrative Hearing as well as the Board's Third Amended Complaint in this matter.

12.     In or around August 2008, Dr. Chavason started working at the Holiner Group, a healthcare entity.

13.     In or around August 2008, Dr. Chavason obtained privileges at Medical City Green Oaks (MCGO) and Medical City Dallas.

14.     On October 9, 2015, Dr. Chavason completed the Vanderbilt University Maintaining Proper Boundaries Course.

15.     On January 16, 2018, Dr. Chavason submitted a letter of resignation to MCGO while under investigation into the allegations made by Patient Nine.

## IV. STAFF'S FORMAL CHARGES

In its Third Amended Complaint, Staff alleged that Dr. Chavason violated the Act and the Board rules because he:

- failed to maintain professional boundaries with patients and employees and was disciplined by his peers for misconduct;

- engaged in a pattern of sexual misconduct and abuse designed to exploit patient sexual boundaries and which adversely impacted patient care; and

- posed inappropriate questions of a sexual nature, commented on patients' physical appearance and sexual desirability, fondled, groped and in some instances, engaged in sexual contact with patients.

Staff also alleged that Dr. Chavason's pattern of inappropriate conduct, physical contact, and unwanted sexual advances extended to female subordinates with whom he worked.

## V. EVIDENCE

At the hearing, Staff presented live testimony from three witnesses: Dr. Joel Holiner, the founder and owner of the Holiner Group; Patient Seven; and Dr. Barbara Ziv, Staff's expert witness. Staff had numerous exhibits admitted into evidence, including some patient medical

TMB0006694

records, Holiner Group employee files and records, some videos, and designated portions of depositions of several witnesses.

Dr. Chavason testified on his own behalf and presented additional testimony from his expert witness, Dr. Sanjay Adhia. Dr. Chavason had subpoenaed Patients One, Nine, and Eleven to appear at the hearing to testify. Patient One appeared and testified, but Patients Nine and Eleven did not appear. The ALJs advised Dr. Chavason that he could attempt to secure the attendance and testimony of the non-appearing patients through a court order, and that the record would be reopened for that limited purpose. Dr. Chavason did not notify the ALJs that he had secured such a court order, so the record was not re-opened. Because many of his proposed exhibits were duplicative of Staff's exhibits, Dr. Chavason mostly relied on and/or admitted portions of Staff's exhibits and made several offers of proof.

This section summarizes most of the relevant testimony for each witness and about each patient and coworker. Because the record is voluminous, not all facts are restated or discussed in this PFD.

The patients were not necessarily listed in the Third Amended Complaint according to the chronological timeline of events. For example, and as is shown below, Patient One began seeing Dr. Chavason for treatment in July 2013 whereas Patient Eleven began treatment with Dr. Chavason in 2010. The time periods for the patients' treatments may also overlap to a certain extent.

Staff withdrew allegations pertaining to Patients Three and Five from the Third Amended Complaint because those patients did not wish to participate in this case.[8] The Third Amended Complaint therefore includes allegations regarding Patients One, Two, Four, Six, Seven, Eight, Nine, Ten, Eleven, and Twelve. It also includes allegations regarding two peer disciplinary actions (the First and Second Peer Disciplines) and a discussion of aggravating and mitigating factors. The

---

[8] Third Amended Complaint at 9, 11.

aggravating and mitigating factors include allegations regarding Dr. Chavason's conduct towards two coworkers, Employee One and Employee Two.[9]

## A.     Patient One

On or about July 1, 2013, Patient One, a 46-year-old woman, began receiving psychiatric treatment from Dr. Chavason at the Holiner Group. Staff alleges that, during Patient One's treatment, Dr. Chavason repeatedly asked inappropriate sexual questions of Patient One and made inappropriate comments to her, leading to unwanted physical and sexual contact.[10]

### 1.     Patient One's Testimony

Patient One was one of two patients to testify at the hearing, the other being Patient Seven. Patient One was also deposed on February 20, 2020, and portions of her deposition were submitted into evidence.[11] Patient One first saw Dr. Chavason on July 1, 2013.[12] She was referred to the Holiner Group by her marriage counselor, for treatment of ADHD. She recalled that she told Dr. Chavason about being sexually abused by her father. She also recalled that she told Dr. Chavason that she and her husband were having issues with sexual intimacy.[13] Patient One could not recall talking about her medications with Dr. Chavason during their initial sessions.[14]

She saw Dr. Chavason for additional office visits on February 4, February 11, March 19, April 21, and May 14, 2014.[15]

---

[9] Staff included allegations concerning a third Employee, Employee Three, in the Third Amended Complaint, but Staff did not present evidence or argument concerning Employee Three. Accordingly, this PFD does not discuss the allegations concerning Employee Three.

[10] The specific allegations related to Patient One are numbered 5 through 33 in the Third Amended Complaint.

[11] Patient One's deposition testimony was largely consistent with her hearing testimony. Staff Ex. 3A (Patient One Deposition).

[12] Staff Ex. 3B at 1281.

[13] Transcript of the Hearing on the Merits (Tr.) Vol. 6 at 629.

[14] Staff Ex. 3A at 1161.

[15] Staff Ex. 3B at 1285-1308.

TMB0006696

According to Patient One, either Dr. Chavason or his nurse practitioner (NP) Rinda Jordan would take her vitals (weight and blood pressure) at the beginning of the office visit. She would see Ms. Jordan for medication management for five to ten minutes after the end of her visits with Dr. Chavason. She remembered that sometimes the office door was open and sometimes it was closed during her office visits with Dr. Chavason. After Dr. Chavason took her vitals, he would make notes on the computer and then the office visit would start.[16]

Dr. Chavason prescribed her medications that Patient One said impaired her memory. She recalled that the medications were Lorazepam, Klonopin, Prozac, and Neurontin. He prescribed her other psychotropic medications, but she could not recall the names of those drugs.[17] Patient One explained that she was sedated for many years on these medications, and was unable to function at work, be an engaging mother, or a supportive and loving wife. The medications she was prescribed by Dr. Chavason ruined her life, she said. Her marriage ended two years ago. Patient One said her memory is "awful," although she remembers "... exactly what happened with Dr. Chavason. And I tried to tell everyone in his office that."[18]

According to Patient One, Dr. Chavason hugged her at visits at the Holiner Group. She did not tell him that she objected to the hugs or that they caused her discomfort. She in fact did not object to the hugs, she said.[19] Patient One testified that her primary care physician is a female friend of 20 years, that they were friends before a physician-patient relationship was established, and that they had first met at Patient One's sister's wedding and baby shower. They hugged at every office visit, she said.[20]

Her last visit with Dr. Chavason occurred on May 14, 2014. Patient One said that at the end of the session Dr. Chavason had an erection and made grinding movements against her backside during an incident involving a wall clock in his office.

---

[16] Tr. Vol. 6 at 604.

[17] Tr. Vol. 6 at 607-09.

[18] Tr. Vol. 6 at 615-16.

[19] Tr. Vol. 6 at 618.

[20] Tr. Vol. 6 at 609-10.

TMB0006697

She explained that a large wall clock in Dr. Chavason's office was not showing the correct time because the battery was dead. Patient One testified that she noticed the incorrect time and mentioned it to Dr. Chavason during the session. Patient One offered to help with the clock, and Dr. Chavason went to find batteries. Patient One stated that when he returned to the office, she went to take the clock off the wall. While she was turned towards the clock, Patient One said that he stepped behind her and made grinding motions behind her. Patient One testified that she felt he had an erection. Patient One then put the clock down and left his office. She said she went directly to Ms. Jordan's office and told Ms. Jordan that Dr. Chavason had just rubbed himself against her with an erection and made grinding movements while she was helping him with the clock.[21] Ms. Jordan allegedly told Patient One that she must have misread the situation.[22]

According to Patient One, she also told other people in the Holiner Group about the incident. She recalled that in addition to Ms. Jordan, she told the office manager, the woman in charge of billing, and maybe Dr. Rodolfo Molina's physician assistant (PA). Her complaint was documented in the Holiner Group records on March 3, 2015.[23] She could not recall whether she told Dr. Molina, also with the Holiner Group, about the assault.[24] She saw Dr. Molina for medication management on March 10 and April 8, 2015, but she was ultimately discharged from the practice for not entering an intensive outpatient day hospital program.[25] Patient One testified that there was no way she could have misread the situation with the clock because she felt Dr. Chavason's erection and the grinding movements he was making against her backside.[26]

Although the clock incident in May 2014 was the incident that led her to end her treatment with Dr. Chavason, there were other incidents that occurred between Patient One and him. She testified:

---

[21] Tr. Vol. 6 at 622-23.

[22] Tr. Vol. 6 at 624.

[23] Staff Ex. 3B at 1309.

[24] Tr. Vol. 6 at 612.

[25] Staff Ex. 3B at 1311-23.

[26] Tr. Vol. 6 at 633.

TMB0006698

> I believe that Dr. Chavason took advantage of ...my unhappy marriage to — to really pry into the privacies and the intimacies of –... my marriage and my life. And I trusted him as a physician, ... who was supposed to help me, and instead he –... hurt me. So when he asked me things about my marriage and about my husband and specifically about our sexual relationship, ...never having seen a psychiatrist in my life before and having a sister and a brother-in-law who are physicians, I really, you know, thought that these questions and conversations we were having were part of my care; and I realized [later] that they were not.[27]

Patient One recalled that during an appointment on February 4, 2014, she told Dr. Chavason about an argument she had had with her husband, and Dr. Chavason inquired as to whether Patient One had been intimate with her husband.[28] When Patient One said she had not been intimate with her husband, Dr. Chavason began to ask Patient One questions about her sexual preferences. In particular, he asked Patient One if she and her husband engaged in any kind of foreplay before sex, or asked Patient One if she and her husband would role-play during sex.[29] Dr. Chavason suggested that Patient One attempt to seduce her husband, and he told Patient One that if he were her husband he would "fuck her brains out."[30] Dr. Chavason's questions, comments, and flirtatious manner alarmed Patient One.[31]

Patient One recounted other instances in which Dr. Chavason would ask her about her sexual relationship with her husband. During a visit on February 11, 2014, Dr. Chavason asked Patient One if she had tried to seduce her husband by surprising him at the door, seducing him, making him dinner, role-playing, or by wearing lingerie.[32]

---

[27] Tr. Vol. 6 at 621-22.

[28] Staff Ex. 3A at 1163.

[29] Staff Ex. 3A at 1164, 1166.

[30] Staff Ex. 3A at 1164, 1166.

[31] Staff Ex. 3A at 1164.

[32] Staff Ex. 3A at 1172.

TMB0006699

During an appointment on March 19, 2014, Dr. Chavason maintained that Patient One's husband was "crazy," and that he would be treating Patient One differently if he were her husband, and that he would engage in the kind of foreplay that Patient One found pleasurable.[33]

Patient One believes that Dr. Chavason took advantage of her. She is no longer able to watch people kissing on television because it makes her uncomfortable.[34] He also put her on medications that negatively impacted her life.[35] Patient One recalled that her appointments with Dr. Chavason typically lasted between 45-minutes to one hour.[36] Patient One believes that there are years of memory that she lost because she was in bed unable to move from the amount of benzodiazepines Dr. Chavason prescribed her.[37]

## 2.     Dr. Chavason's Testimony about Patient One

Patient One's initial appointment on July 21, 2013, with Ms. Jordan started at 11:06 a.m. and ended when Ms. Jordan electronically signed the note at 1:19 p.m.[38] Dr. Chavason thought it unlikely that the appointment really lasted almost two hours.[39] He testified that she met him briefly at the close of her initial evaluation by Ms. Jordan.[40]

Dr. Chavason explained that at the beginning of a session, the patient's vital signs, including weight and blood pressure, would be taken and noted in the chart. The chart would indicate an automatic time stamp done by the computer program when the vital signs were taken. It was an indication, he said, of when the session began. The session ended when the physician or

---

[33] Staff Ex. 3A at 1177.

[34] Staff Ex. 3A at 1213.

[35] Staff Ex. 3A at 1174.

[36] Staff Ex. 3A at 1182.

[37] Staff Ex. 3A at 1213.

[38] Staff Ex. 10B at 1281-84.

[39] Tr. Vol. 5 at 578.

[40] Staff Ex. 3B at 1281-84.

other provider electronically signed the note. He was encouraged to complete the note while he was with the patient and then walk the patient to the check-out desk.[41]

Dr. Chavason also testified that lunch at his office was from noon to 1:00 p.m. During lunch, the staff at the Holiner Group left their desks and were in the break room or somewhere in the office suite. The number of staff dropped off at the end of the day, which was at 5:00 p.m., and there was a skeleton crew until 5:30 p.m.[42] Dr. Chavason testified that he did not schedule individual patients because he did not have access to the scheduling program. He denied that he ever asked staff to schedule a patient visit during times that the office staffing was reduced.[43]

Patient One's first full appointment with Dr. Chavason was on February 4, 2014.[44] According to Dr. Chavason, the appointment started at 3:55 p.m. and ended at 4:25 p.m. based on the time stamp for when the patient's vital signs were taken.[45]

For the next visit on February 11, 2014, Dr. Chavason took Patient One's vital signs at 10:52 a.m. and electronically signed the note at 11:04 a.m.[46]

The fourth appointment on March 19, 2014, started at 4:45 p.m. and ended at 5:07 p.m.[47] The fifth appointment on April 21, 2014, started at 3:21 p.m. and ended at 3:47 p.m.[48] Dr. Chavason's final appointment with Patient One was on May 14, 2014. It started at 5:05 p.m. and ended at 5:23 p.m.[49] Patient One's next appointment at the Holiner Group was on May 10, 2015, when she was seen by Dr. Molina's NP.[50]

---

[41] Tr. Vol. 5 at 577-81.

[42] Tr. Vol. 5 at 573-74.

[43] Tr. Vol. 5 at 574.

[44] Staff Ex. 3B at 1285-89.

[45] Tr. Vol. 6 at 685-86.

[46] Staff Ex. 10B at 1290-93.

[47] Staff Ex. 3B at 1294-98; Tr. Vol. 6 at 686.

[48] Staff Ex. 3B at 1299-1303; Tr. Vol. 6 at 687.

[49] Staff Ex. 3B at 1304-08; Tr. Vol. 6 at 687.

[50] Staff Ex. 3B at 1311.

TMB0006701

After Patient One complained to the Holiner Group about Dr. Chavason's behavior during the clock incident, Dr. Chavason remembered attending the meeting on March 12, 2015, regarding Patient One's complaint.[51] He recalled that the only complaint related to Patient One that was discussed during that meeting was the clock incident. He said that no one at the Holiner Group had told him there were any other complaints against him made by Patient One.

Dr. Chavason admitted that he occasionally hugged Patient One but said he used lean-in side hugs at the end of their sessions. He denied spending far longer with Patient One during their medication management visits than the scheduled time and denied that they discussed personal matters unrelated to treatment. He denied that he commented on Patient One's sexual desirability during their treatment sessions. He denied asking Patient One what kinds of foreplay she enjoyed and whether she dressed up or role-played during foreplay with her husband.

Dr. Chavason testified that he would have asked how her marriage was doing because it was a huge stressor for Patient One and would affect what medications he prescribed. He said it was Patient One who would volunteer information, and that he would attempt to steer the conversation back to more pertinent information.[52] He denied that he told Patient One she was beautiful, attractive, and a catch, but stated he may have told her things to bolster her self-esteem, like she was beautiful, attractive, smart, funny.[53] He denied that he had made denigrating comments about Patient One's husband, calling him crazy, an idiot, and questioning his virility, stating that he would not say those things about someone's spouse.[54] He denied that he told Patient One that he would have sex with her all of the time if he were her husband or that he described what he would do to her during sex, such as fondling her breasts.

Dr. Chavason agreed that on or about May 14, 2014, he saw Patient One for a medication management visit. He denied he hugged Patient One at the beginning of the session because, if he

---

[51] Tr. Vol. 6 at 690-92. Respondent offered Staff Exhibit 3C at 1332-34. These pages were already admitted as Staff Exhibit 1C at 789-91.

[52] Tr. Vol. 6 at 694-95.

[53] Tr. Vol. 6 at 696.

[54] Tr. Vol. 6 at 697.

TMB0006702

hugged her at all, it would have occurred at the end of the session. Dr. Chavason agreed he closed the door to his office during the session because of patient privacy reasons. He denied he told Patient One that if he were her husband, he would "fuck her brains out," because he said he would never say that anyone.

He agreed that Patient One noticed that a large clock on the office wall in his office had stopped running and that Patient One offered to change the batteries in the clock. He testified that Patient One went to the clock and attempted to remove it from the wall. He testified that he approached Patient One from behind while she was facing the clock and trying to remove it but said that, based on the location of his desk and the clock, he had to approach her from behind. As he got closer to Patient One and the clock, he said he moved around to her side. Dr. Chavason stated that his hands were on the clock, but that it was possible their shoulders touched because he was standing to her side. He denied that he had an erection. He denied that he apologized to her because he said the incident never happened.

Dr. Chavason denied that his conduct caused Patient One to feel uncomfortable, shocked, alarmed, and sexually harassed because he said the incident did not occur. He denied that his conduct irreparably damaged his physician-patient relationship with Patient One because Patient One continued to see other physicians. He testified that he did not see Patient One again after the incident on May 14, 2014.

## B.     Patient Two

From about August 2013 until September 2015, Patient Two, a 33-year-old female, received psychiatric treatment from Dr. Chavason at the Holiner Group. Staff alleges that, during Patient Two's treatment, Dr. Chavason violated Board Rules by blending his professional and personal relationship with Patient Two. Staff alleges that Dr. Chavason hugged Patient Two during appointments, visited Patient Two at her workplace, paid Patient Two to perform a back peel procedure on him, and took Patient Two out to lunch.[55]

---

[55] The specific allegations related to Patient Two are numbered 34 through 56 in the Third Amended Complaint.

1.    **Patient Two's Testimony**

Patient Two was deposed in this proceeding on January 26, 2021, and portions of her deposition were admitted into evidence.[56] Patient Two testified that at one point, Dr. Chavason told her that he would get acne breakouts on his back.[57] Dr. Chavason came in for a back facial once at the spa where Patient Two worked.[58] She testified that he paid her $100 for the back facial.[59] Dr. Chavason had lunch with Patient Two after the treatment, but Patient Two could not recall any details about the lunch.[60] Patient Two had phone conversations with Dr. Chavason about medication or family, but she did not recall those conversations as being "indecent."[61]

2.    **Dr. Chavason's Testimony about Patient Two**

Patient Two was referred to the Holiner Group for psychiatric care in July 2013 for treatment of panic attacks and anxiety, among other issues. She was first seen by Ms. Jordan on July 24, 2013.[62] Patient Two saw Dr. Chavason for an appointment on August 7, 2013. That appointment started at 1:42 p.m. when the patient's vital signs were taken, and Dr. Chavason electronically signed the note at 2:19 p.m. At this visit, Dr. Chavason coded it for 30 minutes of psychotherapy with Patient Two.[63]

On August 4, 2014, Dr. Chavason saw Patient Two for an appointment. The patient's vital signs were taken by Dr. Chavason at 11:55 a.m. and he electronically signed the note at 12:48 p.m.[64] Dr. Chavason claimed that he had made an error in the medical record because he

---

[56] Staff Ex. 4A (Patient Two Deposition).

[57] Staff Ex. 4A at 1371.

[58] Staff Ex. 4A at 1355.

[59] Staff Ex. 4A at 1372, 1375.

[60] Staff Ex. 4A at 1355.

[61] Staff Ex. 4A at 1356.

[62] Staff Ex. 4B at 1415-19.

[63] Staff Ex. 4B at 1420-24.

[64] Staff Ex. 4B at 1526-30.

TMB0006704

would not have an appointment with a patient that took his entire lunch hour.[65] Dr. Chavason coded this visit as "99214," which he said meant it was a medium complexity note. He thought that an appointment with that code should take at most 15 minutes.[66]

On October 17, 2014, Dr. Chavason was in an appointment with Patient Two when Dr. Holiner came to his office door and found it to be locked. Dr. Chavason had taken the patient's vital signs at 12:17 p.m. and he electronically signed the note at 1:31 p.m.[67] Dr. Chavason posited that Patient Two must have been late for her appointment, and he worked her into his schedule over his lunch hour. He did that, he said, because he did not want to be backed up with patients the remainder of the day.[68] Dr. Chavason coded this visit as 99214, which he previously said meant that the appointment should only be about 15 minutes.

Nikki Havens, the office manager for the Holiner Group, wrote a memo to the file regarding the locked door. That memo indicates that Dr. Holiner tried to enter Dr. Chavason's office at approximately 12:35 p.m. and that by that time, Dr. Chavason had been in the session with Patient Two for approximately 18 minutes and he had not yet started writing the visit note. After the door had been unlocked and opened, Dr. Holiner reportedly saw that Patient Two had been crying. Ms. Havens had noted in her memo that the session was coded as an office visit under code 99214.[69]

According to a memo to the file dated July 23, 2015, by Corina Hobson, the Administrative Assistant for the Holiner Group, on July 7, 2015, Dr. Chavason called Patient Two and the call lasted 30 seconds. Patient Two had not left Dr. Chavason a message through the front desk and there was no record of the call in her medical record. That same afternoon, Dr. Chavason saw

---

[65] Tr. Vol. 6 at 712.

[66] Tr. Vol. 6 at 713.

[67] Staff Ex. 4B at 1543-47.

[68] Tr. Vol. 6 at 713-15.

[69] Staff Ex. 4C at 1666.

TMB0006705

Patient Two for an appointment that lasted one hour and twenty minutes. No additional time was coded by Dr. Chavason for this appointment.[70]

Ms. Hobson's memo also noted that on July 16, 2015, Dr. Chavason called Patient Two and the call lasted 9 minutes and 39 seconds. Patient Two had not left Dr. Chavason a message through the front desk and there was no record of the phone call in her medical record.

On July 21, 2015, Dr. Chavason saw Patient Two for another follow-up appointment. The system logged that Dr. Chavason took the patient's vital signs at 2:43 p.m. and that he electronically signed the note at 3:21 p.m., which was approximately 38 minutes. He coded the visit as psychotherapy.[71] Dr. Chavason agreed that he and Patient Two were laughing and talking during the visit.[72] Dr. Chavason said that the session was longer because he was using supportive therapy to talk with her about her marriage. He contended nothing inappropriate happened during that visit.

On August 20, 2015, Ms. Hobson wrote another memo to the file that stated, among other things, that Dr. Holiner had called Dr. Chavason on that date to talk to him about the fact that he had called Patient Two four times on August 19, 2015, after Ms. Jordan had already talked to Patient Two on August 17, 2015.[73] The memo stated that Dr. Holiner informed Dr. Chavason that he was giving Patient Two special treatment above other patients, that was against the guidelines set forth for him on March 19, 2015, and August 6, 2015, and that it was inappropriate. Dr. Chavason was prohibited from seeing Patient Two at 11:45 a.m. on a Friday when the staff left for half a day. Dr. Chavason was urged to schedule the boundaries course and therapy as soon as possible.[74] Dr. Chavason testified that the reason he called Patient Two four times that day was

---

[70] Staff Ex. 4C at 1674.

[71] Staff Ex. 4B at 1614-18.

[72] Tr. Vol. 6 at 717-19.

[73] Staff Ex. 4C at 1674.

[74] Staff Ex. 4B at 1671.

TMB0006706

because he was concerned about Patient Two's welfare.[75] Dr. Chavason dismissed Patient Two from his practice on September 2, 2015.[76]

Dr. Chavason admitted that, as Staff alleged, he would occasionally hug Patient Two at the end of their appointments by using a lean-in hug, but that sometimes Patient Two would initiate the hug. He contended that after August 2015, he did not hug Patient Two because Dr. Holiner told him not to hug patients. Dr. Chavason said he would extend his hand for a handshake at the end of the session to avoid a patient trying to hug him.

Dr. Chavason agreed that Staff correctly alleged that Patient Two was not scheduled to be in an appointment with him when Dr. Holiner knocked on his door during the October 17, 2014, appointment. He said Dr. Holiner did tell him to keep his office door unlocked and to be careful with his interactions with patients, particularly regarding refraining from texting patients and to document all his contacts with patients.[77]

Dr. Chavason disagreed that he personally rescheduled Patient Two for the October 17, 2014 appointment because he said he did not have the ability to do so, and that he never did so without informing staff members. He did not know whether Patient Two refused to speak to anyone but him at the Holiner Group.

Dr. Chavason denied that he was having undocumented contact with multiple female patients, including Patient Two, but did state that he once did have a back facial treatment from Patient Two after she was no longer a patient at the Holiner Group.

Dr. Chavason agreed that he was told to document all contact with Patient Two. This would include phone and text contacts. After he was told to document all contacts with Patient Two, Dr. Chavason stated that he never tried to have contact with her again.

---

[75] Tr. Vol. 6 at 724.

[76] Staff Ex. 4B at 1638.

[77] Tr. Vol. 6 at 728.

Dr. Chavason testified that towards the end of 2017 he needed treatment for back acne and so he purchased a Groupon for a back procedure. When he went to the place for the treatment, he recognized Patient Two and that she used to be one of his patients. But he reasoned that it had been a couple of years, and it was only his back, so he went ahead and had the treatment with Patient Two. After the treatment, they walked to a nearby Whataburger, and he bought her lunch. At lunch, they talked about their children and their families.[78]

Dr. Chavason agreed that after Patient Two was no longer his patient at the Holiner Group, he also consulted on two separate surgical procedures performed on Patient Two but denied that he managed her prescription medications. He denied that he continued to discuss with Patient Two her health and personal matters for years after she was no longer his patient. He testified that the last time he spoke with Patient Two was in 2017 when the back treatment occurred. Finally, he said that he did not blend his professional and personal relationship with Patient Two.[79]

## C.     Patient Four

In or around November 19, 2014, Patient Four, a 26-year-old female, began receiving psychiatric treatment from Dr. Chavason at the Holiner Group. Staff alleges that during an appointment with Patient Four, Dr. Chavason made inappropriate comments about Patient Four's attractiveness and personal life and engaged in unwanted physical contact with Patient Four.[80]

### 1.     Patient Four's Testimony

Patient Four was deposed in this proceeding on January 26, 2021, and portions of her deposition were admitted into evidence.[81]

---

[78] Tr. Vol. 6 at 733-34.

[79] Tr. Vol. 6 at 735-39.

[80] The specific allegations related to Patient Four are numbered 57 through 68 of the Third Amended Complaint.

[81] Staff Ex. 5A (Patient Four Deposition).

TMB0006708

Patient Four met Dr. Chavason during her intake process at MCGO in 2014.[82] While at MCGO, Dr. Chavason asked Patient Four if she had a boyfriend.[83] While talking with Patient Four and commenting on her appearance, Dr. Chavason placed his hand on Patient Four's knee, which made Patient Four feel very uncomfortable. [84] Patient Four told Dr. Chavason that her relationship status was not his business.[85] Patient Four felt Dr. Chavason's comments were inappropriate, and he was trying to "hit on her."[86] Patient Four reported the incident to a woman who helped Patient Four with her intake after Dr. Chavason touched her knee.[87] Patient Four also discussed the incident with another patient in the MCGO program because Patient Four "felt [the knee touching] was inappropriate and [she] was very uncomfortable and [she] didn't know if [she] wanted to be there."[88] She did not think it was acceptable conduct by a physician because the patient is in a vulnerable state and the physician is supposed to be helping the patient with their mental health. Patient Four stated that she had been assaulted before, and it was hard for her to talk about.

Patient Four expressed her concerns about Dr. Chavason to another doctor from the Holiner Group, and Patient Four began seeing Dr. Molina instead of Dr. Chavason.[89] Patient Four testified that she has not seen a male healthcare provider since her interaction with Dr. Chavason.[90]

## 2.     Dr. Chavason's Testimony about Patient Four

Patient Four was seen by Ms. Jordan for her initial evaluation on November 19, 2014. Dr. Chavason briefly meet with Patient Four at the end of the visit. On December 5, 2014, Patient Four was seen by Dr. Molina at MCGO for an initial hospital assessment. Dr. Chavason

---

[82] Staff Ex. 5A at 1688.

[83] Staff Ex. 5A at 1706.

[84] Staff Ex. 5A at 1685, 1695.

[85] Staff Ex. 5A at 1706.

[86] Staff Ex. 5A at 1706.

[87] Staff Ex. 5A at 1685.

[88] Staff Ex. 5A at 1688.

[89] Staff Ex. 5A at 1709.

[90] Staff Ex. 5A at 1695.

TMB0006709

denied that he saw Patient Four at the hospital. Other than meeting Patient Four briefly at the end of her appointment with Ms. Jordan on November 19, 2014, Dr. Chavason stated that he did not see her or talk to her.[91]

Dr. Chavason did sign a discharge letter dated September 16, 2015, discharging Patient Four from his practice for non-compliance with medical recommendations. Dr. Chavason admitted that he had begun a treatment regimen for the patient but had not met with her other than briefly the first day. He denied ever being in a room alone with her.[92]

## D.    Patient Six

On or about May 9, 2012, Patient Six, a 44-year-old woman, began receiving psychiatric treatment at the Holiner Group. Staff alleges that during Patient Six's treatment, Dr. Chavason repeatedly asked inappropriate sexual questions of Patient Six and made inappropriate comments to her, in addition to engaging in unwanted physical and sexual contact with Patient Six.[93] Patient Six is licensed in Texas as a professional counselor and as a licensed chemical dependency counselor.

### 1.    Patient Six's Testimony

Patient Six was deposed in this proceeding on July 27, 2020, and portions of her deposition were admitted into evidence.[94]

Patient Six was referred to the Holiner Group for psychiatric services related to her depression and anxiety and attended her first visit at the Holiner Group on May 9, 2012. Patient Six first met Dr. Chavason on August 1, 2012.[95]

---

[91] Tr. Vol. 6 at 742-43.

[92] Tr. Vol. 6 at 748.

[93] The specific allegations related to Patient Six are numbered 69 through 101 of the Third Amended Complaint.

[94] Staff Ex. 6A (Patient Six Deposition).

[95] Staff Ex. 6A at 1781.

TMB0006710

At some point in 2013 or 2014, Dr. Chavason began to walk Patient Six from his office to the reception desk at the end of Patient Six's appointments.[96] Dr. Chavason first placed his arm behind Patient Six as he walked her out.[97] Then, at the end of one appointment, Dr. Chavason hugged Patient Six and placed his hand on her back as he walked her out of his office.[98]

On November 2, 2015, Patient Six had a breast lift and an abdominoplasty ("tummy tuck").[99] Patient Six described these surgeries as a "mommy makeover."[100] During her appointment with Dr. Chavason on December 9, 2015, Patient Six told Dr. Chavason about her "mommy makeover."[101] Dr. Chavason then asked Patient Six if she had photos on her phone of her breasts because he said, "Every woman takes pictures after she has her boobs done."[102] Patient Six described the interaction with Dr. Chavason:

> I had my phone in my hand and – but when he was asking me, he walked around the desk over to me and said, you know, "Open your phone. Let me see. Let me see the pictures." And I had my phone in my hand, and so I didn't – I didn't open them. But I remember kind of feeling panicked, like "How am I going to get out of this? This is awkward."[103]
>
> ….and so I put my phone in my purse, which was on the floor right next to me. And so I just put it in my purse and I said, "No, absolutely not," you know.[104]
>
> **Q: What did he say?**
>
> A: He said, "Oh you're no fun" and walked around the desk and sat back down in his chair.

---

[96] Staff Ex. 6A at 1798.

[97] Staff Ex. 6A at 1798.

[98] Staff Ex. 6A at 1806-07.

[99] Staff Ex. 6A at 1812.

[100] Staff Ex. 6A at 1812.

[101] Staff Ex. 6A at 1812.

[102] Staff Ex. 6A at 1813.

[103] Staff Ex. 6A at 1813.

[104] Staff Ex. 6A at 1814.

TMB0006711

This interaction with Dr. Chavason made Patient Six feel uncomfortable, nervous, and anxious.[105] Dr. Chavason concluded the visit by hugging Patient Six.[106]

When Patient Six told Dr. Chavason that her boyfriend had cheated on her, Dr. Chavason responded with statements like, "He's crazy because you're so hot" or "You're beautiful."[107] Patient Six also recalled that Dr. Chavason would comment on her physical appearance at every visit.[108]

Patient Six had another appointment with Dr. Chavason on July 14, 2016.[109] At the end of this appointment, Dr. Chavason gave Patient Six an extended hug and "he kind of wouldn't release [Patient Six] and his hands went further down towards [Patient Six's] buttocks."[110] Patient Six had to push away from Dr. Chavason to end the hug.[111] Patient Six decided to no longer receive medical care from the Holiner Group because she felt that Dr. Chavason was "more sick" than she was, and she did not want to be hugged or objectified by him again.[112]

Patient Six explained that Dr. Chavason's conduct and behavior negatively affected her and brought up issues related to her being a sexual abuse survivor.[113]

## 2.     Dr. Chavason's Testimony about Patient Six

Patient Six was first seen at the Holiner Group for psychiatric treatment on May 9, 2012.[114] Dr. Chavason testified that if he did occasionally hug Patient Six, it would be at the end of the

---

[105] Staff Ex. 6A at 1814.

[106] Staff Ex. 6A at 1815.

[107] Staff Ex. 6A at 1791.

[108] Staff Ex. 6A at 1791.

[109] Staff Ex. 6A at 1819.

[110] Staff Ex. 6A at 1820.

[111] Staff Ex. 6A at 1820.

[112] Staff Ex. 6A at 1822.

[113] Staff Ex. 6A at 1828.

[114] Staff Ex. 6B at 2130.

appointment and not at the beginning when he would usually weigh patients. Patient Six never told him she was uncomfortable with his hugs or other physical contact, he said. Further, no one from the Holiner Group ever informed him that Patient Six was uncomfortable with his physical contact with her.[115] He denied he ever placed his hand on her back while walking her to the back desk to check out.[116]

Dr. Chavason testified he did not spend more time with Patient Six than necessary, and never commented on her sexual desirability, but did tell her she looked cute in braces. Dr. Chavason denied that he called Patient Six hot or beautiful.[117]

Dr. Chavason did have an appointment with Patient Six on December 9, 2015, but denied the visit lasted an hour or more.[118] He may have asked her why he had not seen her in some time, and Patient Six mentioned having a procedure, but according to him, she did not mention a breast-lift procedure. Dr. Chavason denied that he got excited when she mentioned the procedure or that he asked to see her breasts or that he stood and went to stand next to Patient Six. While she may have been holding her phone, Dr. Chavason testified he never asked to see photos of her breasts or commented that he wanted to see her breasts. He denied hugging Patient Six at the end of the appointment, stating he would not have done that because she had just had surgery.[119]

Dr. Chavason testified that Patient Six was remembering incorrectly or that her memory had been influenced somehow, but that he did not ask to see photos of her breast augmentation.[120]

---

[115] Tr. Vol. 6 at 750-51, 753.

[116] Tr. Vol. 6 at 752.

[117] Tr. Vol. 6 at 755-56.

[118] Staff Ex. 6B at 2252.

[119] Tr. Vol. 6 at 755-57.

[120] Tr. Vol. 8 at 975.

TMB0006713

Dr. Chavason denied spending over an hour with Patient Six during her appointment on July 14, 2016.[121] He testified she did not return for treatment at the Holiner Group after that visit, but he thought her failure to return was due to financial issues.[122]

## E.     Patient Seven

On or about May 25, 2016, Patient Seven, a 20-year-old woman, began receiving psychiatric treatment from Dr. Chavason at MCGO. Staff alleges that during Patient Seven's treatment, Dr. Chavason made inappropriate comments to Patient Seven regarding her physical attractiveness and sexual desirability.[123]

### 1.     Patient Seven's Testimony

Patient Seven testified at the hearing and was deposed on August 10, 2020.[124] Patient Seven graduated from high school in 2014, and at the time of hearing had completed two years of college courses at a college in the Dallas area. In 2018, she obtained a real estate agent license.[125]

Patient Seven began receiving services from the Holiner Group in 2014 to treat her depression, anxiety, and substance abuse issues.[126] Patient Seven's treatment consisted of medication, therapy, the MCGO day program, and some inpatient programs.[127] Patient Seven testified that she went to the Holiner Group at MCGO in 2015 for medication management and help with diagnoses. She saw Dr. Robert Freele for anxiety, depression, and substance abuse.[128] Patient Seven discussed her history of sexual and emotional abuse and trauma with Dr. Freele. She

---

[121] Tr. Vol. 6 at 757.

[122] Tr. Vol. 6 at 757-59.

[123] The specific allegations related to Patient Seven are numbered 102 through 122 in the Third Amended Complaint.

[124] Portions of her deposition were admitted into evidence. Her deposition testimony is largely consistent with her hearing testimony. Staff Ex. 7A (Patient Seven Deposition).

[125] Tr. Vol. 1 at 26-27.

[126] Staff Ex. 7A at 2306.

[127] Staff Ex. 7A at 2306.

[128] Tr. Vol. 1 at 27.

said Dr. Freele communicated with her therapist to coordinate her care. She received medications from Dr. Freele at medication management sessions and was also in an intensive outpatient program (IOP) as well. The IOP was located across the street from MCGO in an office building but was still regarded as a part of MCGO. Patient Seven testified she attended IOP during the day from 8:00 a.m. to 5:00 p.m. During that treatment, she attended group therapy.[129]

Patient Seven stated that a typical appointment with Dr. Freele lasted about 15 minutes. During that time, Dr. Freele would ask her about her mood, whether she was using any substances, and then address her medications based on any signs of symptoms she was showing. Dr. Freele prescribed her Lexapro and Buspar for her anxiety. She had been taking other medications while she was a patient at MCGO, but stated she was unsure when those medications had been prescribed to her.[130]

Patient Seven explained that she had been to MCGO multiple times, the last admission being in 2016 when she was admitted involuntarily for anxiety, depression, and drug addiction after she had told her therapist that she did not want to live anymore.[131] At the time, Patient Seven was abusing Xanax, cocaine, alcohol, marijuana, and opiates. During the second day at MCGO when she was standing at the nurse's station to receive her medications, Patient Seven was attacked by a male patient who grabbed her head, pushed her to the ground, and hit her.[132] Patient Seven was taken across the street to the Medical City Hospital for neck and head X-rays and to check her for a head injury. Patient Seven recalled that she felt unsafe at MCGO and that she entered a "survival mode."[133]

A day or so after the assault, on May 28, 2016, Patient Seven was accosted by another male patient who pinched her bottom.[134] That same male patient later exposed his penis to Patient Seven

---

[129] Tr. Vol. 1 at 28-29.

[130] Tr. Vol. 1 at 30.

[131] Tr. Vol. 1 at 31.

[132] Tr. Vol. 1 at 33-34.

[133] Staff Ex. 7A at 2316.

[134] Staff Ex. 7A at 2320.

when she was in the courtyard at MCGO.[135] This incident scared Patient Seven and made her feel extremely unsafe.[136]

Patient Seven saw Dr. Chavason for the first time the same day (May 28, 2016) because Dr. Freele was on vacation.[137] Patient Seven recalled Dr. Chavason looking at her body, specifically her chest, in a way that made her feel uncomfortable.[138] Although Patient Seven expected the appointment to be a normal medication management visit, she testified that she told Dr. Chavason about the male patient that had exposed himself to her in the courtyard and that she wanted to move to a different unit at MCGO. Patient Seven testified that Dr. Chavason said "something along the lines of, 'Well, I don't blame him for doing that. You have a nice butt and he has good taste.'"[139] Patient Seven said Dr. Chavason's comment made her feel unsafe.[140] Dr. Chavason also told Patient Seven that she was "too pretty" to be at MCGO. Patient Seven felt that Dr. Chavason's conduct and statements were "predatory."

Patient Seven saw Dr. Chavason again on May 29, 2016, her second and last appointment with him.[141] Patient Seven testified that she told Dr. Chavason about having a history of sexual and emotional abuse and that she worked as an exotic dancer. Patient Seven said that Dr. Chavason seemed very interested in her sexual abuse history because she felt he seemed to listen more to that than the other topics. Patient Seven testified that she was uncomfortable with Dr. Chavason's eye contact because it never stopped.[142]

After Patient Seven was discharged from MCGO on May 30, 2016, she continued her treatment with Dr. Freele at Holiner Group for a brief time. She stopped because she felt

---

[135] Staff Ex. 7A at 2322.

[136] Staff Ex. 7A at 2323-26.

[137] Tr. Vol. 1 at 35-36.

[138] Staff Ex. 7A at 2317.

[139] Tr. Vol. 1 at 36, 40, 54.

[140] Tr. Vol. 1 at 54.

[141] Staff Ex. 7B at 2713.

[142] Tr. Vol. 1 at 47, 50.

TMB0006716

uncomfortable with Dr. Freele because she said he would look at her chest and get physically close to her at the end of the sessions.[143] Patient Seven testified that Dr. Chavason did not hug her, and she did not recall any physical contact with Dr. Chavason that made her uncomfortable.[144]

When asked to describe the impact that Dr. Chavason's conduct has had on her life, Patient Seven explained:

> I definitely have not gone back to a psychiatrist. I don't want, like, a male doctor anymore. That's why [my therapist] is a woman. I just feel really uncomfortable being in a room with a male doctor. And that goes for, like, a primary care physician now. That goes for all fields of medicine. Like, all of my doctors are women now.[145]

After Patient Seven was discharged from MCGO, Patient Seven told Dr. Freele and her therapist about Dr. Chavason's conduct.[146]

### 2.    Dr. Chavason's Testimony about Patient Seven

Dr. Chavason first saw Patient Seven on May 28, 2016, at MCGO. He denied ever hugging Patient Seven during a patient session or commenting on her sexual desirability. He testified that he saw Patient Seven at MCGO on the inpatient floor in the day area, which was an open area as opposed to a closed office. He further denied staring at her breasts or her bottom. He testified that he would either make eye contact with her or be looking down while writing notes.[147]

Dr. Chavason denied telling Patient Seven that she was too pretty to be in the facility when he next saw her on May 29, 2016. While he agreed that Patient Seven had told him at that appointment, that a male patient that had exposed himself to her and had pinched her bottom, Dr. Chavason denied that he had responded by saying "I don't blame him." He also testified that

---

[143] Tr. Vol. 1 at 63, 74.

[144] Tr. Vol. 1 at 74.

[145] Staff Ex. 7A at 2336.

[146] Staff Ex. 7A at 2329.

[147] Tr. Vol. 6 at 769-70.

TMB0006717

he did not say to Patient Seven that her assailant had good taste or commented that she had a "nice butt" or "great body." He said Patient Seven was misremembering when she reported his comments.[148] He remembers that he told her he was sorry it had happened.[149] Dr. Chavason never suggested to Patient Seven that he would like to do the same thing to her, he said.

He testified he was not aware that Patient Seven had reported his conduct to anyone or how she was feeling about the allegations. He stated that Dr. Holiner talked to him about the allegations, but he told Dr. Holiner the allegations were false.[150]

## F.    Patient Eight

On or about December 28, 2012, Patient Eight, a 32-year-old woman, began receiving psychiatric treatment from Dr. Chavason at the Holiner Group. Staff alleges that Dr. Chavason hugged Patient Eight at the end of the session on March 28, 2017, despite having been warned numerous times to cease physical contact with female patients.[151]

### 1.    Patient Eight Video

The ALJs admitted into evidence a portion of a video showing a hallway inside the Holiner Group's office building. The video is approximately 5 minutes and 48 seconds long and has no audio. The time stamp on the video reads: 03/28/2017 12:53:44 PM. In the video, unidentified women can be seen entering and exiting doors and walking down the hallway.[152] Two women, one of whom is carrying a large tote bag, enter the hallway.[153] The women walk down to the far end of the hallway and converse.[154] The woman with the tote bag steps into a doorway located on her

---

[148] Tr. Vol. 8 at 984.

[149] Tr. Vol. 6 at 771-72.

[150] Tr. Vol. 6 at 773.

[151] The specific allegations related to Patient Eight are numbered 123 through 125 in the Third Amended Complaint.

[152] Staff Ex. 8D at 00:00-00:47.

[153] Staff Ex. 8D at 00:49.

[154] Staff Ex. 8D at 00:50-01:34.

right and partially disappears.[155] The woman with the tote bag then enters back into the hallway and appears to converse with someone off-screen to her left.[156] A man then enters the hallway from the left side of the woman with the tote bag and hugs her.[157] The woman and the man talk in the hallway for an extended period of time.[158] The woman and the man then exit the hallway to the left and do not reappear for the remainder of the video.[159]

### 2.     Dr. Chavason's Testimony about Patient Eight

Dr. Chavason testified he was aware there were cameras at the Holiner Group and at MCGO in the common areas and in the offices. He had reviewed the video of Patient Eight.[160]

The time stamp on the video was approximately 1:00 p.m. Dr. Chavason stated he does not remember every time he hugged a patient but believed he did hug Patient Eight a few times.[161] Dr. Chavason testified that he did not see Patient Eight for an appointment that day; instead, Patient Eight was seen by an NP. The visit started at approximately 1:42 p.m. when the patient's vitals were taken. The NP signed the note electronically at 2:06 p.m.[162] Because he said he did not see the patient that day for the visit, Dr. Chavason denied that he hugged Patient Eight that day. He also denied that he was the person in the video shown in Staff Exhibit 8D and claimed that the woman shown being hugged was not Patient Eight.[163]

---

[155] Staff Ex. 8D at 01:35-01:37.

[156] Staff Ex. 8D at 01:40.

[157] Staff Ex. 8D at 01:41-01:44.

[158] Staff Ex. 8D at 01:45-03:47.

[159] Staff Ex. 8D at 03:48-05:48.

[160] Tr. Vol. 6 at 778.

[161] Tr. Vol. 6 at 779.

[162] Staff Ex. 8B at 2815-18.

[163] Tr. Vol. 6 at 783-84.

## G.     Patient Nine

On or about December 19, 2017, Patient Nine, a 22-year-old woman, began receiving psychiatric treatment from Dr. Chavason at MCGO, where she was admitted following a suicide attempt. Staff alleges that during Patient Nine's treatment, Dr. Chavason made inappropriate comments to Patient Nine and engaged in unwanted physical contact, including calling Patient Nine a "crazy hot bitch," offering to massage Patient Nine's legs, offering to pay for Patient Nine's groceries, hugging Patient Nine at appointments, stroking her hair, and pressing his erection against her body.[164]

### 1.     Patient Nine's Testimony

Patient Nine was deposed in this proceeding on July 27, 2020, and portions of her deposition were admitted into evidence.[165]

Patient Nine was voluntarily admitted into the MCGO inpatient ward for one week on December 19, 2017.[166] Patient Nine had suicidal ideation and had attempted suicide by cutting her own neck.[167] During her inpatient treatment, Patient Nine interacted with Dr. Chavason briefly. Patient Nine recalled meeting with Dr. Chavason to discuss her mental health, and that Dr. Chavason called her a "crazy hot bitch" and described her as "smoking hot."[168]

Patient Nine participated in group therapy sessions during her outpatient treatment. Often, Dr. Chavason would ask that Patient Nine come to his office for an individual session after her group therapy session. Patient Nine would meet with Dr. Chavason in his office, and he would almost completely close his door.[169] During her sessions with Dr. Chavason, Patient Nine did not

---

[164] The specific allegations related to Patient Nine are numbered 128 through 186 of the Third Amended Complaint.

[165] Staff Ex. 9A (Patient Nine Deposition).

[166] Staff Ex. 9A at 2856.

[167] Staff Ex. 9A at 2852.

[168] Staff Ex. 9A at 2861.

[169] Staff Ex. 9A at 2876.

TMB0006720

feel that she was taken seriously, and Dr. Chavason would tell her that she had "daddy issues."[170] She recalled Dr. Chavason talking to her as if she were a friend rather than a patient.[171] Dr. Chavason would repeatedly offer to hang out with Patient Nine at her apartment and offer to bring her food.[172]

During an appointment with Dr. Chavason on January 5, 2018, Patient Nine shared a song on her phone that she had written and recorded. While Patient Nine played the song on her phone, Dr. Chavason took Patient Nine's phone, and he began to look at photos of Patient Nine on her phone.[173] Dr. Chavason found a photo of Patient Nine wearing only her undergarments and a bra.[174] Patient Nine felt disrespected and embarrassed by Dr. Chavason's conduct.[175] She felt that Dr. Chavason "wanted to use [her] for sex."[176]

Patient Nine attempted to avoid having to hug Dr. Chavason at the end of her appointment with him on January 5, 2018, by offering to shake hands instead.[177] Patient Nine testified that she wanted to avoid hugging Dr. Chavason because she felt that he did not have good intentions.[178] However, Dr. Chavason still told Patient Nine to give him a hug at the end of the appointment.[179] Dr. Chavason initiated a full-body hug and placed both of his arms around Patient Nine's lower back and pressed his erection onto her.[180] This hug made Patient Nine feel uncomfortable and

---

[170] Staff Ex. 9A at 2868, 2887.

[171] Staff Ex. 9A at 2872.

[172] Staff Ex. 9A at 2873.

[173] Staff Ex. 9A at 2888.

[174] Staff Ex. 9A at 2902.

[175] Staff Ex. 9A at 2902.

[176] Staff Ex. 9A at 2903-04.

[177] Staff Ex. 9A at 2915.

[178] Staff Ex. 9A at 2915.

[179] Staff Ex. 9A at 2916.

[180] Staff Ex. 9A at 2916.

"gross."[181] Patient Nine deflected his full-body hug by only giving Dr. Chavason a side hug and hugging him with one arm.[182]

During an appointment with Dr. Chavason on January 8, 2018, Patient Nine discussed her financial issues with Dr. Chavason.[183] She told Dr. Chavason that she was struggling to make enough money, and Dr. Chavason offered to buy her food and to take her shopping later.[184] Dr. Chavason also asked Patient Nine if he could come to her apartment.[185] Patient Nine interpreted this as a proposition, solicitation, and quid pro quo in exchange for sex.[186] Patient Nine had also told Dr. Chavason that she was going to work at Buffalo Wild Wings, and Dr. Chavason asked her if she would be working at the location on Lohman Avenue.[187] Patient Nine felt that Dr. Chavason was planning to visit her at her new job.[188] At one point during the appointment, Patient Nine told Dr. Chavason that she had pulled a muscle in her leg, and Dr. Chavason offered to massage her leg.[189]

During an appointment with Dr. Chavason on January 9, 2018, Patient Nine told Dr. Chavason that she did not want him to hug her anymore and that she wanted her relationship with him to be strictly professional.[190] Dr. Chavason responded to Patient Nine by saying that he was married and had children and that Patient Nine was mistaken about his motives.[191] Patient Nine asked Dr. Chavason why he called her a "crazy hot bitch," and Dr. Chavason

---

[181] Staff Ex. 9A at 2903-04, 2988.

[182] Staff Ex. 9A at 2904.

[183] Staff Ex. 9A at 2942.

[184] Staff Ex. 9A at 2942.

[185] Staff Ex. 9A at 2942.

[186] Staff Ex. 9A at 2943-44.

[187] Staff Ex. 9A at 2945.

[188] Staff Ex. 9A at 2945.

[189] Staff Ex. 9A at 2946.

[190] Staff Ex. 9A at 2926.

[191] Staff Ex. 9A at 2926.

TMB0006722

responded that he was trying to "fit her environment."[192] Patient Nine felt that Dr. Chavason was taking advantage of his higher professional status versus her lower socioeconomic class.[193]

Patient Nine stopped attending her appointments with Dr. Chavason mid-January of 2018 because of his inappropriate conduct, and she felt "too nervous" to come to the clinic.[194] Patient Nine was reassigned from Dr. Chavason to Dr. Holiner that month.[195] Patient Nine testified that she has a phobia around older men and has been celibate because of Dr. Chavason's conduct.[196] Patient Nine also struggles to communicate with male health professionals.[197]

### 2.    Videos of Patient Nine and Dr. Chavason

Three videos of Patient Nine's sessions with Dr. Chavason were admitted into evidence.[198] The videos depict segments of three separate individual sessions that Patient Nine had with Dr. Chavason on January 4, 2018; January 5, 2018; and January 8, 2018. None of the videos have any audio. The descriptions below of these three videos are not based on any witnesses' testimony or any documentary exhibit. Rather, they are the ALJs' descriptions based on the ALJs' viewing of the videos and constitute part of the ALJs' factfinding in this case.

### a.    January 4, 2018 Video (1 minute)

The January 4, 2018 video shows Patient Nine sitting in a chair across from Dr. Chavason's desk. The door of Dr. Chavason's office is shut. Dr. Chavason is seated behind the desk. Patient Nine is listening as Dr. Chavason speaks. Once Dr. Chavason finishes speaking, both he and Patient Nine stand, and Dr. Chavason walks over to Patient Nine and gives her a full-body

---

[192] Staff Ex. 9A at 2927.

[193] Staff Ex. 9A at 2928, 2944.

[194] Staff Ex. 9A at 2993.

[195] Staff Ex. 9A at 2997.

[196] Staff Ex. 9A at 3006-3007.

[197] Staff Ex. 9A at 3007.

[198] Staff Ex. 9D.

hug. Patient Nine deflects Dr. Chavason by turning sideways. Dr. Chavason also wraps his right arm around Patient Nine, so that he is hugging Patient Nine with both arms placed on her body and his head rests on her right shoulder. As Patient Nine turns to the door, opens it, and exits Dr. Chavason's office, Dr. Chavason places his hand on Patient Nine's back and strokes her hair as he follows behind her.

### b.     January 5, 2018 Video (1 minute, 31 seconds)

The January 5, 2018 video shows Patient Nine sitting cross-legged in a chair across from Dr. Chavason's desk. The door of Dr. Chavason's office is shut. Dr. Chavason is seated behind his desk and is looking at a smartphone screen. Dr. Chavason and Patient Nine converse. Dr. Chavason puts his smartphone into his pocket as Patient Nine initiates a handshake with Dr. Chavason from across his desk. Patient Nine then rises from her chair while Dr. Chavason remains seated. Several seconds later, Dr. Chavason stands up from his chair and walks over to Patient Nine. Patient Nine gives a low shrug while Dr. Chavason initiates a full-body hug. Dr. Chavason rubs Patient Nine's back with his right arm. Patient Nine receives the hug with one arm then turns to the door, opens the door, and exits Dr. Chavason's office. Dr. Chavason picks up a pile of binders and follows Patient Nine out of his office.

### c.     January 8, 2018 Video (1 minute)

The January 8, 2018 video shows Patient Nine wearing a jacket and sitting with her right arm across her body in a chair across from Dr. Chavason. The door to Dr. Chavason's office is shut. Dr. Chavason is seated behind his desk. Patient Nine and Dr. Chavason converse. Patient Nine rises from her seat and puts both of her hands in the pockets of her jacket while Dr. Chavason stands up from behind his desk. Dr. Chavason walks over to Patient Nine and initiates a full-body hug with Patient Nine. Patient Nine moves her hips backwards to avoid physical contact with Dr. Chavason and only touches him with her arms. Dr. Chavason leans his head into Patient Nine's hair and shoulder and visibly squeezes her torso with his arms. As Patient Nine opens the door of Dr. Chavason's office and exits, Dr. Chavason places his hand on the door frame, then turns around and moves a binder on his desk.

TMB0006724

### 3.     Dr. Chavason's Testimony about Patient Nine

Patient Nine was first admitted at MCGO for psychiatric treatment on December 19, 2017.[199] On January 2, 2018, Dr. Chavason had a follow-up visit with Patient Nine at the day hospital. He remembers the appointment lasting 20 minutes. He saw Patient Nine again on January 4, 2018, for what he estimated was another 20-minute appointment. His appointment with Patient Nine on January 5, 2018, was longer, about 25 minutes, because the patient played a song that she had written, he said. The appointment on January 8, 2018, was again 20 minutes. The appointment on January 9, 2018, was approximately 30 minutes long, he said, because Patient Nine told him at that visit that she was uncomfortable with their interaction. Dr. Chavason said he took extra time during the appointment to clarify and apologize to her if she misinterpreted their interaction as anything other than him trying to boost her self-esteem.[200] The appointments on January 4, 5, and 8, 2018, were captured on videotape and the last portions of those videos admitted.

According to a memo by Alexis Johnson, Vice President-Risk and Quality at MCGO, the lengths of these visits based on a review of the videos were: January 2, 2018, 47 minutes; January 4, 2018, 33 minutes; January 5, 2018, 36 minutes; January 8, 2018, 26 minutes; and January 9, 2018, 21 minutes. Dr. Chavason hugged Patient Nine at the end of visits on January 2, 4, 5, and 8, 2018.[201]

Other than admitting that he had hugged Patient Nine at the end of four appointments and looked on the internet to see whether there was a Buffalo Wild Wings in Dallas, Dr. Chavason denied all other allegations made concerning his comments to or his conduct with Patient Nine. Dr. Chavason pointed out that nowhere in the medical records did it state that he had pressed his erection against Patient Nine or looked at the photographs on her phone or that he had engaged in

---

[199] Staff Ex. 9B at 3166.

[200] Tr. Vol. 7 at 801-804.

[201] Staff Ex. 9A at 3084-85.

any misconduct with Patient Nine.[202] Regarding the appointment on January 4, 2018, Dr. Chavason agreed that he did hug Patient Nine at the end of the session, but he maintained that his conduct was appropriate:

> I did not stroke her hair without her knowledge. I did put my hand up, as I generally do, to prevent us running into each other as we exited either because she might back up because someone was there or because I wasn't paying attention and may run into her if she stops and I was looking elsewhere.[203]

Regarding the hug he gave Patient Nine at the end of the appointment on January 8, 2018, Dr. Chavason testified:

> I did hug her. There was a lean-in hug. I did not slide my hand down her lower back and inhale deeply nor did I moan or groan or—and I did not ever even remotely get close—I mean, gosh, that's just so outrageously false. There was never an erection to be subtly pressed against Patient Nine.[204]

On cross-examination, Dr. Chavason acknowledged that Patient Nine also had a history of sexual abuse. He testified that Patient Nine would be lying if she said that he called her a "crazy hot bitch" and "smoking hot."[205]

Dr. Chavason admitted it was possible that he used casual curse words with Patient Nine.[206] He also said that Patient Nine would be lying or possibly misunderstood him if she said that he offered to rub her leg.[207]

Dr. Chavason further testified that he hugged Patient Nine because she was feeling lonely. And "[i]f she's feeling alone and isolated and you shun her, or she perceives it as being shunned, rejected, it's very easy to go right back down to where she was; and we—she's already proven that

---

[202] Tr. Vol. 7 at 807-809; 811-17.

[203] Tr. Vol. 7 at 813.

[204] Tr. Vol. 7 at 816.

[205] Tr. Vol. 8 at 985-86.

[206] Tr. Vol. 8 at 986.

[207] Tr. Vol. 8 at 987.

TMB0006726

she is willing and capable of doing severe acts of self-harm."[208] He contended that Patient Nine initiated the hugs, not him. When asked earlier why he would default to hugging patients first instead of not hugging patients, Dr. Chavason testified that it was part of his Thai culture:

> It's part of my culture and upbringing. I mean, I've—that is my culture; and so for 25-ish—24 so 2015, what is that, almost 30 years—I have always been huggy and, you know, hey, kind of thing, jovial, friendly. And they were wanting me to try to change that, break that; and that's fine. I'm not saying it's wrong. It just took me some time.[209]

## H.     Patient Ten

On or about July 21, 2010, Patient Ten, a 41-year-old woman, began receiving psychiatric treatment from Dr. Chavason at Holiner Group. Staff alleges that Dr. Chavason repeatedly asked inappropriate sexual questions of Patient Ten, made inappropriate comments to Patient Ten, and propositioned Patient Ten for dates and sex.[210]

### 1.     Patient Ten's Testimony

Patient Ten was deposed in this proceeding on September 14, 2020, and portions of her deposition were admitted into evidence.[211]

Patient Ten was referred to the Holiner Group by her primary care physician in 2010 for anxiety and depression.[212] Patient Ten was assigned to Dr. Chavason and his NP for care.[213] Patient Ten recalled that her sessions with Dr. Chavason typically lasted about 30 minutes or longer, and that Dr. Chavason did not take her weight or blood pressure measurements.[214]

---

[208] Tr. Vol. 8 at 989.

[209] Tr. Vol. 8 at 976-77.

[210] The specific allegations related to Patient Ten are numbered 187 through 240 in the Third Amended Complaint.

[211] Staff Ex. 10A (Patient 10 Deposition).

[212] Staff Ex. 10A at 3453.

[213] Staff Ex. 10A at 3454.

[214] Staff Ex. 10A at 3454, 3471, 3473.

During her appointments, Dr. Chavason would ask her many questions about her personal life, including what she described as "intrusive" questions about her marriage, her husband, and her sex life.[215] Patient Ten felt that she did not have a "real formal doctor-patient relationship" with Dr. Chavason because he would often complain about his wife and his marital problems.[216] Eventually, Dr. Chavason asked Patient Ten to meet him outside of their appointments.[217] Dr. Chavason also attempted to hug Patient Ten at every appointment.[218] Patient Ten recalled that at one visit, she had to quickly move her purse in front of her to prevent Dr. Chavason from hugging her.[219] Patient Ten was made very uncomfortable by Dr. Chavason's conduct.[220]

After one appointment, Patient Ten reviewed her checkout sheet and noticed that she had been coded as having a diagnosis for bipolar I, which surprised her.[221] Patient Ten asked Dr. Chavason about her diagnosis at her next visit:

> And so at my next visit, I asked him about it. I said, you know, "Dr. Chavason, I don't understand. I saw that, you know, the ICD code is for Bipolar Type I and, you know, you've never mentioned to me anything about that. I'm just, you know, wondering why that is." And he told me—he said, "Oh, it's either so that"—"so that we can get the insurance company to pay for the visits with me." And it was kind of a shock.[222]

During an appointment on August 2, 2016, Dr. Chavason began commenting on Patient Ten's physical appearance and asking even more intrusive questions about her husband and her relationship with her husband.[223] In particular, Dr. Chavason called Patient Ten "hot" and asked her if her husband was able to satisfy her sexually.[224] Patient Ten felt that Dr. Chavason was

---

[215] Staff Ex. 10A at 3456, 3459.

[216] Staff Ex. 10A at 3459.

[217] Staff Ex. 10A at 3459.

[218] Staff Ex. 10A at 3461-62.

[219] Staff Ex. 10A at 3462.

[220] Staff Ex. 10A at 3462.

[221] Staff Ex. 10A at 3458.

[222] Staff Ex. 10A at 3458.

[223] Staff Ex. 10A at 3468.

[224] Staff Ex. 10A at 3469.

TMB0006728

using the appointment as an opportunity to "entice [her] into some sort of relationship with him, which [she] was so not interested in."[225] When asked why Patient Ten did not switch providers at the time, Patient Ten explained:

> It was the bipolar. He'd diagnosed me with Bipolar Type I and—fraudulently, which he admitted, and that can impact my nursing license. And I was terrified to go somewhere else that they would want a copy of my records that—and how was I going to explain that. You know, who was I? I mean, I was the – the psych patient, right? And he was the psychiatrist and, you know, what he said holds weight more than what I say. And so I was really terrified of what was going to happen to me and to my career. And, you know, I worked really hard for my nursing license. It's – I feel like it's a calling in my life. And I felt like that was all at jeopardy. And as awful was Dr. Chavason was, he wasn't going to be telling anybody that because – so I just stayed mostly out of fear.[226]

During one appointment, Dr. Chavason asked Patient Ten if her husband, who is 14 years older than her, was taking Viagra to, in his words, "keep it up."[227] Dr. Chavason also asked Patient Ten about her sexual preferences, other personal questions about her sex life, and stated that he could provide her with more sexual satisfaction.[228] Patient Ten felt as though Dr. Chavason were "digging and digging and trying to find some reason for [her] to be unhappy with [her] marriage so that [she] would want to go out with him" and that his interest in her husband's sexual ability was "creepy."[229] Dr. Chavason also bragged to Patient Ten about his ability to give oral sex.[230] At one appointment, Dr. Chavason also suggested that he and Patient Ten go out together for lunch.[231]

---

[225] Staff Ex. 10A at 3471.

[226] Staff Ex. 10A at 3475.

[227] Staff Ex. 10A at 3477.

[228] Staff Ex. 10A at 3477, 3480.

[229] Staff Ex. 10A at 3478, 3484.

[230] Staff Ex. 10A at 3485.

[231] Staff Ex. 10A at 3482.

TMB0006729

Patient Ten testified that Dr. Chavason's comments and behavior caused her great discomfort: "[T]he last thing I wanted was [Dr. Chavason], who I didn't like, making really inappropriate and invasive personal comments about my life . . . it was stressful to go see him."[232]

Patient 10 said during an appointment on March 17, 2017, Dr. Chavason told her that if he were her husband that he would keep her so sexually satisfied that she would be wandering around with a smile on her face all the time.[233] Dr. Chavason told Patient Ten that he was "always available" for a sexual relationship with her.[234]

During an appointment on June 7, 2017, the Holiner Group informed Patient Ten that she would not be seeing Dr. Chavason at her next appointment because he would be treating patients at an inpatient psychiatric hospital.[235] Patient Ten recalled that Dr. Chavason framed this job change as a positive development because he would have more time to meet with Patient Ten if she desired a sexual relationship with him.[236] At the conclusion of the appointment, Patient Ten realized that Dr. Chavason was attempting to give her a full-body contact hug, but she was able to deflect it by using her purse to block him and by getting to the door exiting his office immediately.[237]

Patient Ten started seeing Dr. Walter Elliston on August 1, 2017. Patient Ten testified that Dr. Elliston changed her diagnosis from bipolar to depression and anxiety.[238] Dr. Elliston also significantly reduced the number of medications that Patient Ten had been prescribed by Dr. Chavason.[239]

---

[232] Staff Ex. 10A at 3495.

[233] Staff Ex. 10A at 3502.

[234] Staff Ex. 10A at 3503.

[235] Staff Ex. 10A at 3508.

[236] Staff Ex. 10A at 3509.

[237] Staff Ex. 10A at 3512.

[238] Staff Ex. 10A at 3515.

[239] Staff Ex. 10A at 3527.

TMB0006730

Patient Ten testified that she saw Dr. Chavason one day at Medical City Dallas after she was no longer his patient. He approached her and told her that since he was no longer her physician that there were no longer any conflicts preventing them from having a sexual relationship.[240] Dr. Chavason then attempted to give Patient Ten his personal cell phone number.[241] Dr. Chavason also attempted to hug Patient Ten.[242]

During an appointment with Dr. Elliston on February 19, 2018, Patient Ten told Dr. Elliston about Dr. Chavason's inappropriate conduct and comments.[243] Dr. Elliston expressed surprise and began to take notes about Patient Ten's past experiences with Dr. Chavason.[244] After the appointment, Dr. Elliston called Patient Ten to inform her that he would be reporting Dr. Chavason to the Board.[245]

When asked how Dr. Chavason's conduct has impacted her, Patient Ten explained:

> To be honest, I don't really want to see another psychiatrist. I mean, I don't—I don't—I mean, I know they're not all like that, you know, I mean, that he's just an aberration, you know, a sick individual. But I'm afraid to go see somebody.[246]

## 2.    Dr. Chavason's Testimony about Patient Ten

Dr. Chavason denied all the allegations made against him and testified that Patient Ten sued him.[247] Dr. Chavason said that he saw Patient Ten in the lobby of Medical City Dallas, but he denied saying anything inappropriate to her. Instead, he said he "quickly waved and said hi and

---

[240] Staff Ex. 10A at 3519.

[241] Staff Ex. 10A at 3520.

[242] Staff Ex. 10A at 3521.

[243] Staff Ex. 10A at 3524.

[244] Staff Ex. 10A at 3525.

[245] Staff Ex. 10A at 3525.

[246] Staff Ex. 10A at 3529.

[247] Tr. Vol. 7 at 821-27.

TMB0006731

asked what she was doing there because it was lunchtime. She advised that she had an appointment with Dr. Elliston. I said 'Okay' and 'Have a nice day' and left. I proceeded to get my lunch."[248]

Dr. Chavason stated that Patient Ten was not remembering correctly when she said that he would ask about her marriage every session and comment on her husband's sexual virility. He was sure, however, that he asked about her marriage because it was a stressor in her life.[249]

## I.     Patient Eleven

On or about September 14, 2010, Patient Eleven, a 30-year-old woman, began receiving psychiatric treatment from Dr. Chavason at the Holiner Group. Staff alleges that during Patient Eleven's treatment, Dr. Chavason repeatedly asked inappropriate sexual questions of Patient Eleven, made inappropriate comments to Patient Eleven, and engaged in sexual contact with Patient Eleven.[250]

### 1.     Patient Eleven's Testimony

Patient Eleven was deposed in this proceeding on February 20, 2020, and portions of her deposition were admitted into evidence.[251]

In August 2010, Patient Eleven began having suicidal thoughts and voluntarily admitted herself into MCGO.[252] At MCGO, Patient Eleven met Dr. Chavason.[253] Patient Eleven was

---

[248] Tr. Vol. 7 at 827.

[249] Tr. Vol. 8 at 993.

[250] The specific allegations related to Patient Eleven are numbered 241 through 291 in the Third Amended Complaint.

[251] Staff Ex. 11A (Patient Eleven Deposition).

[252] Staff Ex. 11A at 4051.

[253] Staff Ex. 11A at 4051.

TMB0006732

discharged from MCGO approximately two weeks later with a diagnosis of major depression.[254] Patient Eleven was prescribed Klonopin, Risperdal, and Zoloft.[255] She had a history of abuse.[256]

During an appointment on September 14, 2010, Dr. Chavason began to ask Patient Eleven questions about her sexual behaviors and preferences.[257] Dr. Chavason then told Patient Eleven that he would have sex with her on his desk if she were not his patient.[258] Patient Eleven testified that she asked Dr. Chavason about whether her Risperdal prescription was making her hypersexual.[259] At the conclusion of the appointment, Dr. Chavason walked Patient Eleven to the door exiting his office and then he rubbed his body against her body, with his genitalia pressed against her back.[260] Patient Eleven testified that Dr. Chavason would hug her and hold and caress her breasts and buttocks at her appointments.[261]

On September 21, 2010, Patient Eleven attended a medication management appointment with Dr. Chavason.[262] During the appointment, Dr. Chavason approached her, hugged her, pulled her close and squeezed her breasts and buttocks.[263] Patient Eleven asked Dr. Chavason if the Risperdal could cause her breasts to lactate. Dr. Chavason responded by asking Patient Eleven if he could taste her breast milk, lifting her blouse and sucking both of her nipples.[264] Dr. Chavason told Patient Eleven that her breast milk was tasty and that he enjoyed it.[265]

---

[254] Staff Ex. 11A at 4051-52.

[255] Staff Ex. 11A at 4052.

[256] Tr. Vol. 8 at 995.

[257] Staff Ex. 11A at 4054.

[258] Staff Ex. 11A at 4054.

[259] Staff Ex. 11A at 4054.

[260] Staff Ex. 11A at 4055.

[261] Staff Ex. 11A at 4057.

[262] Staff Ex. 11A at 4060.

[263] Staff Ex. 11A at 4060.

[264] Staff Ex. 11A at 4060.

[265] Staff Ex. 11A at 4060.

TMB0006733

Patient Eleven testified that Dr. Chavason asked her about her favorite sexual positions and told her that she turned him on.[266] During his appointments with her, Dr. Chavason would keep the door closed.[267]

On September 30, 2010, Patient Eleven attended a medication management appointment with Dr. Chavason.[268] Patient Eleven testified that she engaged in sexual activities with Dr. Chavason during this appointment.[269] Specifically, she testified that he squeezed her breasts, felt her buttocks, and "he pulled down to the side my clothing on the bottom portion of my body and he stuck his fingers, three of them, I think, two or three, into my vagina and proceeded to masturbate me."[270] Afterward, Dr. Chavason removed his fingers from Patient Eleven's vagina and placed them in his mouth.[271] He told Patient Eleven that it tasted nice.[272]

On October 6, 2010, Patient Eleven attended a medication management appointment with Dr. Chavason.[273] Patient Eleven testified that she engaged in sexual activities with Dr. Chavason during this appointment:

> He would always come around to my side of the desk and hug me tightly, squeeze my buttocks, rub on my breasts, and squeeze them very tightly to where they hurt. He, again, pulled my pants aside and began to stick his fingers in the same place as the third visit, the vagina, and to masturbate me.[274]

At times, Dr. Chavason told Patient Eleven that she was "hot" and "sexy."[275]

---

[266] Staff Ex. 11A at 4062.

[267] Staff Ex. 11A at 4062.

[268] Staff Ex. 11A at 4067.

[269] Staff Ex. 11A at 4069.

[270] Staff Ex. 11A at 4070.

[271] Staff Ex. 11A at 4073.

[272] Staff Ex. 11A at 4073.

[273] Staff Ex. 11A at 4075.

[274] Staff Ex. 11A at 4082.

[275] Staff Ex. 11A at 4354-57.

TMB0006734

On November 9, 2010, Patient Eleven attended a medication management appointment with Dr. Chavason.[276] Patient Eleven testified that she engaged in sexual activities with Dr. Chavason during this appointment.[277]

On November 16, 2010, Patient Eleven attended a medication management appointment with Dr. Chavason.[278] Patient Eleven testified that Dr. Chavason forced her to perform oral sex on him and to masturbate him.[279] Dr. Chavason attempted to penetrate Patient Eleven's vagina, but she was menstruating.[280] Dr. Chavason hugged Patient Eleven, felt her breasts and buttocks, and sucked on her nipples.[281]

In early December 2010, Patient Eleven reported Dr. Chavason's sexual misconduct to Dr. Holiner.[282] Patient Eleven informed Dr. Holiner that Dr. Chavason had put his lips on her breasts, held her breasts, put fingers in her vagina, and that she put his penis in her mouth. She said that Dr. Holiner's response was to ask Patient Eleven whether she spit or swallowed Dr. Chavason's semen.[283] On December 10, 2010, Dr. Chavason sent Patient Eleven a letter terminating their patient/physician relationship because of non-compliance and her approaching other physicians outside of the Holiner Group for treatment.[284]

Patient Eleven testified that Dr. Chavason's conduct traumatized her and has made her feel awkward, uncomfortable, objectified, and sexually abused. Patient Eleven has trust issues with authority figures, especially men, because of Dr. Chavason's conduct.[285]

---

[276] Staff Ex. 11A at 4367-70.

[277] Staff Ex. 11A at 4104.

[278] Staff Ex. 11A at 4111.

[279] Staff Ex. 11A at 4108-12.

[280] Staff Ex. 11A at 4177-78.

[281] Staff Ex. 11A at 4179-80.

[282] Staff Ex. 11A at 4180-81.

[283] Staff Ex. 11A at 4125-26.

[284] Staff Ex. 11A at 4127.

[285] Staff Ex. 11A at 4139-40.

Patient Eleven filed a complaint with the Board on November 23, 2010, alleging that Dr. Chavason had acted inappropriately both in terms of his statements to her and his sexual conduct towards her.[286] Patient Eleven also contacted the local police to report Dr. Chavason and made an outcry to her sponsor at approximately the same time.[287] The Board later dismissed the complaint against Dr. Chavason.

## 2.     Dr. Chavason's Testimony about Patient Eleven

Dr. Chavason testified that other staff members could interrupt his patient sessions, inflating the length of the patient's appointment from two to 20 minutes, depending on what was needed. He acknowledged that there would be no entry into the medical record regarding any of those interruptions.[288] He noted that Dr. Holiner discussed these interruptions in the letter he wrote to the Board in July 2011 in response to Patient Eleven's complaint with the Board, and that Dr. Holiner's letter was favorable to him.[289]

Dr. Chavason testified he saw Patient Eleven on September 14, 2010, as indicated in the office visit note.[290] The note itself did not state when the appointment began, but hand-written comments indicate Patient Eleven checked in at 12:39 p.m. Dr. Chavason guessed that the appointment started around 12:58 to 1:00 p.m. because he said he would not see a patient until he was finished with his lunch, which was from noon to 1:00 p.m.[291] The note indicated that the visit ended at 1:06 p.m. when Dr. Chavason electronically signed the note.

Regarding Patient Eleven's first visit on September 14, 2010, Dr. Chavason testified that for the September 14, 2010, visit, it was a quick appointment, and he said he did not have to

---

[286] Staff Ex. 11F at 4414-16.

[287] Staff Ex. 11D.

[288] Tr. Vol. 6 at 644.

[289] Staff Ex. 11A at 4335.

[290] Staff Ex. 11A at 4309.

[291] Tr. Vol. 6 at 648-49. Respondent compared the note admitted as Staff Exhibit 11A at 4309 with the note of the same date admitted as Staff Exhibit 11C at 4344, the latter of which contained no hand-written information or printed header. The note admitted as Staff Exhibit 11A at 4309 is marked as "Patient Review Past Note" and indicates the note for the patient was last saved on December 8, 2010.

TMB0006736

provide a lot of support. He denied commenting on her sexual desirability during their sessions. He testified that during the September 14, 2010 visit, he only engaged in superficial discussion about personal matters, if at all. Dr. Chavason denied commenting on her physical attractiveness and sexual desirability, including telling her she was "hot," although he testified that he "would have said something like, 'Oh, don't worry. You're attractive. You're smart. You're funny. You're easy to talk to...' and then moved on."

Dr. Chavason testified that Patient Eleven had reported feeling isolated and lonely and wanted to be with someone so bad she reported that she had had a one-night stand.[292] He agreed Patient Eleven stated she had a particularly heightened sexual state, which she believed was caused by the Risperdal prescription, although he stated he tried to correct her about the medication and told her that it was unlikely caused by the medication. He denied asking Patient Eleven about her sexual preferences or telling her that if she were not his patient, he would have sex with her, which he called "outrageously false." He also denied rubbing his body against Patient Eleven when he opened the door to let her out of his office.

Patient Eleven's next visit was on September 21, 2010. Patient Eleven checked in at 12:56 p.m. and her appointment was at 1:00 p.m. The note was electronically signed by an NP at 1:17 p.m. and the patient checked out at 1:22 p.m.[293] Dr. Chavason said did not see Patient Eleven at this visit. The NP increased Patient Eleven's Risperdal prescription dosage at this visit.[294]

Dr. Chavason next saw Patient Eleven for a medication management appointment on September 30, 2010.[295] Dr. Chavason electronically signed the note at 11:41 a.m. Patient Eleven checked in at 10:46 a.m. and checked out at 11:45 a.m. Dr. Chavason said that it was uncertain what time the appointment started or when Patient Eleven was called back to his office, but he said he probably started the appointment at around 11:00 a.m.[296] He agreed that he spent longer than

---

[292] Tr. Vol. 6 at 652.

[293] Staff Ex. 11A at 4311-12.

[294] Tr. Vol. 6 at 654.

[295] Staff Ex. 11A at 4313-14.

[296] Tr. Vol. 6 at 656-57.

TMB0006737

usual with Patient Eleven because he said he was worried that Patient Eleven was pregnant and he was concerned with how her medications could effect a fetus. His concern was noted in the office note.

Additionally, Dr. Chavason:

- Agreed that Patient Eleven told him that the Risperdal caused her to lactate, and agreed that lactation was a possible side-effect of the medication;

- Denied that he stood beside Patient Eleven and asked if he could taste her lactation;

- Denied that he suckled Patient Eleven's left breast; and

- Denied that he hugged Patient Eleven during the visit, felt her breasts and buttocks, and suckled on her nipples. He testified he may have given her a lean-in side hug to let her know it was okay if she might be pregnant.[297]

The next medical management visit with Patient Eleven occurred on October 6, 2010. Dr. Chavason was the treating provider and electronically signed the note at 4:02 p.m.[298] Patient Eleven checked in at 3:15 p.m. for a 3:30 p.m. appointment, and checked out at 4:08 p.m. Dr. Chavason:

- Denied talking about her sexual behavior during the visit; and

- Denied that he gave Patient Eleven a hug during the visit, felt her breasts and buttocks, or sucked on her nipples, but stated that he may have given her a lean-in side hug because he was trying to comfort her.

The fifth office visit with Patient Eleven occurred on October 27, 2010. Patient Eleven checked in at 1:59 p.m. for a 2:15 p.m. appointment. Dr. Chavason electronically signed the note at 2:42 p.m. and Patient Eleven checked out at 2:49 p.m.[299] Dr. Chavason testified that because she was self-pay, Patient Eleven could not return soon for the next appointment even though he

---

[297] Tr. Vol. 6 at 660.

[298] Staff Ex. 11A at 4315-16.

[299] Staff Ex. 11A at 4317-18.

wanted to see her sooner. He was also considering prescribing Geodon if the Risperdal was not effective. He did increase the dosage of Risperdal during this visit.[300] Dr. Chavason:

- Denied that during this visit he penetrated Patient Eleven's vagina with his fingers, knowingly smelling and tasting his fingers afterward; and

- Denied that he hugged Patient Eleven during the visit, felt her breasts and buttocks, and sucked on her nipples, although he testified that he may have given her a lean-in side hug because she seemed to be doing better, "so kind of congratulations."

The next medication management visit occurred on November 9, 2010. Patient Eleven checked in at 7:52 a.m. for an 8:00 a.m. appointment. Dr. Chavason electronically signed the note at 8:54 a.m. and Patient Eleven checked out at 9:06 a.m. Dr. Chavason agreed that the visit on November 9, 2010, was about an hour long, but he testified it was because he needed to give her informed consent for stopping the Risperdal and starting the Geodon. He said he also needed time to get her samples of the Geodon from the samples closet and to instruct her on how to titrate up the dosage.[301] Dr. Chavason:

- Denied that he brought Patient Eleven to the closed door of his office where he blocked the door with his foot to prevent anyone from walking in on him;

- Denied that he had Patient Eleven perform oral sex on him and masturbate him, adding that he had never had or received oral or sex or requested any patient to masturbate him;

- Denied that he penetrated Patient Eleven's vagina with his fingers during visits, knowingly tasting his fingers afterward; and

- Denied that he hugged Patient Eleven during the visit, felt her breasts and buttocks, or sucked on her nipples, saying that he had given the patient a lean-in side hug.[302]

The final office visit occurred on November 16, 2010. Patient Eleven checked in at 3:31 p.m. for a 3:45 p.m. appointment, and she checked out at 4:17 p.m. Dr. Chavason

---

[300] Tr. Vol. 6 at 665.

[301] Tr. Vol. 6 at 667-68.

[302] Tr. Vol. 6 at 669.

TMB0006739

electronically signed the note at 4:08 p.m.[303] Dr. Chavason testified that he prescribed Klonopin to Patient Eleven to help with her anxiety, but that he was using it as a "stop-gap" until the mood stabilizer (either Risperdal or Geodon) kicked in.[304] He increased the dosage of the Risperdal because, other than the reported side-effects, he said the medication was helping Patient Eleven.[305] Later, he re-prescribed Risperdal to the patient, even with the side-effect of lactation and hypersexuality, because the drug seemed to work the best for her.[306]

Dr. Chavason:

- Denied that he had Patient Eleven perform oral sex and masturbate him;

- Denied that he tried to penetrate her vagina with his fingers but Patient Eleven was menstruating; and

- Denied that he gave Patient Eleven a hug during the visit, felt her breasts and buttocks, or sucked her nipples, stating that he may have given her a side-hug.

According to the office notes, at approximately 7:30 p.m. on November 16, 2010, Patient Eleven called the after-hours answering service. The message indicates that she had been in the office earlier that day, had started a new medication, that her speech was slurred, and that she needed a call back.[307] Dr. Freele was the on-call physician. The following morning a note was entered into the medical record stating that Patient Eleven had called the previous night but that she was presently okay.[308] On Sunday, November 21, 2010, Patient Eleven called the office again at approximately 5:00 p.m. and told the on-call service she only wanted to talk to Dr. Chavason. The note indicates that the patient expressed that if she could not speak to Dr. Chavason, she would

---

[303] Staff Ex. 11A at 4321-22.

[304] Tr. Vol. 6 at 671.

[305] Tr. Vol. 6 at 672.

[306] Tr. Vol. 8 at 999.

[307] Staff Ex. 11C at 4377.

[308] Staff Ex. 11C at 4378; Tr. Vol. 6 at 678-79.

overdose.[309] She later denied any suicidal ideation and explained that she was irritable and continued to take the medication to try to calm down.[310]

Dr. Chavason testified that he hugged Patient Eleven at the end of office visits because "she was kind of initiating it, kind of leaning in." Patient Eleven never communicated to him that the hugs were objectionable; rather, he said that the patient felt that the hugs were helpful.[311]

After Patient Eleven complained to the Board, Dr. Chavason wrote a letter to the Board to explain his treatment of the patient and his response to her allegations against him.[312] In that letter, he denied that he had engaged in any inappropriate sexual conduct with Patient Eleven, among other matters.

When asked whether he took accountability for the reported incidences of inappropriate conduct, Dr. Chavason said:

> I did take accountability. I really did, like I said, curtail my hugging. I greatly reduced it. Like I said, it's difficult to stop three decades of upbringing, you know —you know, cold turkey. But as I mentioned earlier, I resigned January 1st, 2018, mostly for, you know, work-home-life balance but also to—you know, I wanted to work on myself as well. And so I was planning on leaving—clearly, I was planning on leaving and leaving patient care at that time as well to, again, mostly do home-life balance but also to kind of work on me.[313]

He also stated that he learned from the boundaries course to take cues from patients about whether they wanted to be hugged. If a patient told him she did not want to be hugged, he would not hug that patient. Dr. Chavason acknowledged that a patient may not be able to verbalize to him that she did not want to be hugged but thought that his manner with them—laughing and joking

---

[309] Staff Ex. 11C at 4379.

[310] Staff Ex. 11C at 4380.

[311] Tr. Vol. 6 at 674-75.

[312] Staff Ex. 11A at 4323-24.

[313] Tr. Vol. 8 at 1001.

TMB0006741

with them—would make them feel more comfortable with telling him they did not want to be hugged.[314]

## J.    Patient Twelve

On or about December 22, 2011, Patient Twelve, a 20-year-old woman, began receiving psychiatric treatment from Dr. Chavason at the Holiner Group and MCGO. Staff alleges that Dr. Chavason inappropriately hugged, touched, stroked, and squeezed Patient Twelve during an appointment.[315]

### 1.    Patient Twelve Video

The ALJs admitted into evidence a portion of a video showing the end of the session on June 30, 2016, between Dr. Chavason and Patient Twelve.[316] The video is approximately 22.5 minutes long. The description below of this video is not taken from any witnesses' testimony or from any exhibit. Rather, it is based on the ALJs' viewing of this video and constitutes part of the ALJs' factfinding in this case.

In the video, Dr. Chavason is seated at his desk. Patient Twelve is sitting on a chair directly in front of Dr. Chavason's desk, while another member of Patient Twelve's family, an older woman, sits in a chair facing the side of Dr. Chavason's desk. The door to Dr. Chavason's office is closed. Patient Twelve and Dr. Chavason converse.[317] Dr. Chavason offers Patient Twelve a Kleenex, which she accepts.[318] Dr. Chavason types on his computer while Patient Twelve's family member and Patient Twelve talk to him for several minutes.[319] Dr. Chavason hands Patient Twelve a spiral-bound notebook which Patient Twelve puts into her purse.[320] Patient Twelve and

---

[314] Tr. Vol. 8 at 1001-1003.

[315] The specific allegations related to Patient Twelve are numbered 292 through 305 in the Third Amended Complaint.

[316] Staff Ex. 12B.

[317] Staff Ex. 12B at 00:10-00:52.

[318] Staff Ex. 12B at 00:53.

[319] Staff Ex. 12B at 1:05-04:32.

[320] Staff Ex. 12B at 04:34-06:58.

Patient Twelve's family member continue to converse with Dr. Chavason, who sits with hands over his computer keyboard. Patient Twelve throws her Kleenex at Dr. Chavason, and he throws it back to her.[321] She throws it to him again, and he puts it in the trash can next to his desk.[322] The appointment continues as Dr. Chavason, Patient Twelve, and Patient Twelve's family member continue to talk to one another.[323] Dr. Chavason picks up a pen and begins filling out a two-page form on his desk.[324]

Patient Twelve's family member picks up her purse and gets up from her chair.[325] Dr. Chavason stands and hands her paperwork.[326] The two shake hands.[327] The family member goes to the door and places her hand on the door handle, while Patient Twelve stands up.[328] Dr. Chavason has moved from behind his desk and is seated on the corner of his desk nearest to his office door and directly in front of Patient Twelve.[329] Patient Twelve's family member opens the door, and begins to exit Dr. Chavason's office.[330] While Patient Twelve's family member has her back turned to Patient Twelve and Dr. Chavason, Dr. Chavason begins to stroke Patient Twelve's back and his hand slides down Patient Twelve's side and along the area between her back and her breast.[331] He then gives Patient Twelve a full-body hug and wraps his arms around her.[332] Dr. Chavason keeps one arm around Patient Twelve's waist after he disengages from hugging Patient Twelve.[333] He then strokes the back of Patient Twelve's arm and shoulder.[334]

---

[321] Staff Ex. 12B at 07:00-07:05.

[322] Staff Ex. 12B at 07:08-07:13.

[323] Staff Ex. 12B at 07:14-12:00.

[324] Staff Ex. 12B at 12:11.

[325] Staff Ex. 12B at 14:20.

[326] Staff Ex. 12B at 14:24.

[327] Staff Ex. 12B at 14:28-14:30.

[328] Staff Ex. 12B at 14:48.

[329] Staff Ex. 12B at 14:48.

[330] Staff Ex. 12B at 15:00.

[331] Staff Ex. 12B at 15:01.

[332] Staff Ex. 12B at 15:03-15:06.

[333] Staff Ex. 12B at 15:05-15:10.

[334] Staff Ex. 12B at 15:11-15:14.

Patient Twelve continues to talk with Dr. Chavason, and Dr. Chavason puts his hands back at his sides.[335] While they are talking, Dr. Chavason rubs Patient Twelve's side once.[336] Patient Twelve's family member reappears in the doorway to Dr. Chavason's office.[337] Dr. Chavason continues to talk with both women.[338] Eventually Patient Twelve's family member leaves again, and Dr. Chavason gives Patient Twelve another hug with one arm.[339] He pulls Patient Twelve close to him and wraps his arm around Patient Twelve's neck.[340] He walks Patient Twelve out of his office with his arm around her shoulder.[341] Dr. Chavason rubs and pats Patient Twelve as they exit his office.[342]

## 2. Dr. Chavason's Testimony about Patient Twelve

Dr. Chavason testified that he would occasionally give Patient Twelve a lean-in side hug at the end of the appointments. He denied ever commenting on Patient Twelve's sexual desirability or attractiveness during any of the sessions. He also denied that he inappropriately hugged, touched, stroked, squeezed, and caressed Patient Twelve's body during the June 30, 2016 appointment, as shown in the video. Dr. Chavason denied that the video showed him inappropriately hugging, touching, stroking, squeezing, or caressing Patient Twelve's body. Dr. Chavason agreed that his hugging occurred after Dr. Holiner asked him in August 2015 not to hug patients, and that the hugging was inappropriate in that regard. But he maintained that based on his knowledge of Patient Twelve, it would have done more harm to her self-esteem if he had pushed her away.[343]

---

[335] Staff Ex. 12B at 15:15.

[336] Staff Ex. 12B at 15:34.

[337] Staff Ex. 12B at 15:39.

[338] Staff Ex. 12B at 15:44.

[339] Staff Ex. 12B at 17:42.

[340] Staff Ex. 12B at 17:44-17:47.

[341] Staff Ex. 12B at 17:48-17:55.

[342] Staff Ex. 12B at 17:48-17:55.

[343] Tr. Vol. 7 at 829.

## K.     Employee One

Employee One was deposed on August 21, 2020, and portions of her deposition were admitted into evidence.[344]

During the beginning of her employment at the Holiner Group, Employee One worked with Dr. Chavason daily as his NP, and Dr. Chavason acted as a mentor to Employee One.[345] Employee One said that Dr. Chavason would share details about his personal life, including details about his marriage, and would ask Employee One questions about her relationship status and past relationships.[346] Employee One stated that Dr. Chavason complimented her appearance and her personality.[347]

At one point in November or December 2009, Employee One volunteered to babysit Dr. Chavason's children.[348] Employee One stated that she offered to babysit because Dr. Chavason had expressed that his marriage was strained and that he was stressed from taking care of his young children.[349] While babysitting Dr. Chavason's children, Employee One received a text message from Dr. Chavason informing her that his wife was angry because she had observed him putting his hand on Employee One's back while he was showing her around the house when Employee One had first arrived.[350] He told Employee One that his wife had taken the car and was returning home, and that Employee One was to leave as soon as his wife got there.[351] Employee One did not babysit again for Dr. Chavason after this incident.

---

[344] Staff Ex. 14 (Employee One Deposition).

[345] Staff Ex. 14 at 5309.

[346] Staff Ex. 14 at 5312.

[347] Staff Ex. 14 at 5313.

[348] Staff Ex. 14 at 5316.

[349] Staff Ex. 14 at 5316-17.

[350] Staff Ex. 14 at 5317.

[351] Staff Ex. 14 at 5318.

A few months after the babysitting incident, Employee One began to feel that Dr. Chavason was "keeping tabs" on her.[352] She explained that he would count the number of his patients cared for by Employee One.[353] Employee One said that during business hours, Dr. Chavason would massage her shoulders even though she asked him to stop and that he hugged her and attempted to kiss her two times.[354] Employee One recalled that when Dr. Chavason would hug her, his hand would go down her lower back and he would try to grab her backside.[355] Employee One asked him to stop hugging her.[356]

Employee One acknowledged that toward the end of December 2009, she and Dr. Chavason had sexual intercourse at the Holiner Group.[357] Employee One recalled that Dr. Chavason did not wear a condom, and that he had difficulty with an erection and a small penis.[358] Employee One did not recall whether she verbally consented, but she did not refuse to have intercourse with Dr. Chavason.[359]

## L.    Employee Two

Employee Two was deposed in this proceeding on August 19, 2020, and portions of her deposition testimony were admitted into evidence.[360]

Employee Two first encountered Dr. Chavason when she began working as a mental health technician at the inpatient level at MCGO in April 2014.[361] She worked with Dr. Chavason until

---

[352] Staff Ex. 14 at 5323.

[353] Staff Ex. 14 at 5323.

[354] Staff Ex. 14 at 5324, 5328.

[355] Staff Ex. 14 at 5330.

[356] Staff Ex. 14 at 5330.

[357] Staff Ex. 14 at 5336.

[358] Staff Ex. 14 at 5339-40.

[359] Staff Ex. 14 at 5338-39.

[360] Staff Ex. 16 (Employee Two Deposition).

[361] Staff Ex. 16 at 5774.

TMB0006746

she was moved to a different unit in January 2016.[362] Employee Two recalled that Dr. Chavason was friendly and would spend more time talking with the mental health technicians than the other psychiatrists.[363] At that time, Employee Two was 22 years old.[364]

A few months into her work at MCGO, Employee Two noticed that Dr. Chavason began spending more time asking her about her personal life, including whether she was dating or why she was still single.[365] Employee Two also recalled that Dr. Chavason began to engage in other inappropriate behaviors. For instance, she recalled that Dr. Chavason would: put his hand on her shoulder or find other ways to touch her at work;[366] or find Employee Two's phone so he could at look at photos of her and ask her for photos of her wearing less clothing.[367] Employee Two testified:

> He would make a point to touch my shoulder or the small of my back anytime that I would be passing by, whether it be me walking around on the rounds or if he would be in the doorway that I had to walk through. Or I would be in the nurses' station working on my charting and he would give me an unsolicited shoulder massage…it would sometimes be a lingering touch, but it was always…could have been avoided. It wasn't necessary for him to touch me when I'm passing by or anything.[368]

Employee Two recalled one incident when Dr. Chavason offered to purchase her a sandwich from the nearby cafeteria and he grabbed her hand while they were walking back to MCGO.[369] In response to this unwanted and startling touch, Employee Two placed the bag holding her sandwich into her other hand.[370] After this incident, Dr. Chavason approached Employee Two

---

[362] Staff Ex. 16 at 5929.

[363] Staff Ex. 16 at 5775.

[364] Staff Ex. 16 at 5784.

[365] Staff Ex. 16 at 5776.

[366] Staff Ex. 16 at 5777.

[367] Staff Ex. 16 at 5778, 5780.

[368] Staff Ex. 16 at 5793.

[369] Staff Ex. 16 at 5802.

[370] Staff Ex. 16 at 5804.

TMB0006747

and told her that someone had seen him holding her hand and that the observer had assumed there was a romantic relationship between him and Employee Two.[371]

As a result of the hand-holding incident, Employee Two's supervisor met with her to discuss the nature of her relationship with Dr. Chavason.[372] Employee Two recalled telling her supervisor that Dr. Chavason would pay special attention to her but that there was no personal relationship between them that existed outside of her working relationship with him.[373] As a result of this meeting, Employee Two was instructed to no longer speak with Dr. Chavason.[374] Employee Two felt that she was no longer supported at work and that she was being blamed for Dr. Chavason's inappropriate conduct.[375]

Employee Two said that Dr. Chavason attempted to look at the photos on her phone and would tell Employee Two that he was searching for photos of her in a bikini or of her bottom.[376]

Dr. Chavason's behavior made Employee Two feel very uncomfortable at work.[377] She acknowledged that she did not report Dr. Chavason to the human resources department.[378] But when asked how she would handle the same situation now, Employee Two affirmed that she would report the conduct as sexual harassment.[379] Employee Two estimated that during her time at MCGO, Dr. Chavason touched her at least 90 times and made 9 inappropriate comments.[380] Employee Two testified:

---

[371] Staff Ex. 16 at 5805.

[372] Staff Ex. 16 at 5805.

[373] Staff Ex. 16 at 5805.

[374] Staff Ex. 16 at 5805.

[375] Staff Ex. 16 at 5805.

[376] Staff Ex. 16 at 4782.

[377] Staff Ex. 16 at 5783.

[378] Staff Ex. 16 at 5819.

[379] Staff Ex. 16 at 5819.

[380] Staff Ex. 16 at 5930.

I see [Dr. Chavason] as a harm to female patients physically and his female staff and believe that although he is currently not in direct patient care, he is still in interaction with female coworkers; and with him being a danger to others, he should no longer be able to practice.[381]

## M.     Dr. Holiner

Dr. Joel Holiner testified at the hearing and was deposed on February 21, 2020.[382] Dr. Holiner is licensed in Texas and is the owner and founder of the Holiner Group, which primarily provides psychiatric evaluation and medication management.

Dr. Holiner attended the University of Texas at Austin but did not graduate. He was accepted into medical school at the University of Texas at Southwestern Medical School after taking prerequisite courses and the admission examination. After he graduated from medical school in 1979, Dr. Holiner completed an internship at Parkland Hospital in Dallas, Texas, followed by a residency at the University of California, San Diego. He is board certified by the American Board of Psychiatry and Neurology. He also holds a subspecialty certification in addiction psychiatry. He is a member of several psychiatric and medical associations, including the American Medical Association and the American Psychiatric Association. Dr. Holiner has hospital privileges at Medical City Dallas Hospital and Medical City McKinney Hospital.[383] Dr. Holiner participated in over a hundred peer reviews from about 2003 to 2019 when he was Medical Director at MCGO.[384] He was not offered as an expert witness in this hearing.

Dr. Holiner opened the Holiner Group in 1983. In addition to psychiatric evaluation and medication management, the Holiner Group occasionally provides supportive psychotherapy, although formal psychotherapy sessions are not typical and not encouraged.[385] A typical follow-up office appointment is a medication management session that is scheduled for 15 minutes.

---

[381] Staff Ex. 16 at 5875.

[382] Portions of Dr. Holiner's deposition were admitted into evidence. His deposition testimony was largely consistent with his hearing testimony.

[383] Tr. Vol. 2 at 120-23. Dr. Holiner's CV was admitted as Staff Exhibit 28.

[384] Tr. Vol. 2 at 123-24.

[385] Tr. Vol. 2 at 126.

TMB0006749

Currently, there are three physicians on staff. The practice employs approximately 35 total people, which includes 13 NPs or physician assistants (PAs).[386]

Dr. Holiner was part of the management team at the Holiner Group, along with the office administrator or manager; other administrative personnel; and ADP, the third-party human resources (HR) company hired by the Holiner Group. This team was responsible for disciplining employees and making termination decisions, he said.[387]

Although he stated he would review and approve the office policies and procedures, Dr. Holiner said those policies and procedures were developed by the

Employee One worked for the Holiner Group in 2009 or 2010 as a part of Dr. Chavason's team. Dr. Holiner remembered her as a young, recent graduate, who was very smart and nice.

Employee One had apparently talked with an NP on Dr. Holiner's team about Employee One's relationship with Dr. Chavason. As part of the internal investigation at the Holiner Group, the NP wrote a statement dated February 4, 2010, detailing Employee One's interactions with Dr. Chavason as related to her by Employee One.[388] A PA on Dr. Holiner's team had also advised Dr. Chavason that he and Employee One should not be sharing personal information with each other and that their relationship should be on a professional basis only. The PA also wrote a statement for the file, dated February 5, 2010, regarding her conversation with Dr. Chavason.[389]

ADP conducted an investigation that included interviewing Employee One, Dr. Chavason, and Dr. Holiner's NP.[390] ADP found no violation of policy and recommended that Employee One be assigned to a different doctor. Dr. Holiner testified that he talked to Dr. Chavason about the

---

[386] Tr. Vol. 2 at 127.

[387] Tr. Vol. 2 at 127-28.

[388] Staff Ex. 1C at 722.

[389] Staff Ex. 1C at 723.

[390] Staff Ex. 1C at 25.

necessity of having professional relationships with coworkers and to not let those relationships become personal.[391]

Dr. Holiner did not treat Patient Eleven, but he said he had a telephone conversation with her on December 9, 2010, about her office visits with Dr. Chavason.[392] As documented by Dr. Holiner in the office note, Patient Eleven informed Dr. Holiner that she was reporting Dr. Chavason to the Board because she alleged that at every office visit with him, Dr. Chavason would "put his lips on my breasts, held my breast, put his fingers in my vagina, & I put my mouth on his penis." Dr. Holiner's note concluded with, "When I asked about intercourse, she said 'no, but he talked about anal sex.'"[393]

Dr. Holiner testified that he was shocked by his phone call with Patient Eleven because he did not have any reason to believe, at that time, that Dr. Chavason would have sex with patients.[394]

He recalled that he did not ask Patient Eleven if she "spit or swallowed" but that he may have asked Patient Eleven if Dr. Chavason had ejaculated onto something: "I don't remember specifically asking this, but if I was to ask the question, I might say something like, Did – did he ejaculate? Did you swallow the semen, did you not, wondering if, you know, there was semen on a dress, kind of the Monica Lewinsky kind of thing . . . ."[395] He thought that the allegations of sexual behavior were unrealistic because physicians' sessions with patients were interrupted frequently by NPs or PAs coming in to get signatures for prescriptions. He said that sometimes patients make untrue claims about sexual issues, and he noted that one patient had made a false accusation against him. Nonetheless, he expressed at the hearing that he had been happy that it had been reported to the Board for investigation.[396]

---

[391] Tr. Vol. 2 at 146.

[392] Tr. Vol. 2 at 147; Staff Exs. 1C at 4384; 1E at 4410-11.

[393] Staff Ex. 1E at 4411.

[394] Staff Ex. 27 at 14473.

[395] Staff Ex. 27 at 14482.

[396] Tr. Vol. 2 at 152.

TMB0006751

According to Dr. Holiner, the Holiner Group also investigated Patient Eleven's complaint but could not determine what happened. Dr. Holiner discussed the complaint with Dr. Chavason, and Dr. Chavason had denied that it was true. Dr. Holiner recalled Dr. Chavason acting incredulous about the accusation and denying it vehemently.[397] Dr. Holiner believed Dr. Chavason at that time but clarified that given what he knows now about Dr. Chavason, he would guess that Dr. Chavason probably did have sexual interactions with Patient Eleven.[398] Patient Eleven was terminated from the practice at Holiner Group.[399]

Employee Two was a mental health technician at Green Oaks Hospital. Around the time allegations regarding Dr. Chavason's interactions with Employee Two were raised, Dr. Holiner viewed a video that showed Dr. Chavason and Employee Two sharing a Coke and hugging. Dr. Holiner testified that he discussed the video with Dr. Chavason.[400] Dr. Holiner thought the behavior was inappropriate and not professional enough, and he shared his opinion with Dr. Chavason. According to Dr. Holiner, Dr. Chavason met with Tom Collins, the chief executive officer for Green Oaks, and was "told clearly that he can't do that and if that behavior continues that there are going to be serious consequences at the hospital."[401]

Dr. Holiner stated that the group's policy regarding contacting a patient was that the contact should be made by telephone for security reasons, and each contact should be documented in the patient's records. Contact by cell phone was allowed when the provider was on call away from the hospital. The provider's phone number would be blocked. Texting is not permitted, he said.[402] Suzan Reicherts,[403] practice administrator at the Holiner Group, sent Dr. Chavason an email on July 15, 2014, advising him not to text with patients.[404] Dr. Holiner also discussed not texting

---

[397] Staff Ex. 27 at 14477.

[398] Staff Ex. 27 at 14478-79.

[399] Staff Ex. 11E at 4413.

[400] Tr. Vol. 2 at 161.

[401] Tr. Vol. 2 at 162; Staff Ex. 1C at 768.

[402] Tr. Vol. 2 at 163-64.

[403] Suzan Reicherts and Suzan Ross (mentioned below) are the same person. Tr. Vol. 8 at 1016, 1018.

[404] Staff Ex. 1C at 766.

TMB0006752

patients on several occasions with Dr. Chavason. Dr. Holiner testified that he told Dr. Chavason that "we absolutely cannot do it because it's not—there's not enough privacy involved when you text; and [Dr. Chavason] said he understood and would not text patients."[405]

Dr. Holiner also spoke with Dr. Chavason about undocumented contact with patients and made it clear to him that all contacts with patients must be documented in the medical records.[406] On October 22, 2014, Ms. Reicherts sent an email to Dr. Chavason with a copy to Dr. Holiner, inquiring if Dr. Chavason was not documenting all his contacts with patients:

> There have been patients recently added to your schedule that have not had any phone messages or communication documented with you. How is this happening? Are you communicating with them without documenting? If so, how are you communicating if they have not left you a message?[407]

In his response, Dr. Chavason wrote that he had been contacting patients because they had not been seen for a while and "owe me money." Dr. Chavason also did not think that it was necessary to document the contact if the patient set up an appointment the day of the contact or if he could not actually reach the patient. Ms. Reicherts reiterated that every patient contact, call, or interaction had to be documented in the records.[408]

Dr. Holiner testified that he wanted to talk with Dr. Chavason about a matter concerning the hospital and went to Dr. Chavason's office over lunchtime, knocked on the door, and then tried to enter the office but the door was locked. Dr. Chavason came to the door and unlocked it and Dr. Holiner entered the office. The patient in Dr. Chavason's office—identified as Patient Two— was crying and was "very, very upset," according to Dr. Holiner. This incident occurred on October 17, 2014, and was documented by Nikki Havens, the office manager.[409] Dr. Holiner stated

---

[405] Tr. Vol. 2 at 165.

[406] Tr. Vol 2 at 165.

[407] Staff Ex. 1C at 772.

[408] Staff Ex. 1C at 772.

[409] Tr. Vol. 2 at 168; Staff Ex. 1C at 769.

TMB0006753

that he had a conversation with Dr. Chavason afterwards about not locking his office door. Dr. Chavason told Dr. Holiner he would not lock his office door.[410]

Dr. Holiner explained that while the office did not have a written policy against locking doors, it was the standard of care to not lock the door for the safety of both the clinician and the patient.[411] Ms. Havens noted in the file that the patient had an appointment scheduled for 11:00 a.m., but that Dr. Chavason had called the patient himself and changed the appointment to 12:00 p.m. At approximately 12:35 p.m., Dr. Holiner knocked on the door and discovered it was locked. Based on the audit trail in the electronic records, Dr. Chavason had been in his office with Patient Two for approximately 18 minutes and had not yet started an office note. Dr. Chavason billed code 99214 with no therapy for that appointment.

On October 27, 2014, Corina Hobson, the administrative assistant for the Holiner Group, sent an email to the employees of the Holiner Group with high importance, advising that office doors were not to be locked at any time for safety purposes. Dr. Chavason replied to the email that he wanted a sign to be posted that people should be careful when opening doors and to do so slowly because he had many patients with children who come to the appointments, and he did not want the door to "smack" them.[412]

Dr. Holiner was asked whether he had any concerns about Dr. Chavason in 2014, to which he responded:

> My concern is that he tended not to follow the rules and guidelines, that he was too casual, not professional enough, that he needed to follow the office rules better that we had in the office. And I worked really hard to try to mentor him and meet with him and talk to him about all of these issues repeatedly.[413]

---

[410] Tr. Vol. 2 at 173.

[411] Tr. Vol. 2 at 169.

[412] Staff Ex. 1C at 781.

[413] Tr. Vol. 2 at 173-74.

Dr. Holiner believed Dr. Chavason was absorbing his advice, and Dr. Holiner was hopeful that Dr. Chavason would mature and be a more professional clinician over time.

Dr. Holiner tried to have breakfast with Dr. Chavason every day at the hospital so that he could "kind of reinforce things and talk about the rules and talk about his practice problems."[414] Because there were significant continued problems with Dr. Chavason's immaturity and not following the Holiner Group guidelines, Dr. Holiner documented a discussion he had with Dr. Chavason on January 12, 2015:

> I met with Dr. Chavason for 15 to 20 minutes at the Green Oaks doctors' lounge to discuss several problematic practice issues. I reviewed the need to document all patient phone calls, not having sessions in office when staff not present, not scheduling his own patients or changing his schedule without staff knowledge—all of which have been problematic violations by Dr. Chavason. I explained the rationale for all of these practice rules. I also expressed concern about the long appointments he sets up only for certain female patients. I reminded him that he can never lock the office door during sessions (which he has done). I asked him to consider whether he was not giving extra attention to some patients to meet his own personal needs and gratifications. He was upset that his visual presentation of his patient schedule had changed, and I explained that this was only due to blocking his ability to change his own schedule due to his abuse of that ability, creating problems for the practice.[415]

Dr. Holiner said that the meeting on January 12, 2015, was not the first meeting he had had with Dr. Chavason about these issues although he could not recall how many meetings he had with him.

Dr. Holiner did not treat Patient One. He recalled that he called Patient One because he received a notice from the billing department that Patient One had some questions about her account and had a concern or complaint about Dr. Chavason. Dr. Holiner said that during that phone call Patient One relayed that she had been in Dr. Chavason's office for a session and that she went to steady a wall clock that looked like it was going to fall down when Dr. Chavason came

---

[414] Tr. Vol. 2 at 179.

[415] Tr. Vol. 2 at 178; Ex. 1C at 786.

TMB0006755

up behind her and rubbed against her as she was steadying the clock. Dr. Holiner asked Patient One to put her complaint in writing, but she declined to do so.[416]

Emily Buchanan, a supervisor in the collections department, wrote a memo dated March 3, 2015, regarding Patient One's complaint.[417] The complaint was then investigated by the administrative team at the Holiner Group and ADP. After the investigation, an additional memo, dated March 6, 2015, was produced with recommendations made to correct Dr. Chavason's behavior.[418] Although the investigation was instituted because of Patient One's complaint, it touched on other areas of concern about Dr. Chavason's behavior.

The memo stated that Dr. Chavason had two incidents that resulted in complaints and several policy violations documented during his employment with the Holiner Group. The first incident occurred in early 2010, when Dr. Chavason's NP—Employee One—filed a complaint of sexual harassment. The second incident, also in 2010, involved a patient complaint—by Patient Eleven—of sexual harassment against Dr. Chavason. Dr. Holiner testified that he discussed all these policy violations with Dr. Chavason at various times. The policy violations listed in the memo were:[419]

1.    Contacting patients by cell phone.

2.    Scheduling patients when office is closed (during the 12:30 p.m. lunch hour and after 5:00 p.m.). It has been noticed that the patients scheduled during these times are young, attractive, female patients.

3.    Allowing female patients to break practice policies—renewing prescriptions without being seen and seeing non-payment patients.

4.    Locking the office door while having patient sessions and sessions lasting 30 minutes (the standard is 15 minutes). This has been noticed that is with young, attractive, female patients. On 10-30-14, Dr. Holiner discussed the violations with Dr. Chavason.

---

[416] Tr. Vol. 2 at 180-81.

[417] Staff Ex. C1 at 788.

[418] Staff Ex. 1C at 789-791; Tr. 185-86.

[419] The memo referenced three policy violations, but five policy violations were actually listed.

TMB0006756

5.    Texting or emailing patients.

The memo stated in part:

"[b]ehavior patterns indicate that Dr. Chavason has no regard for the rules of the practice or implied rules of personal space OR he does understand the rules and has chosen not to include himself [as a person who] has to follow them, but rather [believes he] is able to evade them depending on the situation and circumstance. Either type of behavior will indicate that the likeliness of another incident occurring is high. This poses a risk of liability for the organization."[420]

It was recommended that Dr. Chavason attend an extensive workshop or training regarding patient-doctor relationships, sexual harassment training, and ethical behavior for psychiatric providers. The memo concluded that Dr. Chavason "must understand the seriousness of these allegations...."[421]

Dr. Holiner testified that the Holiner Group did not reach a conclusion about what happened between Patient One and Dr. Chavason because the stories told by each of them were different. Nonetheless, the Holiner Group wanted to investigate the complaint to also review Dr. Chavason's general pattern of not following the practice's rules, he said.[422]

The Holiner Group produced two more memos entitled "Office Concerns," which were signed by Dr. Holiner and Dr. Chavason.[423] Dr. Holiner testified that the memos included lists of office policies and the expectations that they wanted to make sure Dr. Chavason was following.[424]

The first Office Concerns memo, dated March 12, 2015, listed numerous requirements for Dr. Chavason for his employment with Holiner Group and his interaction with patients. These requirements included that that 30-minute appointments were for crisis patients only and could not be continuous for the same patients or routine for pregnant or post-partum patients. Further,

---

[420] Staff Ex 1C at 790-91. Emphasis in original.

[421] Staff Ex. 1C at 791.

[422] Tr. Vol. 2 at 190.

[423] Staff Ex. 1C at 792-93; 803-04.

[424] Tr. Vol. 2 at 191.

Dr. Chavason was advised not to get involved in scheduling, not to block his schedule, and not to see patients at times when the office was closed, or staff were unavailable. He was reminded to code appropriately for time spent with a patient. Dr. Chavason was also advised that he should refer therapy to therapists and should be doing medical management appointments only except on an as-needed basis when clinically necessary. Dr. Chavason was also required to set appropriate boundaries with patients and to not engage in certain practices or behaviors, which included the following items listed in the memo:

> Patients should not have relationship that could be thought of as inappropriate [such as] "I miss you"
> Seeing same patients for extended time periods beyond 15 minutes
> No locked doors for any reason
> No calling patients out of the blue to check on them
> Use Rinda [Jordan, his NP] if worried about a patient
> Rinda should return phone calls to patients- MD only if specific need
> Use Rinda for follow up appointments unless patient is Tricare.[425]

By signing the Office Concerns document, Dr. Chavason agreed that he understood these policies and that he could be disciplined if he did not follow them. He also agreed to attend training chosen by the management team.

Dr. Holiner said that he tried to get Dr. Chavason to interact more professionally with his patients and not be too personal or too casual. According to Dr. Holiner, Dr. Chavason "tended to be immature in his style, youthful, boyish. He would not use as many medical terms. He would use more casual language. He would dress more casually. He would interact in ways with patients that were not as formal or strict. He'd hug patients at times."[426]

Dr. Holiner also was concerned about the length of some of Dr. Chavason's patient visits, noting that "it seemed if he particularly liked that patient, he would extend the sessions longer just chatting..." instead of focusing on medication management, which was the core of his practice.[427] Dr. Chavason seemed to have a lot of pregnant patients with whom he would spend a lot of time,

---

[425] Staff Ex. 1C at 793.

[426] Tr. Vol. 2 at 192.

[427] Tr. Vol. 2 at 193.

TMB0006758

and Dr. Holiner would remind him to refer his patients to therapy instead of Dr. Chavason providing that therapy.[428]

The first Office Concerns memo noted that Dr. Chavason should not prescribe multiple benzodiazepines together and/or to his patients who had alcohol or substance abuse issues. Dr. Holiner testified that the practice at the Holiner Group was not to combine these medications together or to prescribe them to patients with a substance abuse history, both of which he noticed Dr. Chavason was doing. Because benzodiazepines have an addictive effect, the Holiner Group tried to minimize their use. Additionally, prescribing multiple benzodiazepines tends to be more sedating and/or have more addictive potential, he said.[429]

On March 19, 2015, Dr. Holiner and administrative staff consisting of Suzan Ross, Nichole Havens, and Corina Hobson met with Dr. Chavason to talk about some of his prescribing practices. As documented in the Holiner Group records, they discussed Dr. Chavason's prescribing practices for Patient Two because although she had a history of opioid abuse, Dr. Chavason prescribed her the controlled substances Klonopin and Ambien. Dr. Chavason was advised to clearly document why controlled substances were being prescribed to this patient and to get random drug screens and prescription reports from the Texas Department of Public Safety to ensure against abuse.[430]

Even after the first Office Concerns document was issued in mid-March 2015, Dr. Holiner testified that he still had concerns about Dr. Chavason's conduct, including the length of his sessions with patients and the casual nature of those interactions.[431] On July 9, 2015, it was documented in the Holiner Group records that Patient Six came in for an appointment and the live camera video feed showed that Dr. Chavason hugged Patient Six at the end of the appointment.[432]

---

[428] Tr. Vol. 2 at 194.

[429] Tr. Vol. 2 at 196.

[430] Tr. Vol. 2 at 204-05; Staff Ex. 4C at 1673.

[431] Tr. Vol. 2 at 206, 209.

[432] Staff Ex. 1C at 800.

TMB0006759

Another office memo, dated July 23, 2015, was drafted for the file regarding Dr. Chavason's interactions with Patient Six on July 7, 16, and 21, 2015.[433] According to that memo, Dr. Chavason called Patient Six multiple times but did not record those calls in the medical records. Dr. Chavason's office visit with Patient Six on July 7, 2015, lasted approximately 1 hour and 20 minutes. His office visit with her on July 21, 2015, lasted approximately 42 minutes. Dr. Chavason did not code any therapy provided or additional time taken with the patient for these two office visits. During the July 21, 2015 visit, Dr. Chavason pulled a sealed envelope out of his desk drawer and placed on the desk. Patient Six put the envelope into her purse without opening it. No controlled substances were documented in the record for that date and the contents of the envelope were at that time unknown to the Holiner Group.

The second Office Concerns memo, dated August 4, 2015, repeated many of the issues listed in the first Office Concerns memo, such as doing medication management appointments only and referring patients to therapists; not doing extended appointments; not scheduling his own patients or seeing patients while the office was closed; coding appropriately for the time spent with a patient; setting appropriate boundaries with patients; not calling patients just to check on them; and documenting his interactions with patients. The document was signed by Dr. Holiner and Dr. Chavason. Dr. Chavason agreed to attend either the PACE or Vanderbilt University course for boundaries issues and agreed to get therapy. He acknowledged that if he did not follow the guidelines, any future violations would subject him to potential termination by the practice.[434]

Dr. Holiner testified that many of these issues were discussed with Dr. Chavason on a regular basis to "keep him, hopefully, on the straight and narrow."[435] Dr. Holiner thought that therapy was a good idea because he was concerned about Dr. Chavason's failure to follow the rules. Dr. Chavason was warned, he said, that he could be terminated if his conduct continued.[436]

---

[433] Staff Ex. 4C at 1674.

[434] Staff Ex. 1C at 803-04.

[435] Tr. Vol. 2 at 212.

[436] Tr. Vol. 2 at 213.

TMB0006760

On August 1, 2015, the Holiner Group adopted a policy addendum related to romantic relationships. Dr. Chavason signed a copy of this addendum.[437] While adoption of the addendum was influenced by the situation with Dr. Chavason, Dr. Holiner stated that the group wanted to have this policy in general.[438]

With respect to the PACE or Vanderbilt University boundaries courses, Dr. Holiner acknowledged that the courses were only given a few times a year. But he was also requiring attendance if Dr. Chavason were to stay employed by the Holiner Group. Dr. Holiner did not think Dr. Chavason particularly wanted to take the course.[439] According to a memo dated August 20, 2015, Dr. Holiner talked that day with Dr. Chavason about Patient Two and his agreement to get therapy and attend one of the boundaries courses:

> Dr. Holiner called Dr. Chavason to address issues of him calling [P]atient [Two] on 8/19/15 four times after Rinda had already spoken with her on 8/17/15. Dr. Holiner told Dr. Chavason that this was giving [Patient Two] special treatment above other patients and against our guidelines set forth for him (on 3/19/15 and again on 8/16/15). Dr. Chavason said he did not speak with the patient because she was not answering her phone and wasn't sure how many times he should call a patient that is not answering. Dr. Holiner reiterated that it was inappropriate behavior and that he shouldn't have called her repeatedly. Dr. Holiner told Dr. Chavason that we would not allow him to see [Patient Two] at 11:45 am on a Friday when staff leaves for half day. They agreed that she could come in at 10:45 AM while the staff is still in the office.
>
> Dr. Holiner asked Dr. Chavason to please think about what he is doing so this does not happen again. Dr. Holiner asked Dr. Chavason if he scheduled the boundaries course and an appointment with the therapist per the agreement made on 8/15/16. Dr. Chavason stated he has been busy and has not looked at the courses yet and that Dr. Bateman [a therapist known to Dr. Chavason] was working on getting re-credentialed with the EAP. Dr. Holiner informed Dr. Chavason that he should not wait for Dr. Bateman to get re-credentialed and needed to make an appointment ASAP. He also told him to use his afternoon out of the office to work on getting courses and therapy scheduled.[440]

---

[437] Staff Ex. 1C at 806.

[438] Tr. Vol. 2 at 214.

[439] Tr. Vol. 2 at 215-16.

[440] Staff Ex. 1C at 808.

Dr. Holiner expressed feeling frustrated at this time with Dr. Chavason's conduct but was still motivated to turn Dr. Chavason into the best doctor he could be.[441] Dr. Chavason did attend the Vanderbilt University Maintaining Proper Boundaries course on October 7-9, 2015.[442]

However, in June 2016, another patient—Patient Seven—made a complaint to another Holiner Group physician, Dr. Robert Freele, about comments Dr. Chavason made to her during a session that occurred at Green Oaks Hospital. Dr. Holiner recalled that Dr. Freele contacted him about the complaint. Dr. Holiner told Dr. Chavason that he would likely get called in to discuss the situation at Green Oaks and went over boundaries issues with him again.[443]

In January 2017, Dr. Chavason was suspended for three days from the Holiner Group office—but was still required to see patients at Medical City McKinney--because he failed to comply with the previous agreements to reform his conduct. Dr. Chavason was warned that he would be terminated if he did not change his behavior. The written notice was signed by Dr. Holiner and Dr. Chavason.[444] The specific issues listed in the written notice were:

Set boundaries with staff
Do not have relationships with staff that could be thought of as inappropriate
Do not hang out in female staff offices/areas unless work related
Do not make lewd or unprofessional remarks to staff members, example "you look hot"
Do not touch female staff unless medically necessary
Maintain a professional behavior at all times, examples include posture, comments.

Dr. Holiner explained that they wanted to try something different with the office suspension before Dr. Chavason was terminated from the practice. Suspending Dr. Chavason from his office practice affected him financially and created difficulties in rescheduling his patients. In Dr. Holiner's terms, they were trying to get Dr. Chavason's attention.[445]

---

[441] Tr. Vol. 2 at 216.

[442] Staff Ex. 2A at 1116.

[443] Tr. Vol. 2 at 219-220; Staff Ex. 1C at 813.

[444] Staff Ex. 1C at 814.

[445] Tr. Vol. 2 at 222.

TMB0006762

Dr. Holiner continued to be frustrated with Dr. Chavason's conduct and was starting to wonder whether Dr. Chavason was "ever going to get it." Dr. Holiner asked the administrative staff to create a timeline of Dr. Chavason's disciplinary issues so that they could get a perspective over the years because the Holiner Group was getting close to terminating him, he said. The timeline spanned the years 2010 through March 2017.[446]

The three-page disciplinary timeline covered sexual harassment complaints by coworkers; Dr. Chavason texting patients; Dr. Chavason locking his office door during sessions with patients; a complaint that Dr. Chavason inappropriately touched a patient; the requirements for him to get therapy and attend a boundaries course; Dr. Chavason calling patients when he should not; Dr. Chavason making inappropriate comments to a patient; Dr. Chavason not establishing appropriate boundaries with staff; and Dr. Chavason hugging a patient.[447]

Dr. Holiner was asked about Patient Nine, who he said was initially a patient in the inpatient unit. She was seen by Dr. Chavason for a couple of days in the hospital inpatient unit, and then was seen by another Holiner psychiatrist. When Patient Nine transitioned to the day program, she was again seen by Dr. Chavason. Patient Nine made a complaint to the staff at the day hospital that Dr. Chavason was inappropriate with her because of some of his comments to her and that he hugged her, and she did not like it.[448] Dr. Holiner hand-wrote a note to the file about the complaint, which he read into the record during the hearing:

> Dr. Chavason Termination 01/12/18. I met with Dr. Chavason to terminate his employment for continued unprofessional behavior. It was learned on 01/09/18 that a young female day hospital patient [Patient Nine] at Green Oaks complained to staff [that] Dr. Chavason hugged her after each meeting, the last one being extra-long and, … "he sighed." She tried to … shake hands, but he said, "he was a hugger." And [he would] … initiate the hug and he called her a … "crazy sexy bitch" …both in the hospital where he was her attending one day and in the day hospital. He offered to meet her out of the hospital and … "go buy her things." He said that her house was on the way home to his house, and she reported being

---

[446] Tr. Vol. 2 at 223-25.

[447] Staff Ex. 1C at 817-19.

[448] Tr. Vol. 2 at 227.

TMB0006763

concerned about him stalking her at the job she was applying for at Buffalo Wild Wings.... [Dr. Chavason] ... "looked it up on his phone and he said he knew how to get there" .... She complained to staff that she confronted Dr. Chavason on their last visit. The situation was investigated at Green Oaks, and Dr. Chavason was restricted from day hospital as long as the complaint was there as well as not being allowed to treat female patients.

...

Peer review on 01/16/18. He also told this young female patient he wished he could rub her leg when she said she had tightness in her leg. Danielle Greenberg, the day hospital coordinator, said Dr. Chavason has repeatedly said inappropriate comments to her calling her ... "hot" and offering massages. Danielle, as well as all hospital staff hearing the complaints of the female patient, believed the complaint is accurate. In a meeting with myself, Krysla Karlix, the COO, and Tom Collins, the CEO, Dr. Chavason said he was only making those comments ... "to build up [Patient Nine's] self-esteem" .... He said that his hugs were only "side hugs" in response to the patient's initiation of hugs, absolutely refuted by the patient. In addition, Dr. Chavason also refused to take call in McKinney as requested as this would have made him on call every six weeks instead of five in Dallas. This refusal was a violation of his employment contract....[449]

Before his employment was terminated, Dr. Chavason submitted a resignation letter dated January 1, 2018, to be effective March 31, 2018.[450]

After the complaint made by Patient Nine, a peer review was held at MCGO on January 16, 2018. In addition to gathering information from Patient Nine, the hospital staff, and Dr. Chavason, the committee also watched a video of Dr. Chavason's session with Patient Nine in the day hospital. Dr. Holiner recalled that there was a frontal hug between Dr. Chavason and Patient Nine, and then as Patient Nine was exiting the treatment room, Dr. Chavason touched her hair and "kind of went down her hair" and "rolled down her back." Dr. Holiner thought this was inappropriate and the video largely influenced his decision in the peer review to terminate Dr. Chavason's privileges at MCGO. The video was consistent with Patient Nine's description of what happened, he said.[451] Because Dr. Chavason chose to resign his privileges, the matter

---

[449] Tr. Vol. 2 at 228-30; Staff Ex. 1C at 821-22.

[450] Staff Ex. 1C at 820.

[451] Tr. Vol. 2 at 234.

TMB0006764

submitted to the hospital board was only to accept his resignation.[452] Dr. Holiner believed Patient Nine's complaint against Dr. Chavason.[453]

Dr. Holiner subsequently hand-wrote a complaint dated January 28, 2018, to the Board regarding Patient Nine's complaint against Dr. Chavason and the termination of his privileges at MCGO.[454] The complaint noted Dr. Chavason's prior disciplinary history with the Board. He was unsure whether that complaint was filed with the Board. Then on February 9, 2018, Holiner Group employee Suzan Ross submitted a complaint to the Board regarding Dr. Chavason. Dr. Holiner testified that he directed Ms. Ross to submit the complaint and that the complaint covered more than just Dr. Chavason's conduct with Patient Nine.[455]

Dr. Holiner testified that it was not until he observed the video footage of Dr. Chavason with Patient Nine that he realized that prior complaints against Dr. Chavason may have been credible and that Dr. Chavason was lying:

> When [I saw that video], I just said Oh, my God, he's really got a problem. He really is doing these things. And it hit me that—all the other things came to my mind about—about all these accusations and problems. And I said, He's got to be reported to the Board, and he cannot be in our practice, because I no longer believed him and no longer felt that I could help him.[456]

Dr. Holiner testified that Dr. Chavason would not document things that he did or calls that he would make to patients, and he tried to mentor him in these areas.[457] Dr. Holiner explained that he advised Dr. Chavason to not hug or touch his patients or staff and to dress and behave more professionally.[458] Dr. Holiner noted that there was a time where he observed an improvement in

---

[452] Tr. Vol. 2 at 263; Staff Ex. 1C 98-99.

[453] Tr. Vol. 2 at 235.

[454] Staff. Ex. 1C at 828-29.

[455] Tr. Vol. 2 at 241-42.

[456] Staff Ex. 27 at 14523; 14546 ("...when I watched the video and I saw that he was not telling the truth, that it was a frontal hug and it – it was not a side-hug and it did not look like she initiated it at all.")

[457] Staff Ex. 27 at 14524.

[458] Staff Ex. 27 at 14525.

Dr. Chavason's behavior, but that near the end of Dr. Chavason's time at the Holiner Group, he noticed more and more problems with Dr. Chavason.[459]

After Dr. Chavason had been terminated from the Holiner Group, Dr. Holiner became aware that another patient—Patient Ten—had made a complaint about Dr. Chavason to Dr. Elliston, another Holiner physician whom Patient Ten started seeing for treatment after she stopped seeing Dr. Chavason. Dr. Elliston wrote a note for the file regarding his interaction with Patient Ten during a session on February 19, 2018.[460] According to the note, Patient Ten told Dr. Elliston that Dr. Chavason had made inappropriate comments to her during appointments, had suggested meeting up in a different setting, and had suggested that they could get together now that he was not her doctor. Dr. Holiner thought that the conduct reported by Patient Ten likely happened. While he did not know whether Dr. Chavason engaged in sexual acts with patients, Dr. Holiner thought Dr. Chavason had boundary issues and engaged in inappropriate conduct with respect to patients at the Holiner Group.[461]

Dr. Holiner was asked if hugging a patient is ever appropriate at the Holiner Group, and he testified:

> I could imagine a situation where a patient is—it's important for that patient to have physical contact with the doctor. I have a psychotic patient that I hug every visit, because if I don't, then she thinks that I don't like her, that I think she should kill herself, that she's no good. So I hug her every visit, twice every visit. And it really—I think it saved her life. I have other patients—I think another situation it might be appropriate is someone that's had a terrible loss and is really upset, and they might go to hug a patient just to have a connection with them. You know, so I would think there's situations like that where I could see it would be therapeutically reasonable and maybe important to do that.[462]

---

[459] Staff Ex. 27 at 14526.

[460] Staff Ex. 1C at 834.

[461] Tr. Vol. 2 at 244-45.

[462] Staff Ex. 27 (Holiner Deposition) at 14451.

## N.     First Peer Discipline Action

After MCGO opened an investigation into Patient Nine's complaint, Dr. Chavason resigned his privileges. Dr. Chavason agreed that he relinquished his privileges at MCGO while under investigation regarding Patient Nine's complaint, but he said that it was made clear to him that the decision had already been made regarding his alleged conduct. He knew that Dr. Holiner was upset with him for not taking the extra call at Medical City McKinney. Dr. Chavason contended there were never any findings to show that there was harm to the public or to patients.[463]

## O.     Second Peer Discipline Action

Medical City Dallas revoked Dr. Chavason's privileges because he resigned while under investigation at MCGO and because he failed to report the peer action to Medical City Dallas. Dr. Chavason testified he thought that if he resigned from MCGO then he had also resigned his privileges at Medical City Dallas. He did not realize he had to separately resign from Medical City Dallas. The revocation of his privileges at Medical City Dallas had nothing to do with Patient Nine, he said.[464]

## P.     Expert Witness Testimony

### 1.     Dr. Barbara Ziv

#### a.     Dr. Ziv's Background

Dr. Barbara Ziv testified as Staff's expert at the hearing on the merits and was deposed on January 6, 2021.[465] Portions of her deposition were designated and admitted.[466]

---

[463] Tr. Vol. 7 at 830-31.

[464] Tr. Vol. 7 at 830-31.

[465] Dr. Ziv's deposition testimony was largely consistent with her testimony at the hearing. At the time of her deposition, Dr. Ziv had not reviewed the deposition testimony of any of the patients or employees. Staff Ex. 20 (Dr. Ziv Deposition) at 6396.

[466] Staff Ex. 20.

Dr. Ziv is board-certified in psychiatry and neurology.[467] She has testified previously in approximately 250 cases in both civil and criminal matters with more than half of those cases relating to allegations of sexual abuse or sexual misconduct.[468] She has an extensive medical background that is detailed in her CV, which was admitted as Staff Exhibit 19. She is currently licensed to practice medicine in Pennsylvania, New Jersey, North Carolina, Maryland, New Hampshire, and Vermont. Her licensure was pending reactivation in California at the time of the hearing, and she has inactive licenses in Massachusetts and New York. Dr. Ziv maintains a forensic psychiatric practice and is also the medical director for Aetna. In that capacity, she oversees case management, reviews cases, and reviews facilities to ensure that best psychiatric care practices and protocols are implemented.[469] Dr. Ziv has also holds two appointed positions: 1) on the Pennsylvania Sexual Offenders Assessment Board; and 2) on the Commonwealth of Pennsylvania Medical/Legal Advisory Board on Child Abuse.[470]

In this case, Dr. Ziv testified and provided an expert report regarding standard of care, sexual boundary violations, and other factors related to patient harm and severity of patient harm. She reviewed documentation including the medical records but did not interview any of the former patients or coworkers of Dr. Chavason. She was found to be a qualified expert witness and Dr. Chavason's motion to exclude Dr. Ziv's expert testimony and report were denied in Order No. 17. Because Staff was not alleging that Dr. Chavason was a sexual predator, *per se*, the mention of sexual predator patterns of behavior on pages 71 and 79 of Dr. Ziv's expert report were excluded, and Dr. Ziv was not allowed to specifically testify as to sexual predator patterns of behavior. However, the ALJs found that Staff may rely on the number of alleged victims and the alleged evidence against Dr. Chavason to attempt to show the extensive nature and pattern of Dr. Chavason's misconduct, the potential likelihood that the victims were truthful, and that disciplinary action by the Board is warranted.

---

[467] Staff Ex. 20 at 6363.

[468] Staff Ex. 20 at 6380.

[469] Staff Ex. 20 at 6365.

TMB0006768

b.      Dr. Ziv's Testimony

Dr. Ziv explained that, unlike a clinical psychiatrist, a forensic psychiatrist does not have doctor-patient relationships. Instead, a forensic psychiatrist is brought into a criminal or civil matter to address a specific question, which sometimes includes offering an opinion on sexual assault matters.

Dr. Ziv was asked by Staff to review the information related to Dr. Chavason's treatment of various patients with respect to the standard of care and whether his behavior met the standard of care.

Regarding doctor-patient boundary guidelines, Dr. Ziv testified that the American Psychiatric Association (APA) "clearly and definitively and unequivocally says that there is no sexual contact permitted between a psychiatrist and a patient at any point [in] time, now or in the future."[471] The American Medical Association (AMA) guidelines are slightly different but have specific sections that are directly related to psychiatrists, she said. Dr. Ziv recited the following section of the AMA guidelines:

> A psychiatrist shall be ever vigilant about the impact that his or her conduct has upon the boundaries of the doctor-patient relationship and also upon the well-being of the patient. These requirements become particularly important because of the essentially private, highly personal and sometimes intensely emotional nature of the relationship established with a psychiatrist.[472]

She explained that boundaries apply to the structure that surrounds any medical evaluation or examination, psychiatric or otherwise, to guarantee the safety of the patient.[473] Because psychiatric patients are emotionally vulnerable, conduct such as flirtatious behavior, friendly joking, sexualized conversation, or gift-giving is particularly damaging to the doctor-patient relationship.[474] She testified that, "Hugging is almost never appropriate under any circumstances

---

[471] Tr. Vol. 4 at 347.

[472] Tr. Vol. 4 at 348-49.

[473] Tr. Vol. 4 at 355.

[474] Tr. Vol. 4 at 356.

TMB0006769

between a psychiatric patient and a psychiatrist" and is "damaging or potentially damaging."[475] She explained that unique damage to the patient results when a psychiatrist breaches a sexual boundary with a patient because of the nature of the power differential in a doctor-patient relationship: "[I]n a doctor-patient relationship, if a doctor propositions you or a doctor wanted to have sex with you or you wanted to have sex with a doctor, the potential for negative consequences are so far reaching…"[476] According to Dr. Ziv, it is "very rare and generally considered completely inappropriate" for a psychiatrist to touch their patients.[477] She acknowledged that there may be exceptions, but added that those exceptions would be exceedingly rare.[478]

Dr. Ziv stated that Dr. Chavason's patients, based on her review of their medical records in this case, had "specific vulnerabilities" related to either early childhood trauma or abuse or neglect, and therefore, were not in any kind of position to "defend themselves against a sexualized behavior or inappropriate touching…or asking for outside contact."[479] She testified that it was her opinion that Dr. Chavason did not practice within the standard guidelines of the AMA and APA.[480]

Dr. Ziv testified that the length of some of the sessions with patients was a factor, but not an important factor, in making her determinations in this case. Her opinion was based on the patients' and two staff members' descriptions of Dr. Chavason's behaviors.[481]

Dr. Ziv offered the following opinions for each individual patient and the patient testimony in the aggregate.

---

[475] Tr. Vol. 4 at 357; 437.

[476] Staff Ex. 20 at 6384.

[477] Staff Ex. 20 at 6380.

[478] Staff Ex. 20 at 6381.

[479] Tr. Vol. 4 at 360.

[480] Tr. Vol. 4 at 386.

[481] Tr. Vol. 4 at 424.

TMB0006770

*Patient One*

Dr. Ziv testified that the kinds of conversations that Patient One reported having with Dr. Chavason were inappropriate and were likely to damage Patient One's trust of medical professionals and prevent Patient One from seeking appropriate medical care.[482] She also testified that it was her opinion that Dr. Chavason engaged in sexual contact with Patient One.[483]

*Patient Two*

Dr. Ziv testified that patients who become addicted to benzodiazepines become reliant on the physician to continue to supply those medications even if they are not clinically indicated.[484] She opined that she had serious concerns about Dr. Chavason's prescription practices for his treatment of Patient Two.[485]

*Patient Seven*

Dr. Ziv testified that it was an egregious misuse of Dr. Chavason's role to comment on Patient Seven's physical desirability.[486]

*Patient Nine*

When Staff asked Dr. Ziv about her opinion about Dr. Chavason's conduct relative to Patient Nine's history, she stated:

> I think it is grossly inappropriate, unethical, harmful, inexcusable, you know, damaging, and inexplicable in terms of adhering to – I mean, there just [is] no excuse for it. It is abusive.[487]

---

[482] Tr. Vol. 4 at 363.

[483] Tr. Vol. 4 at 387.

[484] Tr. Vol. 4 at 376.

[485] Tr. Vol. 4 at 377.

[486] Tr. Vol. 4 at 364.

[487] Tr. Vol. 4 at 365.

TMB0006771

Regarding the video of Dr. Chavason's January 4, 2018 medication management session with Patient Nine, Dr. Ziv gave the opinion that the hug between Dr. Chavason and Patient Nine was "completely inappropriate" and "salacious."[488] She noted that not only did Dr. Chavason pull Patient Nine into his body when he hugged her; he also caressed Patient Nine's hair.[489]

Regarding the video of Dr. Chavason's January 5, 2018 medication management session with Patient Nine, Dr. Ziv opined that Patient Nine adopted defensive body language during the session ("She is sitting with her legs and her arms cross[ed]. That's a defensive posture.") and attempted to prevent Dr. Chavason from giving her a hug at the end of the session ("She reaches across to shake his hand, probably hoping that, you know, that's her good-bye.").[490] Dr. Ziv explained that there did not appear to be any reason for Dr. Chavason to rise from his desk and walk over to hug Patient Nine.[491]

Regarding the video of Dr. Chavason's January 8, 2018 medication management session with Patient Nine, Dr. Ziv opined that Patient Nine continued to demonstrate defensive body language and that Dr. Chavason engaged in a salacious hug with Patient Nine by resting his head on her shoulder and pressing his groin into her.[492] She explained, "This is a sexualized hug. This is not the kind of hug that a doctor should give a patient ever."[493]

Considering the three videos in the aggregate, Dr. Ziv opined that she could discern no therapeutic benefit from Dr. Chavason's hugs with Patient Nine: "There is no therapeutic benefit, none, and it is damaging."[494] Dr. Ziv testified that because the patients seen by Dr. Chavason were young women with poor self-esteem, Dr. Chavason's inappropriate conduct was not only

---

[488] Staff Ex. 20 at 6401-02.

[489] Staff Ex. 20 at 6401-02.

[490] Staff Ex. 20 at 6403.

[491] Staff Ex. 20 at 6403.

[492] Staff Ex. 20 at 6404.

[493] Staff Ex. 20 at 6404.

[494] Staff Ex. 20 at 6405.

inappropriate but it was also "very powerfully psychologically destructive" and could lead to depression, self-injurious behavior, and suicidal thoughts.[495]

*Patient Eleven*

Dr. Ziv testified that Dr. Chavason's behavior with Patient Eleven was sexually assaultive behavior.[496]

*Patient Twelve*

Dr. Ziv did not comment on Patient Twelve in her report.[497] She did comment on the video of the interaction between Patient Twelve and Dr. Chavason in her deposition. Dr. Ziv explained that she reviewed materials and drew conclusions about Dr. Chavason's behavior, not his intent.[498] To clarify, she stated that "intentional" in her report or testimony meant "deliberate." That meant that his behavior was an intentional act, not that she drew any conclusions about Dr. Chavason's state of mind, his motivations, or his thought processes.[499]

Based on her review of the video, Dr. Ziv testified that the type of hug Dr. Chavason gave Patient Twelve is overtly sexual and not therapeutic ("you would think that it was her boyfriend").[500] She added that even his physical proximity to Patient Twelve is inappropriate.[501] Dr. Ziv testified that when Patient's Twelve's mother returns to the appointment, Dr. Chavason immediately stopped touching Patient Twelve, but when the mother returns for the second time, Dr. Chavason kept his hands on Patient Twelve in an effort to "normalize an abnormal situation." She explained:

---

[495] Staff Ex. 20 at 6405.

[496] Tr. Vol. 4 at 366.

[497] Tr. Vol. 4 at 405.

[498] Tr. Vol. 4 at 413.

[499] Tr. Vol. 4 at 414.

[500] Staff Ex. 20 at 6408.

[501] Staff Ex. 20 at 6411.

TMB0006773

It means that [Dr. Chavason] knows that what he was doing was wrong. It means that he was trying to do it secretly. You know, the fact that he continued after he was, sort of, caught in the act, I think doesn't negate that…There is just no way that it is appropriate for a psychiatrist to be touching her on her waist, to be caressing her arms, to be reaching around, and you know, sort of, fondling her back and maybe her side breast….[502]

Dr. Ziv concluded that all the video footage that she observed of Dr. Chavason demonstrated boundary crossings with patients.[503]

*Patient Testimony in the Aggregate*

Dr. Ziv also offered her opinion that Dr. Chavason was inappropriately involved with multiple patients. She opined that sexual boundary violations occurred.[504] She found that the boundary violations were "pervasive, were egregious, were repeated and were damaging."[505] She opined that the behaviors interfered with patient care and were damaging to the patients.[506] She explained that she based her opinion on the fact that multiple women, none of whom knew each other, described Dr. Chavason as engaging in similar "boundary-less" behaviors over the course of several years.[507] She added that she could not think of a situation in which it would be appropriate for a psychiatrist to ask about a patient's sexual preferences or tell a patient about the patient's level of sexual attractiveness during a medication management appointment.[508] She testified that she could find no basis for Dr. Chavason to hug or otherwise embrace his female patients as he had not known the women for very long and the women all had experienced some level of trauma in their lives, making them particularly vulnerable.[509]

---

[502] Staff Ex. 20 at 6413.

[503] Staff Ex. 20 at 6421.

[504] Staff Ex. 20 at 6435 ("My opinion is that he did not practice medicine in accordance with generally accepted rules and that his interactions with patients was damaging.").

[505] Staff Ex. 20 at 6386.

[506] Staff Ex. 20 at 6444.

[507] Staff Ex. 20 at 6387.

[508] Staff Ex. 20 at 6387-88.

[509] Staff Ex. 20 at 6388-89.

TMB0006774

Dr. Ziv also testified that she could discern a pattern of behavior from Dr. Chavason's interactions with the female patients in this case. She noted that he would begin by making inappropriate comments to the patient, would progress to mentioning himself in sexual situations with the patient, and then proceed to hugging and caressing the patient in a sexual manner.[510] She explained that he either engaged in overt sexual behavior or engaged in inappropriate sexualized conversation with the patients.[511] She also added that multiple female patients described Dr. Chavason as having a small penis and some degree of erectile dysfunction, and that the patients' similar descriptions of Dr. Chavason's genitalia lent credibility to their statements.[512] She noted that the AMA finds inappropriate comments to be as "ethically problematic" as inappropriate behaviors.[513]

Based on her review of the medical records, she observed that Dr. Chavason often prescribed multiple benzodiazepines, which is generally not standard of care, and which can increase the likelihood of physiologic dependence.[514] She opined that when patients become dependent on their provider for these types of medications, an unethical provider can take advantage of that relationship.[515]

Dr. Ziv concluded that Dr. Chavason's inappropriate behaviors with his female patients did not improve despite him receiving reprimands at work, having his medication management sessions recorded, taking additional classes, and ultimately losing his job.[516] She explained that the fact that Dr. Chavason was not able to conform his behavior to "basic reasonable expectations for any physician," despite multiple attempts at intervention over the course of many years, shows that he is unlikely to change and lacks rehabilitative potential.[517] She added: "I believe that his

---

[510] Staff Ex. 20 at 6389-90.

[511] Tr. Vol. 4 at 389.

[512] Tr. Vol. 4 at 458-59.

[513] Tr. Vol. 4 at 390.

[514] Tr. Vol. 4 at 378-79.

[515] Tr. Vol. 4 at 381.

[516] Staff Ex. 20 at 6391-92; 6399.

[517] Tr. Vol. 4 at 384, 393.

TMB0006775

behaviors are disinhibited; and the fact that they have occurred despite sanctions, despite multiple attempts to regulate them, means that he is a danger to the public."[518]

*Employee Testimony*

Dr. Ziv also opined on Dr. Chavason's conduct towards coworkers. The APA and the AMA guidelines prohibit sexual contact between a physician and a subordinate because of the power dynamic differential present in the relationship, she said.[519] Dr. Ziv offered the following opinion concerning Dr. Chavason's behavior towards his subordinates:

> I think that the apparent behavior exhibited by Dr. Chavason, both with employees and patients, was an abuse of his situation and his – with the patients, obviously, it is more egregious, but it is part of a pattern of behavior that bleeds over into other relationships as well. It is not appropriate for him to be engaging in sexualized behaviors, especially unwanted sexualized behaviors, with a subordinate.[520]

She testified that his actions towards his subordinates created a negative impact on patient care.[521] Dr. Ziv testified that it was her opinion that Dr. Chavason was disciplined by his peers and resigned from his position while under investigation for sexual misconduct.[522]

When asked about the presence of aggravating factors in this case, Dr. Ziv testified that: (1) there was harm to more than one patient;[523] (2) the harm was severe;[524] (3) Dr. Chavason poses

---

[518] Tr. Vol. 4 at 391.

[519] Tr. Vol. 4 at 382.

[520] Tr. Vol. 4 at 383.

[521] Tr. Vol. 4 at 390.

[522] Staff Ex. 20 at 6452.

[523] Staff Ex. 20 at 6453 ("I think that there was clearly harm, which is, by the way, to be expected. It impacted these women's ability to trust physicians. It prevented them from getting appropriate treatment. It had a negative impact on their self-esteem, which, in turn, impacted their ability to remain gainfully employed. It worsened underlying psychiatric conditions.").

[524] Staff Ex. 20 at 6453-54.

an increased potential for harm to the public;[525] (4) Dr. Chavason attempted to conceal the acts constituting violations;[526] (5) Dr. Chavason's violations were intentional, premeditated, knowing, and grossly negligent;[527] and (6) Dr. Chavason does not have rehabilitative potential.[528] Dr. Ziv did not testify about the presence of any mitigating factors.

## 2.      Dr. Adhia

### a.      Dr. Adhia's Background

Dr. Sanjay Adhia is board-certified in psychiatry, forensic psychiatry, and brain injury medicine.[529] He practices medicine in the Houston area.[530] Dr. Adhia also serves as an Assistant Professor of Psychiatry at the TIRR Memorial Hermann.[531] He has published one article, "How to Reverse and Prevent Heart Disease and Cancer."[532] He has testified as an expert in two cases involving allegations of sexual misconduct.[533]

Dr. Adhia offered opinions on Dr. Chavason's recordkeeping, whether a boundary violation occurred, and the thoroughness and accuracy of Dr. Ziv's expert report and testimony.[534]

---

[525] Staff Ex. 20 at 6456 ("I think that his particular deviant sexual interest involves the abuse of this specific kind of relationship and whether he does it with patients, even if he is barred from seeing patients, then he will find other people who are in subordinate position in some fashion because I think that, that is part of the whole pattern for him.").

[526] Staff Ex. 20 at 6457 ("But, yes, he attempted to conceal. He didn't –even when he was admonished, he had phone calls that he didn't document. He had outside contact with them that he kept from his supervisors. So, yes, he attempted to conceal it.").

[527] Staff Ex. 20 at 6458-59 ("He knew what he was doing. He was told what he was doing and he continued to do it.").

[528] Staff Ex. 20 at 6462 ("Dr. Chavason had over ten years, at least ten years, during which time he had every opportunity to correct his behavior, to seek treatment for his behavior....He wasn't interested in it. He didn't follow through in it.").

[529] Respondent Ex. 22 (Dr. Adhia Expert Report) at 2.

[530] Respondent Ex. 22 at 3.

[531] Respondent Ex. 22 at 3.

[532] Respondent Ex. 22 at 17.

[533] Respondent Ex. 22 at 3.

[534] In Order No. 18, issued September 7, 2021, the ALJs granted in major part Staff's objections to Respondent's expert designation of Dr. Adhia because he had testified in his deposition that he did not give an expert opinion, or was not an expert, on the numerous issues listed in Order No. 18. He was precluded from testifying on these issues at

TMB0006777

Dr. Adhia reviewed all the available documentary evidence relevant to Patients One through Eleven and Employees One and Two. Dr. Adhia also reviewed Dr. Ziv's expert report.

### b.    Dr. Adhia's Testimony

Dr. Adhia testified as Dr. Chavason's expert at the hearing and was deposed on January 28, 2021.[535] He has testified as a forensic psychiatrist in approximately a dozen cases, primarily in medical malpractice and personal injury cases. He has not testified in a boundary violation case before.[536]

Dr. Adhia testified that a psychiatrist must use the information provided by a patient to determine a proper course of treatment for that patient.[537] He explained that for a patient to receive a diagnosis of bipolar disorder, such as Patient Ten, the patient needs only one instance of a hypomanic, manic, or mixed episode.[538] According to Dr. Adhia, Dr. Chavason's medical records for Patient Ten were consistent with a diagnosis for bipolar disorder, but Dr. Adhia conceded that there could be other possible medical conditions that would cause a hypomanic, manic, or mixed episode.[539] Dr. Adhia testified that it would be healthcare fraud by Dr. Chavason if he chose to diagnose her as having bipolar disorder so that he could bill insurance for it and spend more time with her.[540]

---

the hearing and the related portions of his expert report (Respondent Ex. 22) that purported to give an expert opinion on these issues were stricken.

[535] Portions of Dr. Adhia's deposition were admitted into evidence. His deposition testimony was largely consistent with his hearing testimony. Staff Ex. 24 (Dr. Adhia Deposition).

[536] Tr. Vol. 9 at 1152.

[537] Tr. Vol. 9 at 1091 ("...the standard of care is to find out what's going on and how it's impacting the patient's symptomatology so you can address it and treat it.").

[538] Staff Ex. 24 at 13163. Dr. Adhia's deposition is found both in Staff Exhibit 24 and in Respondent Exhibit 30. Staff's exhibit is used for citation purposes because Staff's exhibit has Bates numbering.

[539] Staff Ex. 24 at 13157-58.

[540] Staff Ex. 24 at 13167.

TMB0006778

When asked about a psychiatrist hugging patients, he testified that a hug is not necessarily sexual conduct and that determining the intent of parties engaged in a hug would require a forensic examination by a trained professional, like a psychiatrist or a forensic psychologist.[541]

Forensic examinations, according to Dr. Adhia, include a psychiatric review of symptoms, past psychiatric history, family history, substance-use history, past medical history, and medical/legal questions.[542] These types of examinations can take anywhere from two to ten hours.[543] He explained that absent a forensic examination of the victims and Dr. Chavason, he does not have enough evidence to determine whether Dr. Chavason met the standard of care for his patients.[544] He added that many of Dr. Ziv's conclusions, such as whether a patient had her defenses lowered or a heightened level of dependence, would require a forensic examination to arrive at that conclusion.[545] He testified:

> ...to determine boundary violations, ... you would require ... intent for sexual gratification, for example. And I don't see how Dr. Ziv could opine on that when she says she can't opine on other aspects of standard of care, which you can, which I actually did in my report.[546]

Dr. Adhia testified that none of the medical records that he reviewed indicated any harm to patients that resulted from Dr. Chavason's conduct in this case. Instead, the records corroborate that Dr. Chavason followed the standard of care.[547] He added that the depositions of the patients in this case constituted some subjective evidence but depositions are not a substitute for a forensic examination.[548]

---

[541] Tr. Vol. 9 at 1092.

[542] Tr. Vol. 9 at 1137-38.

[543] Tr. Vol. 9 at 1138.

[544] Tr. Vol. 9 at 1098.

[545] Tr. Vol. 9 at 1102

[546] Tr. Vol. 9 at 1141.

[547] Tr. Vol. 9 at 1106-07.

[548] Tr. Vol. 9 at 1107.

TMB0006779

Dr. Adhia also testified that the videos were of limited value because the videos were only portions of Dr. Chavason's medication management sessions, were recorded from a stationary position, and lacked audio. He explained that he could not provide an expert opinion on those videos due to those limitations.[549] He added that because he did not observe any touching of the genitals or anything as explicit in the video, he would need to ascertain Dr. Chavason's intent, and to do so, he would need to perform a forensic evaluation.[550]

Dr. Adhia testified that a patient can never consent to a sexual relationship with the patient's physician.[551] He clarified that this would be true even if the patient-physician relationship is terminated.[552] When asked about allegations concerning specific patients, Dr. Adhia stated that he did not have an opinion on those allegations because he was not able to interview the victims.[553] Dr. Adhia conceded that if the patients in this case are telling the truth, then Dr. Chavason's conduct would be improper and unethical.[554] Dr. Adhia did not offer any expert opinions or testimony concerning any mitigating or aggravating factors in this case.[555]

Dr. Adhia primarily criticized Dr. Ziv's opinions regarding the credibility of the patients and the substance of their accusations.[556] Dr. Adhia noted that Dr. Ziv provided opinions about whether boundary violations had occurred, but she had not conducted forensic examinations of the patients nor had she interviewed Dr. Chavason.[557] He testified that, in his expert opinion, there was insufficient objective evidence in this case to allow anyone to determine whether a boundary violation occurred within reasonable medical probability, absent forensic examinations of the victims and Dr. Chavason.[558]

---

[549] Tr. Vol. 9 at 1126.

[550] Tr. Vol. 9 at 1127.

[551] Staff Ex. 24 at 13148.

[552] Staff Ex. 24 at 13148.

[553] Staff Ex. 24 at 13182; 13184.

[554] Staff Ex. 24 at 13183.

[555] Staff Ex. 24 at 13197.

[556] Staff Ex. 24 at 13216-17.

[557] Staff Ex. 24 at 13219.

[558] Staff Ex. 24 at 13220-21; 13223-24.

TMB0006780

# VI. ANALYSIS

## A.  Failure to Practice Medicine Consistent with the Public Health and Welfare and Unprofessional Conduct

The Act provides that a physician is subject to discipline if he fails to practice medicine in an acceptable professional manner consistent with the public health and welfare, while the Board's rules provide that a physician fails to practice in an acceptable professional manner by failing to use proper diligence in his professional practice.[559]

The Act also provides that a physician is subject to discipline if he engages in unprofessional or dishonorable conduct that is likely to deceive, defraud, or injure the public, as further defined under Board Rule 190.8(2).[560]

Staff alleges that Dr. Chavason violated Board Rule 190.8(2)(R) and 190.8(6)(B)(v) because Staff contends he committed indecent assault under Texas Penal Code § 22.012(a). The crime of indecent assault requires that the state prove an intent by the person committing the offense to arouse or gratify a sexual desire either in perpetrator or in the victim. This requires that the state show the person had a state of mind or conscious desire to arouse or gratify himself or the victim.

Dr. Ziv drew a distinction in her testimony between an intentional (deliberate) act and an intent to act (state of mind). She very specifically stated that she was testifying about Dr. Chavason's behaviors and whether those behaviors were deliberate or intentional, not whether he had an intent, or state of mind, to commit the acts. She said she could not opine on his state of mind. There is no evidence of Dr. Chavason's state of mind or intent, and the ALJs also decline to opine on Dr. Chavason's state of mind. Therefore, the ALJs will not determine whether Rule 190.8(2)(R) has been violated in this case.

---

[559] Tex. Occ. Code § 164.051(a)(6); 22 Tex. Admin. Code § 190.8(1)(C).

[560] Tex. Occ. Code §§ 164.051(a)(1), 164.052(a)(5); 22 Tex. Admin. Code § 190.8(2)(E)-(G), (K), (P), (R).

TMB0006781

Staff also alleged the Dr. Chavason's conduct subjects him to sanction under § 164.053(a)(1) of the Act and 25 Texas Administrative Code § 441.101(1) (Abuse) and (114) (Sexual Exploitation) for his conduct with certain patients.

The definition of abuse found in § 441.101(1) references "provider personnel, a counselor, applicant for counselor licensure, or counselor intern" as the potential perpetrator of the abuse. A "provider" is a person who performs or offers to perform substance abuse services under § 441.101(97). Staff did not elaborate on how this rule applies to Dr. Chavason. Further, none of the categories under § 441.101(1) appear to apply to Dr. Chavason, who is a "licensed health professional" under § 441.101(71).

Similarly, the definition of sexual exploitation in § 441.101(114) also references "provider personnel or other individual working under the auspices of a provider, or by a counselor, intern, or applicant" as the potential perpetrators of sexual exploitation. Again, the term is not facially applicable to Dr. Chavason and was otherwise unexplained by Staff. Therefore, for these reasons, the ALJs decline to apply 25 Texas Administrative Code § 441.101 to Dr. Chavason.

This case involves Dr. Chavason's conduct with ten patients and two coworkers spanning approximately eight years from 2010 to 2018. Two of the former patients testified at the hearing (Patients One and Seven). Eight former patients (Patients One, Two, Four, Six, Seven, Nine, Ten, and Eleven) and two former coworkers (Employee One and Employee Two) were deposed. Dr. Holiner testified and was deposed as was Dr. Chavason, along with the two expert witnesses, Dr. Ziv and Dr. Adhia.

In contested cases at SOAH, the ALJs are the sole judge of witness credibility and are free to accept or reject the testimony of any witness or even accept part of the testimony of one witness and disregard the remainder.[561] As will be discussed further below, there are many reasons why the ALJs find Dr. Chavason's credibility to be lacking and find that the former patients and

---

[561] *Granek v. Tex. State Bd. of Med. Exam.*, 172 S.W.3d 761, 778 (Tex. App.—Austin 2005, pet. denied) (internal citations omitted).

coworkers testified credibly. The ALJs also found Dr. Holiner to be a credible witness. Dr. Ziv provided credible expert testimony. Dr. Adhia's expert testimony was limited by his lack of experience opining on sexual boundary cases (this being the first one in which he has testified) and the fact that he declined to give an expert opinion on many issues in this case. As such, the ALJs give little to no weight to his expert testimony.

Staff's expert, Dr. Ziv, is a practicing psychiatrist and has testified numerous times about standard of care and boundary issues. Her extensive qualifications were previously discussed. Dr. Ziv testified and provided an expert report regarding standard of care, sexual boundary violations, and other factors related to patient harm and severity of patient harm.

Dr. Ziv testified that under the APA guidelines there should be no sexual contact between a psychiatrist and a patient at any time. While the AMA guidelines were worded slightly differently, she believed that such contact would also be prohibited by the AMA. Boundaries are necessary, she said, because they guarantee the safety of the patient in a very vulnerable context. Dr. Ziv testified that hugging is almost never appropriate under any circumstances between a psychiatric patient and a psychiatrist and is damaging or potentially damaging to the patient. This is particularly so if the patient has a history of abuse, which she noted a lot of the former patients in this case had.

Dr. Ziv opined that Dr. Chavason was inappropriately involved with multiple patients. She explained that he either engaged in overt sexual behavior or engaged in inappropriate sexualized conversation with the patients. She also noted that multiple female patients described Dr. Chavason as having a small penis and some degree of erectile dysfunction, and that the patients' similar descriptions of Dr. Chavason's genitalia lent credibility to their statements. Whether it was behavior or comments, Dr. Chavason's actions were inappropriate under the guidelines and the applicable law, she said.

Over the approximate eight-year span covered by the allegations in this case, the evidence showed Dr. Chavason's numerous inappropriate behaviors with and/or comments to patients or coworkers and an almost striking similarity to those events. Of the ten patients and two coworkers:

- At least eight patients and one coworker said that Dr. Chavason commented on their physical or sexual desirability (Patients One, Four, Six, Seven, Nine, Ten, Eleven, Twelve, Employee One).

- At least three patients said that Dr. Chavason asked about their sexual practices or their partner's sexual practices or abilities (Patients One, Ten, Eleven).

- At least five patients said that Dr. Chavason called them "hot" or "smoking hot" or "crazy hot bitch" (Patients Six, Nine, Ten, Eleven, Twelve).

- At least one patient and one coworker said that Dr. Chavason told them they had a nice butt (Patient Seven and Employee Two).

- At least one patient and one coworker said they had sex with Dr. Chavason at the office in the Holiner Group (Patient Eleven and Employee One).

- At least five patients said that Dr. Chavason told them he wanted to have sex with them or what he would do with them if they had sex (Patients One, Six, Seven, Ten, Eleven).

- At least four patients and one coworker said that Dr. Chavason had an erection during an appointment or had a problem achieving an erection or had a small penis (Patient One, Nine, Eleven, Twelve, Employee One).

- At least eight patients said that Dr. Chavason would hug them during or at the end of appointments (Patients One, Two, Six, Seven, Nine, Ten, Eleven, Twelve).

- Four patients said that Dr. Chavason had hugged them or were seen being hugged by him in a video after August 2015 when he had already been directed by his employer to stop hugging patients (Patients Six, Nine, Ten, Twelve).

- At least three patients and one coworker said that they actively tried to avoid hugs from Dr. Chavason (Patients Six, Nine, Ten, Employee One).

- At least seven patients said that Dr. Chavason's conduct or comments towards them made them feel unsafe, uncomfortable, or sexually harassed (Patients One, Four, Six, Seven, Nine, Ten, Eleven).

- At least two patients testified that they thought Dr. Chavason was "sick" (Patients Six, Ten).

- At least two patients were health care providers themselves (Patients Six, Ten).

- At least two patients confronted Dr. Chavason about his behavior towards them (Patients Nine, Ten).

TMB0006784

- At least five patients said they did not want to see a physician later because of Dr. Chavason's conduct (Patient One, Four, Nine, Ten, Eleven).

- At least six patients said they had a prior history of physical or sexual abuse (Patient One, Four, Six, Seven, Nine, Eleven).

- One patient had filed a formal complaint with the Board (Patient Eleven).

- At least six patients reported Dr. Chavason's conduct to another employee of the Holiner Group, a friend, a family member, the police, or a counselor (Patient One, Four, Seven, Nine, Ten, Eleven).

That these similar episodes of conduct were independently reported over an eight-year period by multiple persons who had no connection with each other lends credence to their veracity. Eight former patients and two former coworkers gave sworn deposition testimony that these events occurred. The ALJs find that preponderance of the credible evidence shows that Dr. Chavason's inappropriate conduct was pervasive and violative of both the Act and the Board's rules, as further discussed below.

### 1.     Patient Eleven

Patient Eleven testified credibly at her deposition that Dr. Chavason would hug her during appointments and at some point, he started commenting about her sexual desirability and asking about her sexual preferences. He escalated to suggesting he could have sex with her and called her "hot" and "sexy."

Patient Eleven was prescribed Risperdal, among other drugs. The Risperdal was causing Patient Eleven to lactate, and she reported to him that she felt hypersexual. Even with the side effect, Dr. Chavason kept Patient Eleven on Risperdal. Patient Eleven testified consistently that Dr. Chavason asked to taste her lactation and suck on her nipples. After that, Patient Nine stated that Dr. Chavason would sometimes put his finger in her vagina, and would continue to hug her, feel her breasts and buttocks, and suck on her nipples. He would also put his foot against the office door to prevent anyone from entering. Patient Nine stated that Dr. Chavason was unable to achieve an erection so she would perform oral sex on him and masturbate him.

This conduct went on for approximately three months at the appointments before Patient Eleven reported Dr. Chavason's conduct to the Holiner Group on December 9, 2010. The next day, Patient Eleven was terminated from the practice by Dr. Chavason. Dr. Chavason's conduct made Patient Eleven feel uncomfortable, sexually abused, traumatized, and caused her to have trust issues with male authority figures. Dr. Ziv opined that Patient Eleven was particularly vulnerable to Dr. Chavason's inappropriate conduct because she came into the treatment with him with a history of past trauma and suicidal ideation.

By commenting on Patient Eleven's appearance, telling her he wanted to have sex with her, touching her breasts and buttocks, by masturbating her and having her perform oral sex on him, Dr. Chavason's conduct violated §§ 164.051(a)(1) and (6), and 164.052(a)(5) of the Act and the following Board Rules: 190.8(1)(C) (failure to use proper diligence in one's professional practice); 190.8(1)(M) (inappropriate prescription of dangerous drugs or controlled substances to oneself, family members, or others in which there is a close personal relationship); 190.8(2)(E) (engaging in sexual contact with a patient); 190.8(2)(F) (engaging in sexually inappropriate behavior or comments directed towards a patient); 190.8(2)(G) (becoming financially or personally involved with a patient in an inappropriate manner); 190.8(2)(K) (behaving in an abusive or assaultive manner towards a patient or the patient's family or representatives that interferes with patient care or could be reasonably expected to adversely impact the quality of care rendered to a patient); and 190.8(2)(P) (behaving in a disruptive manner toward licensees, hospital personnel, other medical personnel, patients, family members or others that interferes with patient care or could be reasonably expected to adversely impact the quality of care rendered to a patient).

## 2.    Patient Four

On November 19, 2014, Patient Four saw the NP and met Dr. Chavason briefly at the end of the appointment. Dr. Chavason testified that the NP was in the room with him when he met Patient Four and that he had no other appointments with Patient Four and was never in a room alone with her so her allegations against him were not true.

In her deposition, Patient Four testified that Dr. Chavason touched her knee and asked her about her tattoos during an intake session at MCGO, not at the Holiner Group. Patient Four may be mistaken as to where she thought the appointment took place because there is no evidence that Dr. Chavason saw Patient Four at MCGO. There are no other medical records that show an appointment with Dr. Chavason other than the initial appointment that Patient Four had with the NP. Consequently, the ALJs find that Staff failed to prove its allegations with respect to Patient Four.

### 3.     Patient One

Patient One testified credibly at the hearing that Dr. Chavason hugged her during sessions and commented on her appearance and sexual desirability and once told her if he were her husband, he would "fuck her brains out." He inquired into her sexual practices with her husband. On her last visit with Dr. Chavason on May 14, 2014, the "clock incident" occurred. Patient One immediately reported the incident to the NP and then much later told the office manager and the manager in the billing department. That she reported the conduct to employees of the Holiner Group lends credibility to her testimony. As noted by Dr. Ziv, Patient One's history of abuse made her more vulnerable to the abusive conduct.

Dr. Chavason's conduct during the clock incident, the hugging, and his other invasive and inappropriate comments towards Patient One are a violation of §§ 164.051(a)(1) and 165.052(a)(5) of the Act, and of Board Rules 190.8(2)(E) (engaging in sexual contact with a patient); 190.8(2)(F) (engaging in sexually inappropriate behavior or comments directed towards a patient); 190.8(2)(G) (becoming financially or personally involved with a patient in an inappropriate manner); 190.8(2)(K) (behaving in an abusive or assaultive manner towards a patient or the patient's family or representatives that interferes with patient care or could be reasonably expected to adversely impact the quality of care rendered to a patient); and 190.8(2)(P) (behaving in a disruptive manner towards medical personnel or patients that interferes with or could be reasonably expected to adversely impact patient care).

### 4.     Patient Two

Patient Two credibly testified in her deposition that Dr. Chavason hugged her during sessions. On October 17, 2014, Dr. Holiner discovered that Dr. Chavason had locked the door to his office during the lunch hour when Patient Two was in his office. The medical records showed that Dr. Chavason was spending more than 15 minutes or so with Patient Two for several of her appointments. He also claimed unconvincingly that he would not have had an appointment over his lunch hour—a time of low staff levels—because he also said he did see patients during the lunch hour so as not to get backed up later in the day. The office notes at the Holiner Group also established that Dr. Chavason was having phone contact with Patient Two that was undocumented and inappropriate.

After Patient Two was no longer his patient, Dr. Chavason went to have a back peel at a place where Patient Two worked. Whether that was coincidental is not known. In any event, Dr. Chavason decided to go ahead and have his former patient perform the back peel and then afterwards took her to the nearby Whataburger for lunch. At some point, he even consulted on two medical procedures for his former patient, but he denied that he was still prescribing to her. There was no credible evidence that he prescribed to Patient Two after she was not longer his patient so there is no violation of Board Rule 190.8(1)(M) (inappropriate prescribing to someone in a close relationship). Contrary to his assertion, though, Dr. Chavason made poor choices and blended his professional and personal relationship with Patient Two.

By contacting Patient Two without documenting the contact, by hugging her at the appointments, and by becoming financially or personally involved with a patient in an inappropriate manner, Dr. Chavason's conduct violated §§ 164.051(a)(1) and (6), and 164.052(a)(5) of the Act and the following Board Rules: 190.8(1)(C) (failure to use proper diligence in one's professional practice); and 190.8(2)(G) (becoming financially or personally involved with a patient in an inappropriate manner).

5.      **Patient Six**

Patient Six is a licensed professional counselor. She is also a sexual abuse survivor. She testified credibly in her deposition that Dr. Chavason would place his arm behind her when he walked her out at the end of sessions; hugged her at the end of sessions; and asked to see photographs of her breasts post-surgery and walked over to look at her phone. The interactions made her feel very uncomfortable, and she ultimately decided to end treatment with him because she thought he was "more sick" than she was. Dr. Chavason's conduct and behavior negatively affected her and brought up issues related to her past sexual abuse.

Dr. Chavason's conduct towards Patient Six is a violation of §§ 164.051(a)(1) and 165.052(a)(5) of the Act, and of Board Rules 190.8(2)(F) (engaging in sexually inappropriate behavior or comments directed towards a patient); 190.8(2)(G) (becoming financially or personally involved with a patient in an inappropriate manner); 190.8(2)(K) (behaving in an abusive or assaultive manner towards a patient or the patient's family or representatives that interferes with patient care or could be reasonably expected to adversely impact the quality of care rendered to a patient); and 190.8(2)(P) (behaving in a disruptive manner towards medical personnel or patients that interferes with or could be reasonably expected to adversely impact patient care).

6.      **Patient Twelve**

Dr. Chavason's conduct of intimately touching Patient Twelve in the manner shown on the video is a violation of §§ 164.051(a)(1) and 165.052(a)(5) of the Act, and of Board Rules 190.8(2)(F) (engaging in sexually inappropriate behavior or comments directed towards a patient); 190.8(2)(K) (behaving in an abusive or assaultive manner towards a patient or the patient's family or representatives that interferes with patient care or could be reasonably expected to adversely impact the quality of care rendered to a patient); and 190.8(2)(P) (behaving in a disruptive manner towards medical personnel or patients that interferes with or could be reasonably expected to adversely impact patient care).

7.    **Patient Seven**

Patient Seven testified at the hearing that she reported assault and harassment by male patients at MCGO to Dr. Chavason and he responded to her that the male patients had "good taste" and she had a "nice butt." Patient Seven reported these comments to Dr. Freele in June 2016. Patient Seven no longer felt comfortable seeking treatment from male doctors. Her deposition testimony and her testimony at the hearing were largely consistent and credible. That she reported the conduct to Dr. Freele also lends credence to her testimony.

Dr. Chavason's conduct violates §§ 164.051(a)(1) and (6), and 164.052(a)(5) of the Act and Board Rules 190.8(1)(C) (failing to use proper diligence in his practice); 190.8(2)(F) (engaging in sexually inappropriate behavior or comments directed towards a patient); 190.8(2)(K) (behaving in an abusive manner toward a patient that interferes with patient care or could be reasonably expected to adversely impact the quality of care rendered to a patient); and 190.8(2)(P) (behaving in a disruptive manner towards medical personnel or patients that interferes with or could be reasonably expected to adversely impact patient care).

8.    **Patient Eight**

Staff alleged that a video with a date-stamp of March 28, 2017, shows that Dr. Chavason hugged Patient Eight in the hallway of the Holiner Group. Patient Eight had an appointment that day at the Holiner Group with an NP, who electronically signed the office note. The time stamp of the video was approximately 1:00 p.m., and Patient Eight's appointment started at 1:42 p.m. when her vitals were taken. Dr. Chavason denied seeing the patient that day and denied he was the person shown in the video. The video shows two people hugging at a distance down a somewhat dark hallway. It is not possible to see facial features. Based on the credible evidence, Staff failed to prove its allegations with respect to Patient Eight.

TMB0006790

9.       **Patient Ten**

Patient Ten, who is a nurse, testified credibly at her deposition regarding her sessions with Dr. Chavason and how he acted with her and the comments he made to her.

She was uncomfortable with the intrusive questions about her marriage and her sex life and with Dr. Chavason's attempts to hug her at every appointment. Dr. Chavason went so far as to comment on how he could keep her sexually satisfied and repeatedly told her he was available for a sexual relationship even though she reminded him that she was married. Patient Ten was surprised by his diagnosis of Bipolar Type I and felt trapped into seeing him because she was concerned for her nurse licensure. Notably, she said she stayed as his patient out of fear. And she said she did not like him, which made it even more difficult when he made inappropriate and invasive personal comments. Dr. Chavason again propositioned her for a sexual relationship when she was no longer his patient, and they ran into each other the lobby of Medical City Dallas. Patient Ten finally reported Dr. Chavason's conduct to Dr. Elliston sometime in early 2018 and Dr. Elliston told her he would be reporting Dr. Chavason to the Board.

Not surprisingly, given all that occurred, Patient Ten testified that she did not feel like her interactions with Dr. Chavason were a real doctor-patient relationship. She called Dr. Chavason a sick individual.

Dr. Chavason's intrusive questions about Patient Ten's marriage and her sex life, his attempts to hug her at every appointment, his comments on how he would satisfy her sexually, and his repeated solicitations for a sexual relationship all violate the Act and the Board rules. Specifically, his conduct was a violation of §§ 164.051(a)(1) and (6), and 164.052(a)(5) of the Act and the following Board Rules: 190.8(1)(C) (failure to use proper diligence in one's professional practice); 190.8(2)(F) (engaging in sexually inappropriate behavior or comments directed towards a patient); 190.8(2)(K) (behaving in an abusive or assaultive manner towards a patient or the patient's family or representatives that interferes with patient care or could be reasonably expected to adversely impact the quality of care rendered to a patient); and 190.8(2)(P) (behaving in a disruptive manner toward licensees, hospital personnel, other medical personnel, patients, family

members or others that interferes with patient care or could be reasonably expected to adversely impact the quality of care rendered to a patient).

### 10.    Patient Nine

Patient Nine credibly testified in her deposition that Dr. Chavason hugged her; commented on her sexual desirability; told her she was a "crazy hot bitch" and that she was hot, smoking hot, and her boyfriend must be lucky; and offered to rub her legs because during one appointment she told him they were hurting. In the three videos from early January 2018 more fully described above, Dr. Chavason gives Patient Nine full body hugs, touches her hair, keeps his arm around her body, rubs her back, and leans in and squeezes Patient Nine during a hug.

At their last visit, Patient Nine confronted Dr. Chavason about his conduct. She also complained to MCGO, which led to the peer review and Dr. Chavason's termination and resignation. Dr. Ziv testified that Dr. Chavason's conduct towards Patient Nine was grossly inappropriate, unethical, harmful, inexcusable, damaging, and abusive, and the ALJs agree.

Dr. Chavason's behavior and comments to Patient Nine violated §§ 164.051(a)(1) and (6), and 164.052(a)(5) of the Act and the following Board Rules: 190.8(1)(C) (failure to use proper diligence in one's professional practice); 190.8(2)(F) (engaging in sexually inappropriate behavior or comments directed towards a patient); 190.8(2)(K) (behaving in an abusive or assaultive manner towards a patient or the patient's family or representatives that interferes with patient care or could be reasonably expected to adversely impact the quality of care rendered to a patient); and 190.8(2)(P) (behaving in a disruptive manner toward licensees, hospital personnel, other medical personnel, patients, family members or others that interferes with patient care or could be reasonably expected to adversely impact the quality of care rendered to a patient).

TMB0006792

**B.      Peer Review Disciplinary Actions**

Section 164.051(a)(7) of the Act authorizes the Board to take disciplinary action against Dr. Chavason based on disciplinary action taken by his peers, as further defined by Board Rule 190.8(4).

On or about January 16, 2018, MCGO opened an investigation into Dr. Chavason regarding Patient Nine's complaint involving unprofessional conduct that was likely to harm the public. Dr. Chavason admitted that he resigned his privileges at MCGO while under investigation even after he was advised that it would be considered disciplinary action and reported to the Board and the National Practitioner Databank. On or about April 17, 2018, Medical City Dallas revoked Dr. Chavason's privileges based on his resignation of privileges while under investigation at MCGO for unprofessional conduct and his failure to timely report his resignation to Medical City Dallas.

Dr. Chavason's resignation while under investigation and the later revocation of his privileges at Medical City Dallas constitute disciplinary action that is appropriate and reasonably supported by the evidence submitted to the Board under Board Rule 190.8(4). The Board is therefore authorized to sanction Dr. Chavason under § 164.051(a)(7) of the Act.

## VII. AGGRAVATING AND MITIGATING FACTORS

The Board's rules set out certain aggravating and mitigating factors relevant to determining whether more or less severe or restrictive action by the Board is warranted. The aggravating and mitigating factors argued in the parties' closing arguments are discussed below.

**A.      Aggravating Factors**

Under Board Rule 190.15, the Board may consider aggravating factors in reaching a determination of sanctions. The Board's rules identify eleven potential aggravating factors for the

Board's consideration in determining whether a licensee's actions warrant more severe or restrictive disciplinary action. Staff argues that the following factors apply here:

## 1.     Harm to One or More Patients

Dr. Chavason's violations affected at least seven patients. Patients One, Four, Six, Seven, Nine, Ten, and Eleven all testified credibly that Dr. Chavason's conduct made them feel, at a minimum, uncomfortable. The video footage of Patient Twelve's and Patient Nine's appointments with Dr. Chavason shows him engaging in overtly sexual and inappropriate hugs and touching of both patients. The evidence overwhelmingly establishes "harm to one or more patients" as an aggravating factor.

## 2.     Severity of Patient Harm

Dr. Chavason's actions resulted in severe harm to multiple patients. Patient One testified that the prescriptions Dr. Chavason prescribed her affected her personal life and memory function. Patient Eleven was traumatized and felt sexually abused as a result of her interactions with Dr. Chavason. Patient Nine left her outpatient program and feels that she has a phobia around older male professionals after Dr. Chavason's actions. Patients Four and Seven testified credibly that Dr. Chavason's actions resulted in them losing trust in male healthcare providers completely and seeing only female healthcare providers. Patient Six testified that Dr. Chavason's actions negatively affected her because it brought up issues related to her being a survivor of sexual abuse. Patient Ten no longer wants to receive treatment from a psychiatrist because of Dr. Chavason's actions. This is an aggravating factor that may be considered by the Board.

## 3.     One or More Violations that Involve More than One Patient

The preponderance of the credible evidence shows that Dr. Chavason's conduct involved one or more violations that involved more than one patient. The ALJs consider this an aggravating factor.

### 4.      Increased Potential for Harm to the Public

In this case, Staff argues that Dr. Chavason remains untruthful about his conduct, fails to take responsibility for the harm done to his patients, has shown no remorse or regret, and continues to engage in inappropriate conduct despite receiving warnings and admonitions from his employer. The ALJs agree and conclude that this point should be treated as an aggravating factor.

### 5.      Attempted Concealment of the Act Constituting a Violation

Staff argues that Dr. Chavason attempted to conceal his conduct with his patients by continuing to claim that his patients misinterpreted his conduct or fabricated the allegations. Staff adds that Dr. Chavason also concealed his conduct by asserting that the frontal hugs evident in the video footage are "lean in, side hugs." However, Dr. Chavason is entitled to prepare his own defense in his case and his legal arguments do not evidence an "attempt to conceal" a violation.

But the evidence does show that Dr. Chavason repeatedly locked his office door, despite being told by his employer to keep his door unlocked during appointments. The patient testimony and video footage indicate the Dr. Chavason engaged inappropriate conduct with his patients when the door was either locked or shut. Patient Eleven testified that Dr. Chavason would close the door to his office during her appointments when he would ask her about her sexual preferences and engage in sexual activities with her. The video footage of Patient Nine shows that Dr. Chavason's door is closed during her appointment, and in each appointment, he hugs Patient Nine in an inappropriate manner. Accordingly, there is evidence that Dr. Chavason attempted to conceal his inappropriate conduct by keeping his office door locked or shut during his appointments with female patients, and it should be considered an aggravating factor.

6.    **Intentional, Premeditated, Knowing, or Grossly Negligent Act Constituting a Violation**

The basis for sanction here is Dr. Chavason's repeated inappropriate conduct towards his patients. Dr. Chavason received numerous admonishments and warnings concerning his overtly sexual and inappropriate conduct with his female patients, but he continued to engage in those behaviors. Accordingly, the evidence establishes this aggravating factor.

7.    **Previous Disciplinary Action by the Board, any Government Agency, Peer Review Organization, or Health Care Entity**

MCGO opened an investigation into Dr. Chavason regarding Patient Nine's complaint involving unprofessional conduct that was likely to harm the public. He resigned before the peer review could take action other than accept his resignation. His privileges were later revoked by Medical City Dallas based on his resignation of privileges while under investigation at MCGO for unprofessional conduct and his failure to timely report his resignation to Medical City Dallas. This constitutes disciplinary action by a peer review organization. The ALJs consider this an aggravating factor.

8.    **Other Relevant Circumstances Increasing Seriousness of the Misconduct**

    a.    **Continued Violations Despite Remedial Education, Warnings, and Disciplinary Action**

Staff argues that Dr. Chavason's continued violations despite his having attended remedial courses and workshops, received warnings, and been subject to disciplinary action should be considered an aggravating factor. The evidence shows that Dr. Chavason:

- completed a Sexual Harassment and Preventions training and Counseling Workshop by the Sexual Harassment Prevention Institutes, LLC, in March 2015;

- reviewed and signed the Holiner Group's Romantic Relationships Policy in August 2015, which required him to attend a course on boundaries, go to a minimum of three therapy sessions and get a letter of clearance from that therapy provider;

- completed the Vanderbilt University Maintaining Proper Boundaries Course in October 2015;

TMB0006796

- ignored the Holiner Group's policy that providers do not text patients nor lock their office doors during appointments;

- met with Dr. Holiner in January 2015 to discuss his failure to document patient phone calls, locking his office door, and long appointment times with female patients;

- was the subject of an HR investigation that resulted from Patient One's complaint against Dr. Chavason;

- reviewed and signed the Holiner Group's "Office Concerns" policy which required Dr. Chavason to attend a workshop and attend therapy in March 2015; and

- was subject of a three-day suspension and sent to cover shifts at Medical City McKinney hospital, an undesirable assignment, in 2016 for continuing to commit boundary violations.

Yet, Dr. Chavason continued to commit boundary violations that harmed patients with respect to Patient Two, Six, Seven, Eight, Nine, Ten, and Twelve even after completing courses, workshops, therapy, and agreeing to the Holiner Group's policies. Dr. Chavason's conduct resulted in his termination from the Holiner Group. The Holiner Group also reported Dr. Chavason to the Board in 2018 because of Patient Nine's complaint and "years of behaviors that are similar."[562] Because Dr. Chavason's boundary violations persisted despite multiple, outside interventions, the ALJs agree and conclude that the evidence establishes this as an aggravating factor.

### b.      Inappropriate Conduct Towards and Sexual Harassment of Subordinate Employees

According to Dr. Ziv, medical ethics advise against sexual contact with subordinates because of a power differential—the relationship can become problematic and coercive since the subordinate individual may be worried about economic or employment consequences. In this case, two female subordinates, Employee One and Employee Two, were targeted by Dr. Chavason in 2009 and 2014 respectively. Employee One testified that Dr. Chavason would massage her shoulders, hug her, attempted to kiss her, and groped her bottom. Employee One testified that on

---

[562] Staff Ex. 1C at 828-29; Staff Ex. 34 at 14813-15.

one occasion she and Dr. Chavason had unprotected sexual intercourse at the office; she testified that although she consented to it, she felt like she had to do it. As a result of these inappropriate interactions, Employee One was reassigned to a different physician with new patients at the Holiner Group.

Employee Two testified that Dr. Chavason made unwanted advances and asked her constantly about her personal life, including who she was dating. Dr. Chavason told Employee Two that she had a "good body" and a "good butt." Employee Two testified that Dr. Chavason's conduct impacted her ability to do her job and affected patient care by taking away her availability to patients. The evidence shows that Dr. Chavason's inappropriate conduct as it extended to fellow employees created a disruptive work environment that negatively impacted patient care. Accordingly, it should be considered an aggravating factor.

## B.     Mitigating Factors

Board Rule 190.15 also authorizes the Board to consider mitigating factors in reaching a determination of sanctions. The Board's rules identify eight factors for the Board's determination of whether a licensee's actions warrant less severe or restrictive disciplinary action. Staff alleged no mitigating factors. Dr. Chavason argues that the following factors should be considered as mitigating factors in this case:

### 1.     Effect of Community and Life Experience

Dr. Chavason testified that he was raised in a household that encouraged physical interaction. He also attributed his desire to hug people and be in close physical proximity to his Thai heritage. While Dr. Chavason's background may influence how he conducts himself in his personal social interactions, his upbringing does not and cannot overcome the professional standards to which physicians are held. The APA unequivocally says that sexual contact is prohibited between a psychiatrist and a patient. Psychiatrists should be aware that hugging or any physical touch between them and a patient can be easily misinterpreted and potentially damaging

TMB0006798

in a psychiatrist-patient relationship. Therefore, Dr. Chavason's testimony is not persuasive and does not establish his "core values" as a mitigating factor in this case.

## 2.    Asserted Supportive Value of Hugging

Dr. Chavason's explanation that he hugged his patients to perform "supportive therapy" techniques is not credible. Dr. Chavason was tasked with conducting medication management sessions with his female patients, not therapy. To the contrary, Dr. Chavason was instructed by the Holiner Group to refrain from conducting any form of therapy during his medication management sessions. Further, all but one of the patients in this case testified that they felt only negative, uncomfortable feelings when Dr. Chavason would hug or touch them. Finally, the record does not contain any evidence, aside from Dr. Chavason's own testimony, that "supportive therapy" includes hugging, touching, or complimenting a patient's physical or sexual attractiveness at every appointment.[563]

## 3.    Effects of Remedial Measures

Dr. Chavason did not present sufficient credible evidence to establish that he has implemented remedial measures to correct or mitigate harm from his violations in this case.

Accordingly, Dr. Chavason failed to establish any mitigating factors.

## VIII. FINDINGS OF FACT

*Procedural History*

1.    Arthur Arrit Chavason, M.D. (Dr. Chavason or Respondent) is a physician licensed by the Texas Medical Board (Board) under License No. M-7104 issued on August 24, 2007. His license was in full force and effect at all times material and relevant to this case.

---

[563] Dr. Holiner testified that he recalled treating one patient with "supportive therapy" by hugging her each visit. However, Dr. Holiner was not qualified as an expert on "supportive therapy" in this case, and therefore his testimony about "supportive therapy" is limited to his treatment of that particular patient.

TMB0006799

2.     Dr. Chavason and his attorney received notice of and appeared at an Informal Settlement Conference (ISC) regarding Case No. 11-0868 on August 15, 2011. No agreement to settle was reached after this ISC.

3.     Dr. Chavason and his attorney received notice of and appeared at an ISC regarding Case No. 18-0697 on August 10, 2018. No agreement to settle was reached after this ISC.

4.     On February 5, 2019, the staff (Staff) of the Board filed a request to docket and the original Complaint with the State Office of Administrative Hearings (SOAH). The request to docket requested an immediate referral to mediation.

5.     On June 26, 2019, the mediators filed a report stating that the parties were unable to settle the matter and returned the case to the contested case docket for assignment of an Administrative Law Judge (ALJ).

6.     On October 7, 2019, Staff filed and served its First Amended Complaint against Dr. Chavason.

7.     On February 27, 2020, Staff filed and served its Second Amended Complaint against Dr. Chavason.

8.     On March 16, 2021, Staff filed and served its Third Amended Complaint and Notice of Administrative Hearing.

9.     On July 29, 2019, Dr. Chavason filed his first plea to the jurisdiction, generally disputing SOAH's jurisdiction based on allegations that Staff had failed to comply with certain due process requirements prior to bringing formal charges. The plea to the jurisdiction was denied in Order No. 1. Dr. Chavason's second plea to the jurisdiction was denied in Order No. 3.

10.    Staff filed a motion for summary disposition on February 25, 2021, and Dr. Chavason filed a response on March 11, 2021. The motion was denied by Order No. 20.

11.    Staff filed its Request for Official Notice on March 19, 2021, which was granted by Order No. 14, issued April 9, 2021.

12.    The Notice of Hearing contained a statement of the legal authority and jurisdiction under which the hearing was to be held, a reference to the applicable rules and statutes, and either a short, plain statement of the factual matters asserted or an attachment that incorporated by reference the factual matters asserted in the complaint or petition filed with the state agency. Order No. 16, issued May 3, 2021, notified the parties of the date and time for the convening of the hearing.

13.    The hearing on the merits convened via Zoom videoconference before ALJs Beth Bierman and Amy Davis on September 13 through 23, 2021. Staff attorneys Kemisha Williams and Michelle McFaddin represented Staff. Dr. Chavason appeared and was represented by

attorney Lee Bukstein. The record in the case closed on December 6, 2021, upon filing of the final written closing arguments.

*Background*

14. In or around August 2008, Dr. Chavason started working at the Holiner Group, a healthcare entity.

15. In or around August 2008, Dr. Chavason obtained privileges at Medical City Green Oaks (MCGO) and Medical City Dallas (MCD).

16. On October 9, 2015, Dr. Chavason completed the Vanderbilt University Maintaining Proper Boundaries Course.

17. On January 16, 2018, Dr. Chavason submitted a letter of resignation to MCGO while under investigation into the allegations made by Patient Nine.

*Patient Eleven*

18. On or about September 14, 2010, Patient Eleven, a 30-year-old woman, began receiving psychiatric treatment from Dr. Chavason at the Holiner Group.

19. Dr. Chavason would hug her during appointments and at some point, he started commenting about her sexual desirability and asking about her sexual preferences. He escalated to suggesting he could have sex with her and called her "hot" and "sexy."

20. Patient Eleven was prescribed Risperdal, among other drugs. The Risperdal was causing Patient Eleven to lactate, and she reported to Dr. Chavason that she felt hypersexual. Even with the side effect, Dr. Chavason put Patient Eleven back on Risperdal.

21. Dr. Chavason asked to taste Patient Eleven's lactation and suck on her nipples. Dr. Chavason would sometimes put his finger in her vagina, and would continue to hug her, feel her breasts and buttocks, and suck on her nipples. He would also put his foot against the office door to prevent anyone from entering. Dr. Chavason was unable to achieve an erection so she would perform oral sex on him and masturbate him.

22. Patient Eleven reported Dr. Chavason's conduct and that they had had sexual relations to the Holiner Group on December 9, 2010.

23. On December 10, 2010, Patient Eleven was terminated from the practice by Dr. Chavason.

24. Dr. Chavason attended an ISC on August 15, 2011, for the allegations related to Patient Eleven.

TMB0006801

25.  Dr. Chavason's conduct made Patient Eleven feel uncomfortable, sexually abused, and traumatized, and caused her to have trust issues with male authority figures.

26.  Patient Eleven was particularly vulnerable to Dr. Chavason's inappropriate conduct because she had a history of past trauma and suicidal ideation.

*Patient Four*

27.  On November 19, 2014, Patient Four, a 26-year-old woman, received psychiatric treatment from Dr. Chavason at the Holiner Group. At that visit, she saw the nurse practitioner (NP) and met Dr. Chavason briefly at the end of the appointment.

28.  The NP was in the room with Dr. Chavason when he met Patient Four and there is no evidence that he had another appointment with Patient Four where he was in a room alone with her.

*Patient One*

29.  On or about July 1, 2013, Patient One, a 46-year-old woman, began receiving psychiatric treatment from Dr. Chavason at Holiner Group. She had a documented history of abuse.

30.  Dr. Chavason hugged Patient One during sessions and commented on her appearance and sexual desirability and once told her if he were her husband, he would fuck her brains out. Dr. Chavason also inquired into her sexual practices with her husband.

31.  On May 14, 2014, Patient One offered to help change the batteries in a wall clock in Dr. Chavason's office. As she was trying to take the clock off the wall, Dr. Chavason came up behind her and she could feel his erection on her backside.

32.  Patient One immediately reported the incident to the NP and then much later told the office manager and the manager in the billing department about the incident. That was Patient One's last visit with Dr. Chavason.

33.  Patient One's history of abuse made her more vulnerable to Dr. Chavason's abusive conduct.

34.  Patient One was affected by the drugs prescribed to her by Dr. Chavason because she was sedated, which affected her job, marriage, and memory.

*Patient Two*

35.  In or around August 2013, Patient Two, a 33-year-old female, began receiving psychiatric treatment from Dr. Chavason at Holiner Group.

TMB0006802

36.     Dr. Chavason hugged Patient Two during sessions.

37.     On October 17, 2014, Dr. Holiner discovered that Dr. Chavason had locked the door to his office during the lunch hour when Patient Two was in his office for a session.

38.     Dr. Chavason spent more than 15 minutes or so with Patient Two for several of her appointments.

39.     Dr. Chavason had phone contact with Patient Two that was not documented in her medical records and was inappropriate.

40.     Dr. Chavason was observed on video giving Patient Two an unmarked envelope.

41.     Dr. Holiner told Dr. Chavason not to lock his office door, not to call Patient Two repeatedly, not to schedule patients during low staffing times, and not to give Patient Two special treatment.

42.     After Patient Two was no longer his patient, Dr. Chavason went to have a back peel at a spa where Patient Two worked. Even though he recognized her as a former patient, Dr. Chavason had her perform the back peel and then afterwards took her to the nearby Whataburger for lunch.

43.     After Patient Two was no longer his patient, Dr. Chavason consulted on two medical procedures for Patient Two.

*Patient Six*

44.     On May 9, 2012, Patient Six, a 44-year-old woman, began receiving psychiatric treatment from Dr. Chavason at the Holiner Group. Patient Six is a licensed professional counselor. She is also a sexual abuse survivor.

45.     Dr. Chavason placed his arm behind her when he walked Patient Six out of his office at the end of sessions and hugged her at the end of sessions.

46.     In 2015, Patient Six had a "mommy makeover," which included a breast lift. Dr. Chavason asked to see photos of her breasts post-surgery and walked over to look at her phone. She declined to show him any photos.

47.     The interaction with Dr. Chavason made Patient Six feel very uncomfortable, and she ultimately decided to end treatment with him because she thought he was "more sick" than she was.

48.     Dr. Chavason's conduct and behavior negatively affected Patient Six and brought up issues related to her past sexual abuse.

TMB0006803

49.  Patient Six felt uncomfortable with Dr. Chavason hugging her and believed the hugging to be inappropriate.

*Patient Twelve*

50.  On or about December 22, 2011, Patient Twelve, a 20-year-old woman, began receiving psychiatric treatment from Dr. Chavason at Holiner Group and MCGO.

51.  At the end of an office visit on June 30, 2016, Dr. Chavason is seen on video stroking Patient Twelve's back and his hand slides down Patient Twelve's side and along the area between her back and her breast. He then gives Patient Twelve a full-body hug and wraps his arms around her. Dr. Chavason keeps one arm around Patient Twelve's waist after he disengages from hugging Patient Twelve. He then strokes the back of Patient Twelve's arm and shoulder. Patient Twelve continues to talk with Dr. Chavason, and Dr. Chavason puts his hands back at his sides. While they are talking, Dr. Chavason rubs Patient Twelve's side once. Patient Twelve's family member reappears in the doorway to Dr. Chavason's office. Dr. Chavason continues to talk with both women. Eventually Patient Twelve's family member leaves again, and Dr. Chavason gives Patient Twelve another hug with one arm. He pulls Patient Twelve close to him and wraps his arm around Patient Twelve's neck. He walks Patient Twelve out of his office with his arm around her shoulder. Dr. Chavason rubs and pats Patient Twelve as they exit his office.

*Patient Seven*

52.  On or about May 25, 2016, Patient Seven, a 20-year-old woman with a history of abuse, began receiving psychiatric treatment from Dr. Chavason at MCGO. She was assaulted by a male patient at MCGO on May 26, 2016, and another male patient exposed his penis to her the following day.

53.  When she saw Dr. Chavason on May 28, 2016, Patient Seven reported the assault to Dr. Chavason.

54.  When she saw Dr. Chavason on May 29, 2016, Patient Seven reported the exposure to Dr. Chavason.

55.  Dr. Chavason responded to Patient Seven that the male patient had "good taste" and she had a "nice butt."

56.  Patient Seven reported these comments to another physician at the Holiner Group in June 2016.

57.  After her interaction with Dr. Chavason, Patient Seven was no longer comfortable seeking treatment from male doctors.

*Patient Eight*

58. On or about December 28, 2012, Patient Eight, a 32-year-old woman, began receiving treatment from Dr. Chavason at the Holiner Group.

59. A video with a date-stamp of March 28, 2017, shows two people hugging at a distance down a somewhat dark hallway. It is not possible to see facial features or to confirm that the two people hugging are Dr. Chavason and Patient Eight.

*Patient Ten*

60. On or about July 21, 2010, Patient Ten, a 41-year-old woman, began receiving psychiatric treatment from Dr. Chavason at Holiner Group. Patient Ten is a nurse.

61. Dr. Chavason asked Patient Ten intrusive questions about her marriage and her sex life and what she and her husband like to do for foreplay.

62. Dr. Chavason attempted to hug Patient Ten at every appointment, which Patient Ten felt was inappropriate.

63. Dr. Chavason commented to Patient Ten about how he could keep her sexually satisfied and repeatedly told her he was available for a sexual relationship even though she reminded him that she was married.

64. Dr. Chavason diagnosed Patient Ten with Bipolar Type I, which Patient Ten felt trapped into remaining his patient for fear of having it impact her nursing license. Another physician at the Holiner Group later changed this diagnosis after Patient Ten went to him for her care beginning in August 2017.

65. After Patient Ten was no longer Dr. Chavason's patient, she ran into Dr. Chavason in the lobby of Medical City Dallas. Dr. Chavason again propositioned her for a sexual relationship.

66. Patient Ten reported Dr. Chavason's conduct to Dr. Elliston sometime in early 2018.

67. Patient Ten felt her interactions with Dr. Chavason were not a real doctor-patient relationship and called him a sick individual.

*Patient Nine*

68. On or about December 19, 2017, Patient Nine, a 22-year-old woman, began receiving psychiatric treatment from Dr. Chavason at MCGO.

69. Dr. Chavason hugged Patient Nine during their sessions and commented on her sexual desirability. He told her Patient Nine she was a "crazy hot bitch" and that she was hot, smoking hot, and her boyfriend must be lucky.

70. Patient Nine told her father about Dr. Chavason's inappropriate comments.

71.     Dr. Chavason also offered to rub Patient Nine's legs during one appointment because she told him they were hurting.

72.     The video for the end of the January 4, 2018 appointment with Patient Nine shows that both Dr. Chavason and Patient Nine stand and Dr. Chavason walks over to Patient Nine and gives her a full-body hug. Patient Nine deflects Dr. Chavason by turning sideways. Dr. Chavason also wraps his right arm around Patient Nine, so that he is hugging Patient Nine with both arms placed on her body and his head rests on her right shoulder. As Patient Nine turns to the door, opens it, and exits Dr. Chavason's office, Dr. Chavason places his hand on Patient Nine's back and strokes her hair as he follows behind her.

73.     The video for the end of the January 5, 2018 appointment shows Patient Nine sitting cross-legged in a chair across from Dr. Chavason's desk. The door of Dr. Chavason's office is shut. Dr. Chavason is seated behind his desk and is looking at a smartphone screen. Dr. Chavason and Patient Nine converse. Dr. Chavason puts his smartphone into his pocket as Patient Nine initiates a handshake with Dr. Chavason from across his desk. Patient Nine then rises from her chair while Dr. Chavason remains seated. Several seconds later, Dr. Chavason stands up from his chair and walks over to Patient Nine. Patient Nine gives a low shrug while Dr. Chavason initiates a full-body hug. Dr. Chavason rubs Patient Nine's back with his right arm. Patient Nine receives the hug with one arm then turns to the door, opens the door, and exits Dr. Chavason's office. Dr. Chavason picks up a pile of binders and follows Patient Nine out of his office.

74.     The video for the end of the January 8, 2018 appointment shows Patient Nine wearing a jacket and sitting with her right-arm across her body in a chair across from Dr. Chavason. The door to Dr. Chavason's office is shut. Dr. Chavason is seated behind his desk. Patient Nine and Dr. Chavason converse. Patient Nine rises from her seat and puts both of her hands in the pockets of her jacket while Dr. Chavason stands up from behind his desk. Dr. Chavason walks over to Patient Nine and initiates a full-body hug with Patient Nine. Patient Nine moves her hips backwards to avoid physical contact with Dr. Chavason and only touches him with her arms. Dr. Chavason leans his head into Patient Nine's hair and shoulder and visibly squeezes her. As Patient Nine opens the door of Dr. Chavason's office and exits, Dr. Chavason places his hand on the door frame as Patient Nine leaves and turns around and moves a binder on his desk.

75.     Patient Nine confronted Dr. Chavason about his conduct at their next appointment on January 9, 2018, and complained to MCGO, which opened an investigation.

76.     Patient Nine stopped attending the outpatient program.

*Peer Review Disciplinary Actions*

77.     On or about January 16, 2018, MCGO opened an investigation into Dr. Chavason regarding Patient Nine's complaint involving his conduct. After the meeting on January 16, 2018, Dr. Chavason emailed MCGO to immediately resign.

78. Dr. Chavason sent a letter of resignation to the Holiner Group dated January 1, 2018, giving his 90-day notice.

79. Dr. Chavason resigned his privileges at MCGO while under investigation even after he was advised that it would be considered disciplinary action and reported to the Board and the National Practitioner Databank.

80. Dr. Chavason resigned his privileges at Medical City McKinney on February 28, 2018, based on his resignation while under investigation at MCGO.

81. On or about April 17, 2018, Medical City Dallas revoked Dr. Chavason's privileges based on his resignation of privileges while under investigation at MCGO for unprofessional conduct and his failure to timely report his resignation to Medical City Dallas.

### *Aggravating Factors*

82. Dr. Chavason's violations showed harm to one or more patients. Patients One, Four, Six, Seven, Nine, Ten, and Eleven all testified credibly that Dr. Chavason's conduct made them feel, at a minimum, uncomfortable.

82. The video footage of Patient Twelve's and Patient Nine's appointments with Dr. Chavason shows him engaging in overtly sexual and inappropriate hugs and touching of both patients.

83. Dr. Chavason's actions resulted in severe harm to multiple patients. The prescriptions Dr. Chavason prescribed Patient One affected her personal life and memory function. Patient Eleven was traumatized and felt sexually abused because of her interactions with Dr. Chavason. Patient Nine left her outpatient program and has a phobia around older male professionals after Dr. Chavason's actions. Dr. Chavason's actions caused Patients Four and Seven to lose trust in male healthcare providers completely and to seek only female healthcare providers. Dr. Chavason's actions negatively affected Patient Six because it brought up issues related to her being a survivor of sexual abuse. Patient Ten no longer wants to receive treatment from a psychiatrist because of Dr. Chavason's actions.

84. Dr. Chavason conduct involved one or more violations that involved more than one patient.

85. Dr. Chavason's conduct resulted in an increased potential for harm to the public because he remains untruthful about his conduct, fails to take responsibility for the harm done to his patients, has shown no remorse or regret, and continued to engage in inappropriate conduct despite receiving warnings and admonitions from his employer.

TMB0006807

86.   Dr. Chavason repeatedly locked his office door, despite being told by his employer to keep his door unlocked during appointments, and it was during these closed and/or locked appointments that Dr. Chavason engaged in inappropriate conduct with his patients.

87.   Dr. Chavason would close the door to his office during his appointments with Patient Eleven when he would ask her about her sexual preferences and engage in sexual activities with Patient Eleven.

88.   The video footage of Patient Nine shows that Dr. Chavason's door was closed during her appointment, and in each appointment, he hugged Patient Nine in an inappropriate manner.

89.   Despite receiving numerous admonishments and warnings concerning his overtly sexual and inappropriate conduct with his female patients, Dr. Chavason continued to engage in overtly sexual and inappropriate conduct with patients.

90.   Dr. Chavason's continued violations occurred despite his having attended remedial courses and workshops, received warnings, and been subject to disciplinary action. Among other things, Dr. Chavason:

- completed a Sexual Harassment and Preventions training and Counseling Workshop by the Sexual Harassment Prevention Institutes, LLC, in March 2015;

- reviewed and signed the Holiner Group's Romantic Relationships Policy which required Dr. Chavason to attend a course on boundaries, go to a minimum of three therapy sessions and get a letter of clearance from that therapy provider, in August 2015;

- completed the Vanderbilt University Maintaining Proper Boundaries Course in October 2015;

- ignored the Holiner Group's policy that providers do not text patients nor close their office doors during appointments;

- met with Dr. Holiner in January 2015 to discuss his failure to document patient phone calls, locking his office door, and long appointment times with female patients;

- was the subject of an human resources investigation that resulted from Patient One's complaint against Dr. Chavason;

- reviewed and signed the Holiner Group's "Office Concerns" policy which required Dr. Chavason to attend a workshop and attend therapy in March 2015; and

- was subject of a three-day suspension and sent to cover shifts at Medical City McKinney hospital, an undesirable assignment, in 2016 for continuing to commit boundary violations.

91.     Dr. Chavason continued to commit boundary violations that harmed patients with respect to Patient Two, Six, Seven, Eight, Nine, Ten, and Twelve even after completing courses, workshops, therapy, and agreeing to the Holiner Group's policies. Dr. Chavason's conduct resulted in his termination from the Holiner Group. The Holiner Group also reported Dr. Chavason to the Board in 2018 because of Patient Nine's complaint and "years of behaviors that are similar."

92.     In 2009, Dr. Chavason massaged Employee One's shoulders, hugged her, attempted to kiss her, and groped her bottom. Employee One and Dr. Chavason had unprotected sexual intercourse at the office; although she consented to it, she felt like she had to do it. As a result of these inappropriate interactions, Employee One was reassigned to a different physician with new patients at the Holiner Group.

93.     In 2014, Dr. Chavason made unwanted advances towards Employee Two, asked her constantly about her personal life, including who she was dating, and told her she had a "good body" and a "good butt."

94.     Dr. Chavason's conduct impacted Employee Two's ability to do her job and impacted patient care by taking away her availability to patients.

95.     Dr. Chavason's inappropriate conduct towards and sexual harassment of subordinate employees is an aggravating factor.

96.     Dr. Chavason's inappropriate conduct as it extended to fellow employees created a disruptive work environment that negatively impacted patient care.

## IX.  CONCLUSIONS OF LAW

1.      The Board has jurisdiction over this matter pursuant to the Medical Practice Act, Texas Occupations Code chapters 151-165.

2.      SOAH has jurisdiction to hold a contested case hearing and to issue findings of fact and conclusions of law, subject to the provisions of Section 164.007 of the Act, pursuant to Texas Government Code, chapter 2003.

3.      Notice of the complaint and of the hearing on the merits was provided as required by Texas Occupations Code § 164.005(f) and Texas Government Code §§ 2001.051-.052.

4.      Staff had the burden to prove the alleged violations by a preponderance of the evidence. 1 Tex. Admin. Code § 155.427.

5.  The Board is authorized to reconsider previously investigated complaints and to take disciplinary action against Dr. Chavason based on a pattern of practice violating the Act or Board Rules. Tex. Occ. Code § 154.051(e).

6.  Dr. Chavason is subject to discipline by the Board. Tex. Occ. Code §§ 164.051(a)(1), (6)-(7); 164.052(a)(5); 22 Tex. Admin. Code §§ 190.8(1)(C), (M); 190.8(2)(E)-(G), (K), (P); 190.8(4).

7.  Dr. Chavason failed to practice medicine in an acceptable professional manner consistent with public health and welfare, as further defined by Board Rule 190.8(1)(C), failure to use proper diligence in one's professional practice; and 190.8(1)(M), inappropriate prescription of dangerous drugs or controlled substances to oneself, family members, or others in which there is a close personal relationship. Tex. Occ. Code § 164.051(a)(6); Tex. Admin. Code § 190.8(1)(C), (M).

8.  Dr. Chavason committed unprofessional or dishonorable conduct with several patients that is likely to deceive, defraud, or injure the public by engaging in sexual contact with a patient; engaging in sexually inappropriate behavior or comments directed towards a patient; becoming financially or personally involved with a patient in an inappropriate manner; behaving in an abusive or assaultive manner towards a patient or the patient's family or representatives that interferes with patient care or could be reasonably expected to adversely impact the quality of care rendered to a patient; and behaving in a disruptive manner toward licensees, hospital personnel, other medical personnel, patients, family members, or others that interferes with patient care or could be reasonably expected to adversely impact the quality of care rendered to a patient. Tex. Occ. Code § 164.052(a)(5); 22 Tex. Admin. Code § 190.8(2)(E)-(G), (K), (P).

9.  The Board is authorized to take disciplinary action against Dr. Chavason based on disciplinary action taken by his peers. Tex. Occ. Code § 164.051(a)(7); 22 Tex. Admin. Code § 190.8(4).

10. Pursuant to 22 Texas Administrative Code § 190.15(a), as aggravating factors that may warrant more severe or restrictive action against Dr. Chavason, the Board may consider that the evidence established:

    • Harm to one or more patients;

    • Severity of patient harm;

    • One or more violations that involve more than one patient;

    • Increased potential harm to the public;

    • Attempted concealment of act constituting a violation;

    • Intentional, premeditated, knowing, or grossly negligent act constituting a violation;

- Previous disciplinary action by a peer review organization; and

- other relevant circumstances increasing the seriousness of the misconduct, consisting of continued violations despite remedial education, warnings, and disciplinary action; and inappropriate conduct towards and sexual harassment of subordinate employees.

11.     Pursuant to 22 Texas Administrative Code § 190.15(b), there are no mitigating factors that may warrant less severe or restrictive action against Dr. Chavason.


**SIGNED February 4, 2022.**


                    **/s/ Beth Bierman**
                    **Administrative Law Judge**
                    **State Office of Administrative Hearings**

                    **/s/ Amy Davis**
                    **Administrative Law Judge**
                    **State Office of Administrative Hearings**

TMB0006811

# APPENDIX
# TAB 2

FILED
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
8/11/2022 7:11 AM
STATE OFFICE OF
ADMINISTRATIVE HEARINGS
Carol Hale, CLERK

ACCEPTED
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
8/11/2022 7:39:22 am
STATE OFFICE OF
ADMINISTRATIVE HEARINGS
Carol Hale, CLERK

HEARING CONDUCTED BY THE
TEXAS STATE OFFICE OF ADMINISTRATIVE HEARINGS
SOAH DOCKET NO. 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
TEXAS MEDICAL LICENSE NO. M-7104

| | | |
|---|---|---|
| TEXAS MEDICAL BOARD, | § | BEFORE THE STATE OFFICE OF |
| Petitioner | § | |
| | § | |
| v. | § | |
| | § | |
| ARTHUR ARRIT CHAVASON, M.D., | § | |
| Respondent. | § | ADMINISTRATIVE HEARINGS |

## FINAL ORDER

During an open meeting on June 10, 2022, in Austin, Texas, the Texas Medical Board ("Board") finds that after proper and timely notice was given, the above-styled case was heard by Administrative Law Judges Beth Bierman and Amy Davis ("ALJs") of the State Office of Administrative Hearings ("SOAH"). On September 13 – 23, 2021, the ALJs presided over the case, and prepared a Proposal for Decision ("PFD"), that contained findings of fact and conclusions of law. The PFD was properly served on all parties, and all parties were given an opportunity to file exceptions and replies as part of the record herein. Respondent filed exceptions. Board Staff had no exceptions to the PFD. On April 21, 2022, the ALJs issued an Exceptions Letter with two corrections to the PFD, incorporated herein.

The Board, after review and due consideration of the PFD, adopts the Findings of Fact and Conclusions of Law of the ALJ.

## FINDINGS OF FACT

*Procedural History*

1. Arthur Arrit Chavason, M.D. (Dr. Chavason or Respondent) is a physician licensed by the Texas Medical Board (Board) under License No. M-7104 issued on August 24, 2007. His license was in full force and effect at all times material and relevant to this case.

2. Dr. Chavason and his attorney received notice of and appeared at an Informal Settlement Conference (ISC) regarding Case No. 11-0868 on August 15, 2011. No agreement to settle was reached after this ISC.

3. Dr. Chavason and his attorney received notice of and appeared at an ISC regarding Case No. 18-0697 on August 10, 2018. No agreement to settle was reached after this ISC.

1

TMB0007091

4.    On February 5, 2019, the staff (Staff) of the Board filed a request to docket and the original Complaint with the State Office of Administrative Hearings (SOAH). The request to docket requested an immediate referral to mediation.

5.    On June 26, 2019, the mediators filed a report stating that the parties were unable to settle the matter and returned the case to the contested case docket for assignment of an Administrative Law Judge (ALJ).

6.    On October 7, 2019, Staff filed and served its First Amended Complaint against Dr. Chavason.

7.    On February 27, 2020, Staff filed and served its Second Amended Complaint against Dr. Chavason.

8.    On March 16, 2021, Staff filed and served its Third Amended Complaint and Notice of Administrative Hearing.

9.    On July 29, 2019, Dr. Chavason filed his first plea to the jurisdiction, generally disputing SOAH's jurisdiction based on allegations that Staff had failed to comply with certain due process requirements prior to bringing formal charges. The plea to the jurisdiction was denied in Order No. 1. Dr. Chavason's second plea to the jurisdiction was denied in Order No. 3.

10.   Staff filed a motion for summary disposition on February 25, 2021, and Dr. Chavason filed a response on March 11, 2021. The motion was denied by Order No. 20.

11.   Staff filed its Request for Official Notice on March 19, 2021, which was granted by Order No. 14, issued April 9, 2021.

12.   The Notice of Hearing contained a statement of the legal authority and jurisdiction under which the hearing was to be held, a reference to the applicable rules and statutes, and either a short, plain statement of the factual matters asserted or an attachment that incorporated by reference the factual matters asserted in the complaint or petition filed with the state agency. Order No. 16, issued May 3, 2021, notified the parties of the date and time for the convening of the hearing.

13.   The hearing on the merits convened via Zoom videoconference before ALJs Beth Bierman and Amy Davis on September 13 through 23, 2021. Staff attorneys Kemisha Williams and Michelle McFaddin represented Staff. Dr. Chavason appeared and was represented by attorney Lee Bukstein. The record in the case closed on December 6, 2021, upon filing of the final written closing arguments.

*Background*

2

TMB0007092

14. In or around August 2008, Dr. Chavason started working at the Holiner Group, a healthcare entity.

15. In or around August 2008, Dr. Chavason obtained privileges at Medical City Green Oaks (MCGO) and Medical City Dallas (MCD).

16. On October 9, 2015, Dr. Chavason completed the Vanderbilt University Maintaining Proper Boundaries Course.

17. On January 16, 2018, Dr. Chavason submitted a letter of resignation to MCGO while under investigation into the allegations made by Patient Nine.

*Patient Eleven*

18. On or about September 14, 2010, Patient Eleven, a 30-year-old woman, began receiving psychiatric treatment from Dr. Chavason at the Holiner Group.

19. Dr. Chavason would hug her during appointments and at some point, he started commenting about her sexual desirability and asking about her sexual preferences. He escalated to suggesting he could have sex with her and called her "hot" and "sexy."

20. Patient Eleven was prescribed Risperdal, among other drugs. The Risperdal was causing Patient Eleven to lactate, and she reported to Dr. Chavason that she felt hypersexual. Even with the side effect, Dr. Chavason put Patient Eleven back on Risperdal.

21. Dr. Chavason asked to taste Patient Eleven's lactation and suck on her nipples. Dr. Chavason would sometimes put his finger in her vagina, and would continue to hug her, feel her breasts and buttocks, and suck on her nipples. He would also put his foot against the office door to prevent anyone from entering. Dr. Chavason was unable to achieve an erection so she would perform oral sex on him and masturbate him.

22. Patient Eleven reported Dr. Chavason's conduct and that they had had sexual relations to the Holiner Group on December 9, 2010.

23. On December 10, 2010, Patient Eleven was terminated from the practice by Dr. Chavason.

24. Dr. Chavason attended an ISC on August 15, 2011, for the allegations related to Patient Eleven.

25. Dr. Chavason's conduct made Patient Eleven feel uncomfortable, sexually abused, and traumatized, and caused her to have trust issues with male authority figures.

26. Patient Eleven was particularly vulnerable to Dr. Chavason's inappropriate conduct because she had a history of past trauma and suicidal ideation.

3

TMB0007093

*Patient Four*

27. On November 19, 2014, Patient Four, a 26-year-old woman, received psychiatric treatment from Dr. Chavason at the Holiner Group. At that visit, she saw the nurse practitioner (NP) and met Dr. Chavason briefly at the end of the appointment.

28. The NP was in the room with Dr. Chavason when he met Patient Four and there is no evidence that he had another appointment with Patient Four where he was in a room alone with her.

*Patient One*

29. On or about July 1, 2013, Patient One, a 46-year-old woman, began receiving psychiatric treatment from Dr. Chavason at Holiner Group. She had a documented history of abuse.

30. Dr. Chavason hugged Patient One during sessions and commented on her appearance and sexual desirability and once told her if he were her husband, he would fuck her brains out. Dr. Chavason also inquired into her sexual practices with her husband.

31. On May 14, 2014, Patient One offered to help change the batteries in a wall clock in Dr. Chavason's office. As she was trying to take the clock off the wall, Dr. Chavason came up behind her and she could feel his erection on her backside.

32. Patient One immediately reported the incident to the NP and then much later told the office manager and the manager in the billing department about the incident. That was Patient One's last visit with Dr. Chavason.

33. Patient One's history of abuse made her more vulnerable to Dr. Chavason's abusive conduct.

34. Patient One was affected by the drugs prescribed to her by Dr. Chavason because she was sedated, which affected her job, marriage, and memory.

*Patient Two*

35. In or around August 2013, Patient Two, a 33-year-old female, began receiving psychiatric treatment from Dr. Chavason at Holiner Group.

36. Dr. Chavason hugged Patient Two during sessions.

37. On October 17, 2014, Dr. Holiner discovered that Dr. Chavason had locked the door to his office during the lunch hour when Patient Two was in his office for a session.

4

TMB0007094

38. Dr. Chavason spent more than 15 minutes or so with Patient Two for several of her appointments.

39. Dr. Chavason had phone contact with Patient Two that was not documented in her medical records and was inappropriate.

40. Dr. Chavason was observed on video giving Patient Two an unmarked envelope.

41. Dr. Holiner told Dr. Chavason not to lock his office door, not to call Patient Two repeatedly, not to schedule patients during low staffing times, and not to give Patient Two special treatment.

42. After Patient Two was no longer his patient, Dr. Chavason went to have a back peel at a spa where Patient Two worked. Even though he recognized her as a former patient, Dr. Chavason had her perform the back peel and then afterwards took her to the nearby Whataburger for lunch.

43. After Patient Two was no longer his patient, Dr. Chavason consulted on two medical procedures for Patient Two.

## Patient Six

44. On May 9, 2012, Patient Six, a 44-year-old woman, began receiving psychiatric treatment from Dr. Chavason at the Holiner Group. Patient Six is a licensed professional counselor. She is also a sexual abuse survivor.

45. Dr. Chavason placed his arm behind her when he walked Patient Six out of his office at the end of sessions and hugged her at the end of sessions.

46. In 2015, Patient Six had a "mommy makeover," which included a breast lift. Dr. Chavason asked to see photos of her breasts post-surgery and walked over to look at her phone. She declined to show him any photos.

47. The interaction with Dr. Chavason made Patient Six feel very uncomfortable, and she ultimately decided to end treatment with him because she thought he was "more sick" than she was.

48. Dr. Chavason's conduct and behavior negatively affected Patient Six and brought up issues related to her past sexual abuse.

49. Patient Six felt uncomfortable with Dr. Chavason hugging her and believed the hugging to be inappropriate.

## Patient Twelve

5

TMB0007095

50. On or about December 22, 2011, Patient Twelve, a 20-year-old woman, began receiving psychiatric treatment from Dr. Chavason at Holiner Group and MCGO.

51. At the end of an office visit on June 30, 2016, Dr. Chavason is seen on video stroking Patient Twelve's back and his hand slides down Patient Twelve's side and along the area between her back and her breast. He then gives Patient Twelve a full-body hug and wraps his arms around her. Dr. Chavason keeps one arm around Patient Twelve's waist after he disengages from hugging Patient Twelve. He then strokes the back of Patient Twelve's arm and shoulder. Patient Twelve continues to talk with Dr. Chavason, and Dr. Chavason puts his hands back at his sides. While they are talking, Dr. Chavason rubs Patient Twelve's side once. Patient Twelve's family member reappears in the doorway to Dr. Chavason's office. Dr. Chavason continues to talk with both women. Eventually Patient Twelve's family member leaves again, and Dr. Chavason gives Patient Twelve another hug with one arm. He pulls Patient Twelve close to him and wraps his arm around Patient Twelve's neck. He walks Patient Twelve out of his office with his arm around her shoulder. Dr. Chavason rubs and pats Patient Twelve as they exit his office.

## Patient Seven

52. On or about May 25, 2016, Patient Seven, a 20-year-old woman with a history of abuse, began receiving psychiatric treatment from Dr. Chavason at MCGO. She was assaulted by a male patient at MCGO on May 26, 2016, and another male patient exposed his penis to her the following day.

53. When she saw Dr. Chavason on May 28, 2016, Patient Seven reported the assault to Dr. Chavason.

54. When she saw Dr. Chavason on May 29, 2016, Patient Seven reported the exposure to Dr. Chavason.

55. Dr. Chavason responded to Patient Seven that the male patient had "good taste" and she had a "nice butt."

56. Patient Seven reported these comments to another physician at the Holiner Group in June 2016.

57. After her interaction with Dr. Chavason, Patient Seven was no longer comfortable seeking treatment from male doctors.

## Patient Eight

58. On or about December 28, 2012, Patient Eight, a 32-year-old woman, began receiving treatment from Dr. Chavason at the Holiner Group.

6

TMB0007096

59.	A video with a date-stamp of March 28, 2017, shows two people hugging at a distance down a somewhat dark hallway. It is not possible to see facial features or to confirm that the two people hugging are Dr. Chavason and Patient Eight.

*Patient Ten*

60.	On or about July 21, 2010, Patient Ten, a 41-year-old woman, began receiving psychiatric treatment from Dr. Chavason at Holiner Group. Patient Ten is a nurse.

61.	Dr. Chavason asked Patient Ten intrusive questions about her marriage and her sex life and what she and her husband like to do for foreplay.

62.	Dr. Chavason attempted to hug Patient Ten at every appointment, which Patient Ten felt was inappropriate.

63.	Dr. Chavason commented to Patient Ten about how he could keep her sexually satisfied and repeatedly told her he was available for a sexual relationship even though she reminded him that she was married.

64.	Dr. Chavason diagnosed Patient Ten with Bipolar Type I, which Patient Ten felt trapped into remaining his patient for fear of having it impact her nursing license. Another physician at the Holiner Group later changed this diagnosis after Patient Ten went to him for her care beginning in August 2017.

65.	After Patient Ten was no longer Dr. Chavason's patient, she ran into Dr. Chavason in the lobby of Medical City Dallas. Dr. Chavason again propositioned her for a sexual relationship.

66.	Patient Ten reported Dr. Chavason's conduct to Dr. Elliston sometime in early 2018.

67.	Patient Ten felt her interactions with Dr. Chavason were not a real doctor-patient relationship and called him a sick individual.

*Patient Nine*

68.	On or about December 19, 2017, Patient Nine, a 22-year-old woman, began receiving psychiatric treatment from Dr. Chavason at MCGO.

69.	Dr. Chavason hugged Patient Nine during their sessions and commented on her sexual desirability. He told her Patient Nine she was a "crazy hot bitch" and that she was hot, smoking hot, and her boyfriend must be lucky.

70.	Patient Nine told her father about Dr. Chavason's inappropriate comments.

71.	Dr. Chavason also offered to rub Patient Nine's legs during one appointment because she told him they were hurting.

7

TMB0007097

72. The video for the end of the January 4, 2018 appointment with Patient Nine shows that both Dr. Chavason and Patient Nine stand and Dr. Chavason walks over to Patient Nine and gives her a full-body hug. Patient Nine deflects Dr. Chavason by turning sideways. Dr. Chavason also wraps his right arm around Patient Nine, so that he is hugging Patient Nine with both arms placed on her body and his head rests on her right shoulder. As Patient Nine turns to the door, opens it, and exits Dr. Chavason's office, Dr. Chavason places his hand on Patient Nine's back and strokes her hair as he follows behind her.

73. The video for the end of the January 5, 2018 appointment shows Patient Nine sitting cross-legged in a chair across from Dr. Chavason's desk. The door of Dr. Chavason's office is shut. Dr. Chavason is seated behind his desk and is looking at a smartphone screen. Dr. Chavason and Patient Nine converse. Dr. Chavason puts his smartphone into his pocket as Patient Nine initiates a handshake with Dr. Chavason from across his desk. Patient Nine then rises from her chair while Dr. Chavason remains seated. Several seconds later, Dr. Chavason stands up from his chair and walks over to Patient Nine. Patient Nine gives a low shrug while Dr. Chavason initiates a full-body hug. Dr. Chavason rubs Patient Nine's back with his right arm. Patient Nine receives the hug with one arm then turns to the door, opens the door, and exits Dr. Chavason's office. Dr. Chavason picks up a pile of binders and follows Patient Nine out of his office.

74. The video for the end of the January 8, 2018 appointment shows Patient Nine wearing a jacket and sitting with her right-arm across her body in a chair across from Dr. Chavason. The door to Dr. Chavason's office is shut. Dr. Chavason is seated behind his desk. Patient Nine and Dr. Chavason converse. Patient Nine rises from her seat and puts both of her hands in the pockets of her jacket while Dr. Chavason stands up from behind his desk. Dr. Chavason walks over to Patient Nine and initiates a full-body hug with Patient Nine. Patient Nine moves her hips backwards to avoid physical contact with Dr. Chavason and only touches him with her arms. Dr. Chavason leans his head into Patient Nine's hair and shoulder and visibly squeezes her. As Patient Nine opens the door of Dr. Chavason's office and exits, Dr. Chavason places his hand on the door frame as Patient Nine leaves and turns around and moves a binder on his desk.

75. Patient Nine confronted Dr. Chavason about his conduct at their next appointment on January 9, 2018, and complained to MCGO, which opened an investigation.

76. Patient Nine stopped attending the outpatient program.

*Peer Review Disciplinary Actions*

77. On or about January 16, 2018, MCGO opened an investigation into Dr. Chavason regarding Patient Nine's complaint involving his conduct. After the meeting on January 16, 2018, Dr. Chavason emailed MCGO to immediately resign.

78. Dr. Chavason sent a letter of resignation to the Holiner Group dated January 1, 2018, giving his 90-day notice.

8

TMB0007098

79. Dr. Chavason resigned his privileges at MCGO while under investigation even after he was advised that it would be considered disciplinary action and reported to the Board and the National Practitioner Databank.

80. Dr. Chavason resigned his privileges at Medical City McKinney on February 28, 2018, based on his resignation while under investigation at MCGO.

81. On or about April 17, 2018, Medical City Dallas revoked Dr. Chavason's privileges based on his resignation of privileges while under investigation at MCGO for unprofessional conduct and his failure to timely report his resignation to Medical City Dallas.

*Aggravating Factors*

82. Dr. Chavason's violations showed harm to one or more patients. Patients One, Six, Seven, Nine, Ten, and Eleven all testified credibly that Dr. Chavason's conduct made them feel, at a minimum, uncomfortable.

83. The video footage of Patient Twelve's and Patient Nine's appointments with Dr. Chavason shows him engaging in overtly sexual and inappropriate hugs and touching of both patients.

84. Dr. Chavason's actions resulted in severe harm to multiple patients. The prescriptions Dr. Chavason prescribed Patient One affected her personal life and memory function. Patient Eleven was traumatized and felt sexually abused because of her interactions with Dr. Chavason. Patient Nine left her outpatient program and has a phobia around older male professionals after Dr. Chavason's actions. Dr. Chavason's actions caused Patients Four and Seven to lose trust in male healthcare providers completely and to seek only female healthcare providers. Dr. Chavason's actions negatively affected Patient Six because it brought up issues related to her being a survivor of sexual abuse. Patient Ten no longer wants to receive treatment from a psychiatrist because of Dr. Chavason's actions.

85. Dr. Chavason conduct involved one or more violations that involved more than one patient.

86. Dr. Chavason's conduct resulted in an increased potential for harm to the public because he remains untruthful about his conduct, fails to take responsibility for the harm done to his patients, has shown no remorse or regret, and continued to engage in inappropriate conduct despite receiving warnings and admonitions from his employer.

87. Dr. Chavason repeatedly locked his office door, despite being told by his employer to keep his door unlocked during appointments, and it was during these closed and/or locked appointments that Dr. Chavason engaged in inappropriate conduct with his patients.

9

TMB0007099

88. Dr. Chavason would close the door to his office during his appointments with Patient Eleven when he would ask her about her sexual preferences and engage in sexual activities with Patient Eleven.

89. The video footage of Patient Nine shows that Dr. Chavason's door was closed during her appointment, and in each appointment, he hugged Patient Nine in an inappropriate manner.

90. Despite receiving numerous admonishments and warnings concerning his overtly sexual and inappropriate conduct with his female patients, Dr. Chavason continued to engage in overtly sexual and inappropriate conduct with patients.

91. Dr. Chavason's continued violations occurred despite his having attended remedial courses and workshops, received warnings, and been subject to disciplinary action. Among other things, Dr. Chavason:

- completed a Sexual Harassment and Preventions training and Counseling Workshop by the Sexual Harassment Prevention Institutes, LLC, in March 2015;

- reviewed and signed the Holiner Group's Romantic Relationships Policy which required Dr. Chavason to attend a course on boundaries, go to a minimum of three therapy sessions and get a letter of clearance from that therapy provider, in August 2015;

- completed the Vanderbilt University Maintaining Proper Boundaries Course in October 2015;

- ignored the Holiner Group's policy that providers do not text patients nor close their office doors during appointments;

- met with Dr. Holiner in January 2015 to discuss his failure to document patient phone calls, locking his office door, and long appointment times with female patients;

- was the subject of an human resources investigation that resulted from Patient One's complaint against Dr. Chavason;

- reviewed and signed the Holiner Group's "Office Concerns" policy which required Dr. Chavason to attend a workshop and attend therapy in March 2015; and

- was subject of a three-day suspension and sent to cover shifts at Medical City McKinney hospital, an undesirable assignment, in 2016 for continuing to commit boundary violations.

92. Dr. Chavason continued to commit boundary violations that harmed patients with respect to Patient Two, Six, Seven, Eight, Nine, Ten, and Twelve even after completing courses,

10

TMB0007100

workshops, therapy, and agreeing to the Holiner Group's policies. Dr. Chavason's conduct resulted in his termination from the Holiner Group. The Holiner Group also reported Dr. Chavason to the Board in 2018 because of Patient Nine's complaint and "years of behaviors that are similar."

93.     In 2009, Dr. Chavason massaged Employee One's shoulders, hugged her, attempted to kiss her, and groped her bottom. Employee One and Dr. Chavason had unprotected sexual intercourse at the office; although she consented to it, she felt like she had to do it. As a result of these inappropriate interactions, Employee One was reassigned to a different physician with new patients at the Holiner Group.

94.     In 2014, Dr. Chavason made unwanted advances towards Employee Two, asked her constantly about her personal life, including who she was dating, and told her she had a "good body" and a "good butt."

95.     Dr. Chavason's conduct impacted Employee Two's ability to do her job and impacted patient care by taking away her availability to patients.

96.     Dr. Chavason's inappropriate conduct towards and sexual harassment of subordinate employees is an aggravating factor.

97.     Dr. Chavason's inappropriate conduct as it extended to fellow employees created a disruptive work environment that negatively impacted patient care.

## CONCLUSIONS OF LAW

1.     The Board has jurisdiction over this matter pursuant to the Medical Practice Act, Texas Occupations Code chapters 151-165.

2.     SOAH has jurisdiction to hold a contested case hearing and to issue findings of fact and conclusions of law, subject to the provisions of Section 164.007 of the Act, pursuant to Texas Government Code, chapter 2003.

3.     Notice of the complaint and of the hearing on the merits was provided as required by Texas Occupations Code § 164.005(f) and Texas Government Code §§ 2001.051-.052.

4.     Staff had the burden to prove the alleged violations by a preponderance of the evidence. 1 Tex. Admin. Code § 155.427.

5.     The Board is authorized to reconsider previously investigated complaints and to take disciplinary action against Dr. Chavason based on a pattern of practice violating the Act or Board Rules. Tex. Occ. Code § 154.051(e).

11

TMB0007101

6. Dr. Chavason is subject to discipline by the Board. Tex. Occ. Code §§ 164.051(a)(1), (6)-(7); 164.052(a)(5); 22 Tex. Admin. Code §§ 190.8(1)(C), (M); 190.8(2)(E)-(G), (K), (P); 190.8(4).

7. Dr. Chavason failed to practice medicine in an acceptable professional manner consistent with public health and welfare, as further defined by Board Rule 190.8(1)(C), failure to use proper diligence in one's professional practice; and 190.8(1)(M), inappropriate prescription of dangerous drugs or controlled substances to oneself, family members, or others in which there is a close personal relationship. Tex. Occ. Code § 164.051(a)(6); Tex. Admin. Code § 190.8(1)(C), (M).

8. Dr. Chavason committed unprofessional or dishonorable conduct with several patients that is likely to deceive, defraud, or injure the public by engaging in sexual contact with a patient; engaging in sexually inappropriate behavior or comments directed towards a patient; becoming financially or personally involved with a patient in an inappropriate manner; behaving in an abusive or assaultive manner towards a patient or the patient's family or representatives that interferes with patient care or could be reasonably expected to adversely impact the quality of care rendered to a patient; and behaving in a disruptive manner toward licensees, hospital personnel, other medical personnel, patients, family members, or others that interferes with patient care or could be reasonably expected to adversely impact the quality of care rendered to a patient. Tex. Occ. Code § 164.052(a)(5); 22 Tex. Admin. Code § 190.8(2)(E)-(G), (K), (P).

9. The Board is authorized to take disciplinary action against Dr. Chavason based on disciplinary action taken by his peers. Tex. Occ. Code § 164.051(a)(7); 22 Tex. Admin. Code § 190.8(4).

10. Pursuant to 22 Texas Administrative Code § 190.15(a), as aggravating factors that may warrant more severe or restrictive action against Dr. Chavason, the Board may consider that the evidence established:

- Harm to one or more patients;
- Severity of patient harm;
- One or more violations that involve more than one patient;
- Increased potential harm to the public;

12

TMB0007102

- Attempted concealment of act constituting a violation;
- Intentional, premeditated, knowing, or grossly negligent act constituting a violation;
- Previous disciplinary action by a peer review organization; and
- other relevant circumstances increasing the seriousness of the misconduct, consisting of continued violations despite remedial education, warnings, and disciplinary action; and inappropriate conduct towards and sexual harassment of subordinate employees.

11. Pursuant to 22 Texas Administrative Code § 190.15(b), there are no mitigating factors that may warrant less severe or restrictive action against Dr. Chavason.

## ORDER

Based on the above Findings and Conclusions of Law, the Board finds that Respondent's practice of medicine in Texas would constitute an imminent peril to the public health, safety, and welfare of the citizens of Texas and further ORDERS that:

1. Respondent's Texas medical license is hereby REVOKED.

2. Respondent shall immediately cease practice in Texas. Respondent's practice in the state of Texas after the date of entry of this Order shall constitute a violation of this Order, subjecting Respondent to disciplinary action by the Board or prosecution for practicing without a license in Texas.

3. Respondent shall comply with all the provisions of the Act and other statutes regulating the Respondent's practice.

4. Respondent may petition the Board for reissuance of his Texas Medical License after one year's time from the effective date of this Agreed Order. Respondent may apply for reissuance of his Texas Medical License pursuant to applicable Board Rules and Statutes, including but not limited to §§164.151 and 164.152, and Board Rules 163 and 167. The Board may inquire into the request for reissuance and, may in its sole discretion, grant or deny the petition without further appeal to or review by the Board. Petitions for reissuance may be filed only once a year thereafter. Respondent does not waive and specifically reserves his right to appeal any final decision of the Board regarding re-licensure to the State Office of Administrative Hearings.

TMB0007103

RESPONDENT WAIVES ANY FURTHER HEARINGS OR APPEALS TO THE BOARD OR TO ANY COURT WITH RESPECT TO ALL TERMS AND CONDITIONS OF THIS AGREED ORDER. RESPONDENT AGREES THAT THIS IS A FINAL ORDER.

THIS ORDER IS A PUBLIC RECORD.

[SIGNATURE PAGE FOLLOWS]

14

TMB0007104

SIGNED AND ENTERED by the presiding officer of the Texas Medical Board on this 10 day of _June_ , 2022

_____
Sherif Z. Zaafran, M.D., President
Texas Medical Board

15

TMB0007105

# APPENDIX
# TAB 3

CAUSE NO. D-1-GN-22-003661

| | | |
|---|---|---|
| ARTHUR ARRIT CHAVASON, M.D., | § § § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § § | |
| v. | § § | TRAVIS COUNTY, TEXAS |
| | § | |
| TEXAS MEDICAL BOARD, | § | |
| *Defendant.* | § | 200TH JUDICIAL DISTRICT |

## FINAL JUDGMENT

This matter came before the Court for a merits hearing on this the 8th day of May, 2024. Plaintiff, Arthur Arrit Chavason, M.D., was present through his counsel of record, Lee Bukstein. Defendant, the Texas Medical Board, was present through its counsel of record, Assistant Attorney General Ted A. Ross, Office of the Attorney General. Having considered the parties' pleadings, briefs, the admitted administrative record, and arguments of counsel, the Court finds that the Texas Medical Board Final Order entered on June 10, 2022 (Final Order) is supported by substantial evidence and is not: (1) in violation of a constitutional or statutory provision; (2) in excess of statutory authority; (3) made through unlawful procedure; (4) affected by other error of law; (5) arbitrary or capricious; or (6) characterized by an abuse of discretion or a clearly unwarranted exercise of discretion.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that:

1.    the Texas Medical Board Final Order is AFFIRMED in all respects;

2.      all court costs and attorney's fees are taxed against the parties incurring the same;

3.      all requested relief not expressly addressed herein is denied; and

4.      this Final Judgment disposes of all claims and all parties and is final and appealable.

Signed this the ___6th_____ day of September 2024.


_____
THE HONORABLE AURORA MARTINEZ JONES
126th Judicial District Court, Travis County, Texas


APPROVED AS TO FORM:


*/s/ Ted. A. Ross*
Ted A. Ross
Assistant Attorney General
State Bar No. 24008890
OFFICE OF THE ATTORNEY GENERAL
OF TEXAS
Administrative Law Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 475-4191
ted.ross@oag.texas.gov
***Counsel for Defendant,***
***Texas Medical Board***

_____
Lee Bukstein
612 Crystal Creek
Austin, Texas 78746
Telephone: (512) 626-0215
Fax: (512) 256-8152
buksteinlegalservices@gmail.com
***Attorney for Plaintiff***

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jeff Lutz on behalf of Ted Ross
Bar No. 24008890
jeff.lutz@oag.texas.gov
Envelope ID: 97243415
Filing Code Description: Brief Not Requesting Oral Argument
Filing Description: 2025 0211 Appellee Brief
Status as of 2/11/2025 2:24 PM CST

Associated Case Party: Texas Medical Board

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jeff Lutz | | jeff.lutz@oag.texas.gov | 2/11/2025 2:02:28 PM | SENT |
| Ted A.Ross | | ted.ross@oag.texas.gov | 2/11/2025 2:02:28 PM | SENT |

Associated Case Party: ArthurArritChavason

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Lee Bukstein | | buksteinlegalservices@gmail.com | 2/11/2025 2:02:28 PM | SENT |